# EXHIBIT A

**NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. 1441(c)**
**(FEDERAL QUESTIONS)**

**EXHIBIT A**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**FILED**
2021 DEC 02 02:14 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 21-2-15854-1 SEA

SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

| | |
|---|---|
| EMANUEL D. FAIR, | NO. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | Jury Demanded |
| KING COUNTY, a political subdivision of the State of Washington, et al.; CITY OF REDMOND, a municipal entity and political subdivision of the State of Washington, et al.; the REDMOND POLICE DEPARTMENT; BRIAN COATS, individually and in his official capacity as detective of the Redmond Police Department; JOHN DOES 1–20, | |
| Defendants. | |

Plaintiff EMANUEL D. FAIR, by and through his attorneys of record, Ryan D. Dreveskracht and Corinne Sebren, of Galanda Broadman, PLLC, submits this Complaint and alleges upon personal knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

## I.      INTRODUCTION

1.      This is a civil rights action brought under 42 U.S.C. § 1983 and Washington State law for damages arising from Defendants King County, City of Redmond, Redmond Police Department ("RPD"), RPD Detective Brian Coats, and John Does 1–20's (collectively

COMPLAINT - 1

"Defendants") negligence, and the wrongful and discriminatory investigation, arrest, prosecution, and pretrial detention of Plaintiff Emanuel Fair.

2.     Defendants engaged in actions that fell below the standard of care in the performance of their duties in violation of state law and in violation of Fair's rights under the Fourth and Fourteenth Amendments of the U.S. Constitution.

3.     In 2010, Fair, a Black man, was charged with the November 1, 2008, murder of Arpana Jinaga.  He was acquitted by a jury in June of 2019, after being held in solitary confinement in pretrial detention for nine years at the King County Correctional Facility.

4.     Throughout the investigation and prosecution of Jinaga's murder, Defendants ignored and failed to gather evidence that did not align with their theory of the case, inappropriately questioned Fair in violation of his constitutional rights, treated Fair differently than White suspects in such an extreme manner that the treatment can only be viewed as racial discrimination, and generally performed their duties to such a poor standard that Fair suffered severe deprivations of his liberty and permanent harm.

5.     The murder investigation leading up to Fair's charges and pretrial detention was so badly handled it can only be characterized as bizarre. Not only were all the White suspects afforded the benefit of the doubt while Fair was clearly not; at one point Defendant RPD hired a self-described "psychic medium" by the name of Allison DuBois to aid in the investigation. At the time Defendant RPD hired the psychic, Fair had recently become a new person of interest, supplanting earlier theories that centered around a different suspect, Jinaga's White neighbor, Cameron Johnson.

6.     In brief, Defendants zeroed in on Fair to the exclusion of all other suspects for discriminatory reasons such as race and prior criminal history, and they employed a "gather facts that fit the theory" strategy.

COMPLAINT - 2

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

7.      The manner in which Defendants conducted themselves, their employees, and their investigations caused Fair to be arrested and charged without probable cause for a murder he did not commit.

8.      The manner in which Defendants conducted themselves, their investigations, and their prosecution led to inexcusable delays in Fair's trial and prolonged pretrial detention.

9.      Fair spent more than nine years in the King County Correctional Facility as an innocent man, in conditions of inhumane confinement that are well-known to have a detrimental effect on mental health. *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 380 (N.D.N.Y. 2020) (citing *Davis v. Ayala*, 576 U.S. 257 (2015)).

10.     Fair's incarceration for nine years in a facility not designed for long-term detention constituted excessive force in violation of his constitutional rights.

11.     Over the eleven-year ordeal of the investigation and prosecution of Jinaga's murder—two years of investigation wherein Fair became a primary suspect, two trials, and nine years of incarceration at the King County Correctional Facility—Fair suffered severe distress and sustained permanent damage to his reputation, emotional wellbeing, livelihood, and relationships; he also incurred attorneys' fees to defend himself against the false charges and to assert his rights.

## II.      PARTIES

12.     Plaintiff EMANUEL D. FAIR is a resident and citizen of King County, Washington.

13.     Defendant KING COUNTY is a municipal corporation organized under the laws of the State of Washington. At all times relevant, King County employed a prosecutor who had executive and supervisory responsibility for the acts of King County Prosecutor's Office agents and/or employees. The prosecutor possessed final policy-making and decisional authority within the King County Prosecutor's Office and was responsible for the policies, practices, and customs

COMPLAINT - 3

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   of the Prosecutor's Office, as well as the hiring, screening, training, supervising, disciplining, and

2   control of the deputy prosecutors in the office. At all times material to this Complaint, Defendant

3   King County, by and through its prosecutor had in effect certain explicit and *de facto* policies,

4   practices, and customs which were applied to the acquisition of evidence, and the submittal of

5   invalid or incomplete evidence, against the Plaintiff and prosecution of the Plaintiff.

6   14.   Defendant CITY OF REDMOND is a municipal corporation organized under the

7   laws of the State of Washington. At all times relevant, the City of Redmond had executive and

8   supervisory responsibility for the acts of the Redmond Police Department agents and/or

9   employees. At all times material to this Complaint, Defendant City of Redmond, by and through

10  its employees had in effect certain explicit and *de facto* policies, practices, and customs which

11  were applied to the acquisition of evidence, and the submittal of invalid or incomplete evidence,

12  against Plaintiff and prosecution of Plaintiff.  RPD is an agency of the CITY OF REDMOND.

13  RPD was responsible for the training, supervision, and discipline of RPD employees and/or agents,

14  including the individually named Defendant BRIAN COATS. At all times material to this

15  Complaint, the City of Redmond, by and through its employees had in effect certain explicit and

16  *de facto* policies, practices, and customs which were applied to the acquisition of evidence, and

17  the submittal of invalid or incomplete evidence, against Plaintiff and prosecution of Plaintiff.

18  15.   Defendant BRIAN COATS is the RPD Detective tasked with directing the

19  investigation of Arpana Jinaga's murder, and was therefore responsible for implementing proper

20  policies, procedure, and other managerial decisions as delegated to him by RPD related to the

21  investigation.

22  16.   Defendants JOHN DOES 1 - 20 (hereinafter "Defendants Doe") are subcontractors,

23  employees, and/or agents of King County, City of Redmond, and RPD. Each Defendant Doe was

24  negligent; deliberately indifferent; acted in furtherance of an official and/or *de facto* policy or

25

COMPLAINT - 4

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

procedure that was negligent or deliberately indifferent; and/or were responsible for the promulgation of the policies and procedures and permitted the customs/practices pursuant to which the acts alleged herein were committed. Their identities are unknown at this time and will be named as discovery progresses.

### III.    FACTUAL ALLEGATIONS

17.    In 2008, Arpana Jinaga was murdered in her home at the Valley View Apartments in Redmond, Washington. The murder occurred during the early hours of the morning on Saturday, November 1, 2018, after she co-hosted a Halloween party with other residents of her apartment complex the night before.

18.    In 2010, Plaintiff Emanuel Fair, a Black man with a criminal history, was charged with Jinaga's murder.

19.    Fair had no prior personal connection with the victim—he met her at the Halloween party while he was attending as an invited guest of his friend Leslie Potts, one of the apartment complex's other residents.

20.    Fair spent the next nine years in detention at the King County Correctional Facility awaiting trial for her murder. His first trial in 2017 ended in a hung jury. He was acquitted by a jury in June 2019.

#### THE HALLOWEEN PARTY

21.    Jinaga was one of four hosts of the Valley View Apartments Halloween party. The party occurred Friday, October 31, 2008.

22.    Apartment complex residents and their friends, including Fair, helped to set up and decorate for the party. This is when Fair and Jinaga met.

COMPLAINT - 5

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

23.     Jinaga's apartment was open to all partygoers. Her front door was left open, and most partygoers went regularly in and out of her apartment on the third floor of the building. Guests had full access to her living spaces, including the bedroom and bathroom.

24.     Fair acknowledged being in Jinaga's apartment at various times throughout the party. He reported using her bathroom and also going into her bedroom where she was showing things to partygoers on her computer.

25.     Aside from these instances, Fair had no prior history of being at the apartment complex or any known connection to Jinaga.

26.     The party was well-attended, with approximately forty to fifty people present at any given time.

27.     There was heavy drinking at the party and some guests got rowdy, but generally the attendees all reported having a good time and none of the rowdiness seemed out of the ordinary.

28.     The party wrapped up sometime between 3:00 a.m. and 4:00 a.m., which is around when witnesses reported seeing Jinaga going back up to her apartment.

29.     Fair went to bed between 2:30 a.m. and 3:00 a.m. after listening to some music with apartment resident Cameron Johnson. He went back to his friend Leslie Potts' apartment and slept in her bed without having sex.

30.     Potts' interviews shortly after the murder were consistent with this account.

31.     The last witness to see anything related to Jinaga being awake at the party was a resident of the apartment complex. This resident did not attend the party, but returned home around 3:00 a.m., and reported seeing a man with olive complexion and light stubble standing in Jinaga's doorway talking to someone inside.

32.     The morning after the party, on Saturday, November 1, 2008, starting sometime between 9:00 a.m. and 10:00 a.m., apartment complex residents and other partygoers, including

COMPLAINT - 6

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Fair and Potts, helped to clean up the party by picking up trash, removing decorations, and throwing everything away in the dumpster.

33.     In her first interviews shortly after the murder, Potts reported that she woke up before Fair at around 9:00 a.m., Fair woke up before 10 a.m., and then they started cleaning up with other apartment complex residents.

34.     No one cleaning up reported seeing or hearing any suspicious activity.

35.     After the party, Fair stayed at the apartment complex with Potts for three days, generally hanging out, watching football, and socializing. During those three days, apartment residents reported Fair appeared relaxed and displayed no unusual behavior.

**THE MURDER**

36.     Jinaga's body was found by a family friend and her immediate neighbor, Cameron Johnson, on Monday, November 3, 2008.

37.     Jinaga's father had asked the family friend to look in on her after growing concerned she was not returning calls. Johnson was hanging out by Jinaga's apartment when the family friend arrived, and Johnson helped identify Jinaga's apartment when the friend asked where she lived.

38.     When the family friend and Johnson approached the apartment, the door swung open after knocking. They noticed Jinaga's door was splintered around the jam and the lock was broken.

39.     They found her body in the bedroom, naked but covered with a cloth. They immediately went outside to call the police.

40.     Investigators arrived at the scene and noted that there was a heavy scent of bleach in the apartment and apparent bleach stains on the carpet. Her body from the waist down was covered in what was later determined to be motor oil. Her fingers and fingernails were cleaned and

COMPLAINT - 7

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

then covered with toilet bowl cleaner. A comforter with brownish red stains was in the bathtub. There were burn marks from an apparent attempt to set fire to the body and the apartment. All of this was evidence that the assailant had attempted to cover up Jinaga's murder.

41.     When questioned immediately after finding her body, Johnson reported hearing moaning sounds, which he thought were sex sounds, coming from Jinaga's apartment around 3:00 a.m., but nothing further.

42.     Jinaga's other immediate neighbor, Kyle Rose, reported awaking around 8:00 a.m. on November 1, 2008, and hearing growling sounds that he thought were either Jinaga being sick or having sex. He also heard a thud on the floor, and then a little later, the sound of water running, which he took as a sign that Jinaga was okay.

43.     Kyle's reports were consistent with autopsy reports, which determined that Jinaga's time of death was approximately 8:00 a.m.

44.     The medical examiner ruled Jinaga's cause of death to be asphyxiation by strangulation. There was evidence on the body that she struggled, including significant bruising and chipped teeth. There was also evidence of sexual assault, though rape could not be determined. Her tampon had been removed and found on the floor and she was found naked.

45.     The death was determined to be a sexually motivated murder.

**THE INVESTIGATION**

46.     Investigators from the Redmond Police Department arrived on the scene on Monday, November 3, 2018, and immediately began questioning residents and processing the crime scene.

47.     Detective Greg Mains was originally assigned as lead detective in the case, but the case was transferred to Defendant Detective Brian Coats shortly thereafter due to Mains' retirement.

COMPLAINT - 8

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

48.     Detective Coats had never worked on a case of this complexity before.

49.     Officers did not secure, monitor, or guard the apartment complex's dumpster for the first two days of the investigation.

50.     Officers and detectives on the scene did not have a policy of changing gloves between evidence sample collections or between rooms or locations.

51.     In the investigation's initial days, investigators primarily took photos and videos of the apartment and apartment complex, questioned and identified witnesses, residents, and partygoers, and collected evidence from Jinaga's apartment and the apartment complex. Eventually, investigators searched the dumpster and found what would become some of the most crucial evidence in the case: a bag containing a bottle of motor oil and a boot lace, Jinaga's bed sheets, and a bath robe.

52.     Jinaga's neighbor Cameron Johnson quickly emerged as the lead suspect in the case as inconsistencies in his story began to surface.

53.     For example, Johnson lied to police about his activities the night of the murder. He told detectives he heard sounds coming from her apartment at 3:00 a.m., but neglected to tell them he had also made phone calls to Jinaga at 3:00 a.m. When asked about the calls he merely stated, "oh crap" and then was resolute that he did not remember details or know why he called her.

54.     Johnson drove to Canada and attempted to cross the border without a passport the on November 1, 2018, the day of the murder, for what he described to detectives as a desire to generally "explore." According to RPD detectives who investigated this attempted border crossing, Johnson was turned back by Canadian officials after he attempted to "blow through" the gates.

55.     Johnson also displayed injuries consistent with injuries an attacker would have sustained during the sexual assault and strangulation of Jinaga, but he did not have a convincing explanation for those injuries. He merely stated he went to another Halloween party the next day

COMPLAINT - 9

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    and wrestled with a guy he had never met. Detectives did not conduct a full investigation of this

2    other party he went to in order to verify these statements.

3        56.      Johnson had a printout in his car of the location of local pawn shops dated the

4    morning after the murder. Jinaga's phone and digital camera were missing from her apartment and

5    never recovered by RPD.

6        57.      More closely than Fair, Johnson matched a witness's description of a man seen at

7    Jinaga's doorstep around 3:00 a.m. in the morning, the last time anyone saw evidence of her being

8    awake at the party.

9        58.      Johnson was known to have a sexual attraction to Jinaga.

10       59.      A witness stated Johnson exhibited jealous behavior when Jinaga was talking to

11   other men the night of the Halloween party.

12       60.      Johnson had a history of strange or violent behavior with women.

13       61.      Johnson's DNA was found on the motor oil bottle in the bag found in the dumpster.

14       62.      A lighter with a sticky substance on it was found in Johnson's apartment, though

15   investigators failed to collect or process it.

16       63.      Investigators also failed to look for evidence of a missing boot lace, or collect any

17   shoes, when searching Johnson's apartment despite notes made about the boot lace found in the

18   same bag as the motor oil, and despite that boot lace being consistent with the type of ligature that

19   could have been used to strangle Jinaga.

20       64.      After Johnson was questioned by RPD detectives about his activities the night of

21   the murder, and he was caught in the lie about the calls made to Jinaga at 3:00 a.m., he was released.

22   His belongings, including his phone, were returned to him without being examined by

23   investigators. Johnson subsequently scrubbed his phone of call and text data on the night of the

24   murder, which detectives noted as being suspicious.

25

COMPLAINT - 10

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

65. Other persons of interest in the case emerged as well.

66. One suspect included a man Jinaga had a sexual relationship with—Aaron Gertler—who did not attend the party, but who had no alibi for early hours of the morning, and whose DNA, including semen, was on crucial pieces of evidence.

67. Another suspect was partygoer Neil Marshall, a guest of another resident who many guests mentioned as being sexually aggressive toward Jinaga and other women, and who displayed violent behavior that night.

68. There was also Brian Bundridge, a member of the same motorcycle club as Jinaga who had a prior criminal history of violent sexual crimes.

69. Many unidentified male DNA samples were also recovered from the crime scene.

70. Plaintiff Emanuel Fair emerged as a person of interest after he was identified by detectives as one of the partygoers. **When asked how Fair became a target of the investigation, Fair was described by lead detective Coats as "the only African American at the party" and an "outsider," which were apparently things to especially note as cause for suspicion**. A background check also revealed Fair had a criminal history consisting mostly of juvenile offenses involving minor possession of drugs and carrying an unlicensed weapon. Of course, most concerning to investigators was a statutory rape conviction.

71. Fair quickly became the new prime suspect, though the reasons for motive remained unclear and he had an alibi. Again, Leslie Potts, whose apartment Fair was staying in, confirmed that Fair went to sleep in the same bed with her around 3:00 a.m. and remained in that bed until sometime between 9:00 a.m. and 10:00 a.m.

72. It was around the time that detectives started to prefer Fair as the prime suspect that RPD hired a psychic medium by the name of Allison DuBois to aid with the investigation. Multiple

COMPLAINT - 11

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   consults were exchanged with the psychic. Detectives relied on her to help them find Jinaga's

2   missing phone and camera and consulted her about the potential of Fair as a suspect.

3        73.     Detectives first arrested and questioned Fair based off an outstanding warrant he

4   had for failing to update his address with his probation officer.

5        74.     Detectives staked out Fair, arrested him, put him into an unmarked car, questioned

6   him without reading him his rights, and then booked him for his probation violation.

7        75.     Subsequently, investigators got a warrant to search Fair's friend's mother's house,

8   where he had been staying, and they seized personal property and property containing DNA

9   evidence. Nothing of relevance to the investigation was discovered or collected by this search.

10                              **PROBABLE CAUSE & ARREST**

11       76.     Despite all the evidence pointing to other possible suspects—White suspects—

12  investigators and prosecutors ultimately decided to charge Fair with the murder of Jinaga.

13       77.     Detective Coats, who is White, signed the Affidavit of Probable Cause.

14       78.     Coats's explanation for motive was that Fair wanted sex from Jinaga. His theory

15  was that Fair violently kicked through Jinaga's locked front door in the early morning hours after

16  the Halloween party, sexually assaulted her, strangled her to death, and attempted to cover up the

17  crime by, among other things, throwing evidence in the dumpster outside, pouring motor oil over

18  her body, attempting to set fire to the apartment and body but failing, and leaving the scene to go

19  back downstairs to his friend Potts' apartment. Coats's theory further went that Fair slept on the

20  couch, not in Potts' bed as she reported, and Fair slipped away from the apartment complex three

21  days later once Jinaga's body was found. There was no direct physical evidence to support Coats's

22  theory. There was no eyewitness testimony to support Coats's theory.

23       79.     The primary evidence, outside of Fair's race and prior convictions, used to establish

24  probable cause was circumstantial "trace" DNA evidence.

25

COMPLAINT - 12

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

80.     The other evidence used to establish probable cause was circumstantial and consisted of phone calls that Fair allegedly made to "sex workers," which included his friend Leslie Potts.

81.     Most or all of these phone calls were consistent with pocket dials and could have occurred while he was sleeping, as Fair surmised to the investigators. None of these calls were to Jinaga.

82.     The Affidavit of Probable Cause omitted that some of the DNA evidence that linked Fair to the crime was found in such trace amounts that the samples had to be sent to specialized labs for analysis.

83.     The Affidavit of Probable Cause omitted that the DNA evidence was not an exact match. In fact, lab technicians simply could not exclude Fair as a match.

84.     The Affidavit of Probable Cause omitted that the DNA evidence supposedly linking Fair to the crime scene was found in an unsecured dumpster at the apartment complex. The Affidavit also omitted that Fair admitted to throwing trash into that same dumpster, along with other apartment complex residents, during clean up of the Halloween party.

85.     The Affidavit of Probable Cause omitted that DNA evidence allegedly linking Fair to the crime scene that was found in Jinaga's apartment or on her body was found alongside other identified and unidentified male DNA samples.

86.     The Affidavit of Probable Cause omitted all mention of Cameron Johnson or other suspects.

87.     The Affidavit of Probable Cause omitted that DNA samples of several unidentified males were also found on many pieces of evidence that were at least, if not more, closely linked to the scene of the crime than Fair's samples.

COMPLAINT - 13

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

88. The Affidavit of Probable Cause omitted that pieces of evidence allegedly connecting Fair directly to the crime, like a roll of duct tape believed to be used to gag Jinaga, contained other males' DNA samples.

89. The Affidavit of Probable Cause omitted that Fair admitted to being one of the many partygoers inside Jinaga's apartment the night of the Halloween party.

90. Nonetheless, Fair was charged on October 29, 2010, and booked into the King County Correctional Facility for Jinaga's murder.

**PRETRIAL DETENTION AND TRIALS**

91. Fair remained in pretrial detention until his first jury trial finally commenced on February 14, 2017.

92. The first trial ended in a hung jury. The jury member who was adamant that Fair should be convicted and ended up hanging the jury later described his reasoning: Fair "looked like a thug" because he was "large," "Black," and "had tattooed hands." Other jurors determined there was insufficient evidence for a conviction. These other jurors refused to convict Fair on his race and appearance alone, and the process started over.

93. Defense counsel requested that Fair be released from pretrial detention. The court predictably refused and denied the request.

94. The second trial commenced nearly two years later.

95. Fair was acquitted of all charges in 2019.

**IV.    JURISDICTION AND VENUE**

97. This Court has original subject matter jurisdiction pursuant to the Constitution of the State of Washington, Art. 4, § 6.

98. Venue is proper in King County pursuant to RCW 4.92.010(2).

///

COMPLAINT - 14

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

## V.    STATUTORY COMPLIANCE

99.    More than sixty (60) days prior to the commencement of this suit, Plaintiff filed claims for damages on both the City of Redmond and King County in compliance with RCW 4.92.100.

100.    Any prerequisites to the maintenance of this action imposed by RCW 4.92 have been satisfied accordingly.

## VI.    FIRST CAUSE OF ACTION – 42 U.S.C. § 1983

101.    Plaintiff incorporates all paragraphs above.

102.    The misconduct described in this Count was objectively unreasonable and undertaken with willfulness and reckless indifference to the rights of others for which an award of punitive damages is warranted.

103.    Defendant King County had a duty to properly hire, train, supervise, and discipline its employees.

104.    Defendant King County, as a matter of custom or policy, failed to properly hire, train, supervise, and discipline its employees concerning the rights of citizens, thereby causing its employees to engage in unlawful conduct in the investigation, arrest, and prosecution of Plaintiff Emanuel Fair as described above.

105.    Defendant City of Redmond had a duty to properly hire, train, supervise, and discipline its employees, including Defendants Redmond Police Department and Detective Brian Coats.

106.    Defendant City of Redmond, as a matter of custom or policy failed to properly hire, train, supervise, and discipline its employees concerning the rights of citizens, thereby causing its employees to engage in unlawful conduct in the investigation, arrest, and prosecution of Plaintiff Emanuel Fair as described above.

COMPLAINT - 15

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

107.    Defendant City of Redmond's failure to properly hire, train, supervise, and discipline its employees reflected deliberate indifference to the constitutional rights of its inhabitants and Emanuel Fair.

108.    Defendant Redmond Police Department had a duty to properly hire, train, supervise, and discipline its employees, including Defendant Brian Coats.

109.    Defendant Redmond Police Department, as a matter of custom or policy failed to properly hire, train, supervise, and discipline its employees concerning the rights of citizens, thereby causing its employees to engage in unlawful conduct in the investigation, arrest, and prosecution of Plaintiff Emanuel Fair as described above.

110.    Defendant Brian Coats did not know what constitutes probable cause to arrest and charge a citizen for murder because of inadequate training by the Redmond Police Department.

111.    Defendant Redmond Police Department's failure to properly hire, train, supervise, and discipline its employees reflected deliberate indifference to the constitutional rights of Emanuel Fair.

112.    Defendant Brian Coats, as lead detective, had a duty to properly train, supervise, and discipline employees.

113.    Defendant Brian Coats, as a matter of custom or policy failed to properly train, supervise, and discipline officers and staff under his command concerning the rights of citizens, thereby causing his officers and staff to engage in unlawful conduct in the investigation, arrest, and prosecution of Plaintiff Emanuel Fair as described above.

114.    Defendant Brian Coats' failure to properly train, supervise, and discipline officers and staff under his command reflected deliberate indifference to the constitutional rights of Emanuel Fair.

COMPLAINT - 16

115.    Specifically, Defendants failed to properly train and supervise employees on acceptable methods of investigation. Hiring a psychic medium to aid with a homicide investigation is objectively unreasonable. Hiring a psychic medium to aid with a homicide investigation when there are significant leads, evidence yet to be retrieved and processed, and a prime suspect is especially egregious. Here, investigators acting under color of law hired Allison Dubois, a psychic medium, to consult and aid in the Jinaga homicide investigation when there were significant leads, evidence yet to be retrieved and processed, and a prime suspect—Cameron Johnson. Officers at several levels were engaged in the decision to use the psychic's services and multiple consultations with the psychic occurred. No officers were discharged or reprimanded as a result of this practice. This practice was objectively unreasonable such that it reflected deliberate indifference to and violated the constitutional rights of, at least, Emanuel Fair.

116.    Defendants failed to adequately train and supervise its employees on proper methods of evidence handling, specifically, to change gloves between collecting samples and touching surfaces. At the time of the Jinaga murder, detectives admitted there was no policy in place about changing gloves, only that they should be worn generally when at a crime scene. Here, the entire case turned on DNA evidence. Because Defendants failed to train employees on proper evidence handling techniques, it is impossible to know whether each piece of evidence gathered was handled with clean gloves. It can thus be reasonably inferred that all the evidence in this case was improperly handled. This failure to train and supervise employees on proper evidence handing was objectively unreasonable such that it reflected deliberate indifference to and violated the constitutional rights of Emanuel Fair.

117.    Defendants failed to properly train and supervise employees on how to secure a crime scene. Officers on the scene did not secure the apartment complex dumpster for two days after Jinaga's body was found. They left it in its original location and unguarded. Any member of

COMPLAINT - 17

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

the complex or passerby could have added to, tampered with, or removed items from the dumpster during that time. Nearly all the most critical pieces of DNA evidence found in this case that were used to establish probable cause came out of that dumpster. This failure to train and supervise employees on proper evidence handing techniques was objectively unreasonable such that it reflected deliberate indifference to and violated the constitutional rights of Emanuel Fair.

118.   Defendants failed to properly train and supervise employees on how to conduct racially unbiased investigations. Detectives questioning witnesses asked about, or pointed out, the race of certain individuals connected to the investigation exclusively when they were discussing Emanuel Fair. Not all of this questioning related purely to identification, much of it appeared specifically designed to highlight Fair's race apropos of nothing. Moreover, despite that Cameron Johnson was the lead suspect at the time of his questioning, investigators failed to collect and process Cameron Johnson's phone when he was brought in; they ultimately waived off the fact that he attempted to "blow through" the Canadian border in his car the same day Jinaga was murdered; they considered DNA connecting him to the crime scene, including his DNA on the motor oil bottle found in the dumpster, to be too circumstantial; they allowed Johnson's father and attorney to accompany him into the interrogation room; they allowed the camera to be turned off during crucial moments of testimony; and they granted Johnson immunity during certain questioning sessions. All of this suggests Johnson was given every benefit of the doubt. Other White suspects such as Neil Marshall and Aaron Gertler were given similar, if not more generous, treatment—their testimony was generally credited as being true; investigators only went to cursory lengths to verify their statements, collect evidence from them or their or their friends or family's homes, and perform other investigatory follow up; and DNA connecting them to the scene of the crime was explained away or considered too circumstantial. One White suspect investigators considered, Brian Bundridge, had a personal connection to the victim and a history of sexual

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

crimes, but was not pursued as his connection to the crime scene was considered too weak. In contrast, Emanuel Fair was captured by investigators, brought into an unmarked car for questioning without being read his rights; his statements were generally not credited as being true; his friends' home was searched and property seized; statewide alerts were put out naming him as a suspect in a homicide case; and most importantly, his DNA connections to the crime scene were not considered too circumstantial despite being just as simple, if not more simple, to explain away than other suspects' DNA connections to crime scene. These examples are but a few that describe the clearly disparate treatment Emanuel Fair received at the hands of Defendants. The obvious difference between Fair and the other suspects was race. Fair's race was regularly referenced throughout the investigation for no apparent purpose other than to generally note it as a factor to be considered. The disparate treatment Fair received at the hands of Defendants was discriminatory. Defendants' failure to train and supervise employees on how to conduct racially unbiased investigations was objectively unreasonable such that it reflected deliberate indifference to and violated the constitutional rights of Emanuel Fair.

119.    Defendants failed to properly train and supervise employees on how to appropriately consider the prior criminal history of suspects in investigations. Detective Coats specifically stated that Emanuel Fair's prior statutory rape conviction was significant to his decision to consider Fair as a suspect. In fact, when asked what the significance of a suspect's prior conviction for a sex offense in the context of the Jinaga case was to the investigation, Coats stated: "If you've done it before, you'll do it again." Coats's statement is demonstrative of the attitude investigators had throughout the investigation—that Fair was guilty. Investigators proceeded to fit the facts to their theory of the case. Defendants' failure to train and supervise employees on how to appropriately consider the prior criminal history of suspects in investigations was objectively

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

unreasonable such that it reflected deliberate indifference to and violated the constitutional rights of Emanuel Fair.

120.    Defendants failed to properly train and supervise employees on what constitutes sufficient probable cause. Omissions of material facts including potential exculpatory evidence is Defendants' failure to train and supervise employees on what constitutes sufficient probable cause was objectively unreasonable such that it reflected deliberate indifference to and violated the constitutional rights of Emanuel Fair.

121.    All of the acts and omissions taken in regard to the Fair were in accordance with the Defendants' established practices or were ratified by policymakers and/or supervisors.

### VII.    SECOND CAUSE OF ACTION – MALICIOUS PROSECUTION

122.    Plaintiff re-alleges and incorporates all paragraphs above.

123.    The misconduct described in this Count was objectively unreasonable and undertaken with willfulness and reckless indifference to the rights of others for which an award of punitive damages is warranted.

124.    Defendants' conduct constitutes malicious prosecution.

125.    Defendants instituted a criminal action against Plaintiff, charging him with the murder of Arpana Jinaga.

126.    Defendants acted maliciously, with reckless indifference to Plaintiff's rights in instituting this action without probable cause.

127.    Defendants omitted material facts and potential exculpatory evidence in their affidavit of probable cause.

128.    Had these omissions not occurred, there would have been no probable cause to initiate the criminal proceeding.

COMPLAINT - 20

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

129.     As a proximate result of the acts and omissions of Defendants, Plaintiff Emanuel Fair suffered severe personal injuries.

### VIII.   THIRD CAUSE OF ACTION – NEGLIGENCE

130.     Plaintiff re-alleges and incorporates all paragraphs above.

131.     Defendants had a duty to exercise ordinary care in the performance of their duties and to act as other reasonably careful persons would under the same or similar circumstances.

132.     The actions of Defendants described above fell below the standard of care in the performance of their duties.

133.     Defendants did not act as other reasonably careful persons would under the same or similar circumstances.

134.     As a proximate cause of the actions of Defendants' negligence, Emanuel Fair suffered long-lasting and permanent injuries. He also suffered unimaginable emotional pain and suffering, embarrassment, and terror.

135.     Because investigators and prosecutors acted within the course and scope of their employment with Defendants King County, the City of Redmond, and the Redmond Police Department when they negligently injured Emanuel Fair, these Defendants are liable to Emanuel Fair under the doctrine of respondeat superior.

136.     As a direct and proximate result of the breaches, failures, and negligence of Defendants, as described above and in other respects as well, Plaintiff has incurred and will continue to incur general and special damages in an amount to be proven at trial.

### IX.     FOURTH CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

137.     Plaintiff re-alleges and incorporates all paragraphs above.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

138.    Defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

139.    Defendants' conduct and material omissions were intentional, outrageous, and extreme such that it caused Plaintiff severe emotional distress.

140.    As a direct and proximate result of the acts of Defendants as complained of herein, Plaintiff suffered great emotional anguish, loss of liberty, and he continues to suffer. Plaintiff incurred legal expenses in defending against the prosecution in an amount to be determined at trial.

## X.    FIFTH CAUSE OF ACTION – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

141.    Plaintiff re-alleges and incorporates all paragraphs above.

142.    Defendants negligently inflicted emotional distress upon Plaintiff by breaching duties owed to Plaintiff, as explained above, and such breaches proximately caused Plaintiff harm and injury in the form of emotional distress.

143.    The emotional distress caused by Defendants and suffered by Plaintiff is within the scope of foreseeable harm of Defendants' negligent conduct.

144.    Plaintiff has manifested symptoms of this emotional distress.

145.    As a direct and proximate result of the acts of Defendants as complained of herein, Plaintiff suffered great emotional anguish, loss of liberty, and he continues to suffer. Plaintiff incurred legal expenses in defending against the prosecution in an amount to be determined at trial.

## XI.    PRAYER FOR RELIEF

146.    Damages have been suffered by Plaintiff and to the extent any state law limitations on such damages are purposed to exist, they are inconsistent with the compensatory, remedial and/or punitive purposes of 42 U.S.C. § 1983, and therefore any such alleged state law limitations must be disregarded in favor of permitting an award of the damages prayed for herein.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

147.    WHEREFORE, Plaintiff requests a judgment against all Defendants:

(a) Fashioning an appropriate remedy and awarding general, special, and punitive damages, including damages for pain, suffering, terror, loss of consortium, and loss of familial relations, and loss of society and companionship under Washington State law and pursuant to 42 U.S.C. §§ 1983 and 1988, in an amount to be proven at trial;

(b) Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, or as otherwise available under the law;

(c) Declaring the defendants jointly and severally liable;

(d) Awarding any and all applicable interest on the judgment; and

(e) Awarding such other and further relief as the Court deems just and proper.

DATED this 2nd day of December, 2021.

GALANDA BROADMAN, PLLC

s/Ryan D. Dreveskracht

Ryan D. Dreveskracht, WSBA #42593
s/Corinne Sebren

Corinne Sebren, WSBA # 58777
Attorneys for Plaintiff
P.O. Box 15146 Seattle, WA 98115
(206) 557-7509 Fax: (206) 299-7690
Email: ryan@galandabroadman.com
Email: corinne@galandabroadman.com

COMPLAINT - 23