1

2

3

4                       UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF WASHINGTON
5                                 AT SEATTLE

6    EMANUEL D. FAIR,

7                            Plaintiff,

8           v.

9    KING COUNTY; CITY OF REDMOND; BRIAN          C21-1706 JHC
     COATS; RON J. HARDING; LENWORTH G.
10   KNOWLES; GREG MAINS; GREG L.                 ORDER
     PATRICK; LON SHULTZ[1]; DAVID SOWERS;
11   ANN MARIE FEIN; SHAWN McCRILLIS;
     KRISTI WILSON[2]; TERRY MORGAN; JAN
12   FULLER; JEFF BAIRD; TODD CLARK; JOHN
     DIAZ; and JOHN DOES 1–20
13
                             Defendants.
14
15                                       I

16                               INTRODUCTION

17          This matter comes before the Court on two motions to dismiss (Dkt. ## 43 & 67), each

18   brought by a different group of defendants.  The City of Redmond and individual members of the

19   Redmond Police Department (collectively, the "Redmond Defendants") move for dismissal

20

21          [1] This defendant's last name is spelled as "Shultz" in the caption of the operative pleading, as
     well as in his attorney's notice of appearance (Dkt. # 42), but as "Schultz" in the body of the Amended
     Complaint (Dkt. # 27), as well as in a pending motion to dismiss (Dkt. # 43).  Given the lack of clarity,
     the Court uses the same spelling as in the caption of the operative pleading.

22          [2] The operative pleading identifies this defendant as "Kristi Wilson" in the caption, but as "Kristi
     Miller" in the factual allegations.  *See* Am. Compl. at ¶ 27 (Dkt. # 27).  For purposes of the pending
23   motions, the Court treats Kristi Wilson and Kristi Miller as the same person.

ORDER - 1

under Federal Rule of Civil Procedure 12(c).  *See* Redmond's Mot. (Dkt. # 43).[3]  King County,

supervisors in King County's Department of Adult and Juvenile Detention ("DAJD"), and King

County Senior Deputy Prosecuting Attorney ("DPA") Jeff Baird (collectively, the "King County

Defendants") also move for dismissal, but they cite both Rule 12(b)(6) and Rule 12(c).  *See* King

Cnty.'s Mot. (Dkt. # 67).  No party requested oral argument, and the Court does not believe that

oral argument would be beneficial.  Having reviewed all papers filed in support of,[4] and in

opposition to, the motions, the Court enters the following Order.

## II

### BACKGROUND

Plaintiff Emanuel D. Fair alleges that he was maliciously or negligently prosecuted for a

murder that he says he did not commit, and as to which he was acquitted by a jury in June 2019

after spending nine years in pretrial detention at the King County Correctional Facility,

colloquially known as King County Jail.  He sues the Redmond Defendants and DPA Baird for

malicious prosecution under federal (42 U.S.C. § 1983) and state (common) law, as well as for

negligence, negligent infliction of emotional distress, and intentional infliction of emotional

distress (outrage).  He brings a § 1983 claim and state law negligence and intentional tort claims

---

[3] Ann Marie Fein, Lenworth Knowles, Greg Mains, and Kristi Wilson are not among the individuals listed as moving parties in the Redmond Defendants' motion.  Fein, Mains, and Wilson, however, later joined in the motion.  *See* Notice (Dkt. # 55).  Knowles separately joined.  *See* Notice (Dkt. # 77).

[4] The parties disagree concerning which materials the Court should consider in deciding the pending motions.  The Redmond Defendants cite materials outside the pleadings submitted as appendices to a motion filed and then withdrawn by King County.  *See* Redmond's Mot. at 2–3 (citing Apps. A–H (Dkt. # 16-1)).  The King County Defendants have offered these same documents (and others) in support of their pending motion to dismiss.  *See* Apps. A–L (Dkt. ## 67-1 – 67-12).  Plaintiff agrees that the Court may consider Appendix A, which contains certain charging documents, *see* Pl.'s Resp. at 5 (Dkt. # 59), but he objects to the other materials.  Each of the documents, however, is a form of court record (*i.e.*, motions, orders, transcripts, and so on.), and the crux of Plaintiff's opposition is not whether the Court may take judicial notice, which, of course, it may, *see* Fed. R. Evid. 201, but how the materials should be construed for purposes of res judicata and collateral estoppel.

ORDER - 2

against King County and DAJD personnel for alleged maltreatment during his time at King

County Jail.  Plaintiff's claims relate to the following events.

**A.**     **The Crime, the Suspects, and the Investigation**

In the early morning hours of November 1, 2008, Arpana Jinaga was murdered.  Am.

Compl. at ¶ 33 (Dkt. # 27).  Her body was discovered in her apartment in Redmond on

November 3, 2008, by a family friend, accompanied by one of Jinaga's neighbors, Cameron

Johnson.  *Id.* at ¶¶ 33 & 52; *see* Certification for Determination of Probable Cause ("PC

Certification") at 2 (App. A).  Jinaga had helped host a Halloween party the evening before her

death, which was attended by 40 to 50 people, including Plaintiff Emanuel Fair.  Am. Compl. at

¶¶ 37 & 42.  During the party, the front door to Jinaga's apartment was left open, and guests had

full access to her living space.  *Id.* at ¶ 39.  Plaintiff was inside the unit at various times during

the party; he used Jinaga's bathroom and entered her bedroom while she was present with other

guests.  *Id.* at ¶ 40.  Plaintiff had not, however, previously known Jinaga or been at the apartment

complex.  *Id.* at ¶¶ 38 & 41.

According to Plaintiff, after listening to music in Johnson's apartment, he went to Leslie

Potts's apartment sometime between 2:30 and 3:00 a.m. and slept in her bed until about 10:00

a.m., at which time he began helping clean up debris from the party, depositing some of it in the

complex's dumpster.  *Id.* at ¶¶ 45 & 48–49.  The operative pleading seems to suggest that, during

murder-investigation interviews, Potts corroborated Plaintiff's account.  *Id.* at ¶ 46 & 49.  The

PC Certification, however, states that Potts told detectives she went to bed before Plaintiff, left

the door unlocked for him, and did not know what time he came in.  *See* PC Certification at 7.  In

the morning, she found an empty condom package on the kitchen table, which had not been there

the previous evening, and assumed Plaintiff had had intercourse during the interim.  *Id.*

1    Another resident of the apartment complex, Jeffrey Perras, did not attend the party but

2    returned home around 3:00 a.m. and observed a man wearing an orange fleece jacket, about

3    5'11" to 6'3" in height, with an olive complexion and light stubble, standing in Jinaga's

4    doorway, talking to someone inside the unit.  Am. Compl. at ¶¶ 47 & 59.  This description

5    allegedly matches Johnson (Jinaga's neighbor) more than Plaintiff, who is a short, Black man,

6    and was not wearing an orange jacket.  *Id.* at ¶¶ 3, 34, 47 & 77.  Jinaga was apparently alive and

7    on her computer at 3:29 a.m.; her time of death was estimated to be between 3:30 and 8:00 a.m.

8    on November 1, 2008.  *Id.* at ¶¶ 60–61.

9    The medical examiner opined that Jinaga died from asphyxiation caused by strangulation.

10   *Id.* at ¶ 62; *see* PC Certification at 2.  When discovered, her naked body was covered in motor

11   oil, and her fingers and fingernails had been cleaned and then covered with toilet bowl cleaner.

12   Am. Compl. at ¶¶ 55–56.  Burn marks in the vicinity suggested a failed attempt to set a fire to

13   cover up the murder.  *Id.*  Jinaga's oil-soaked, bloodstained, and torn underpants were found on

14   the kitchen counter, and a roll of black tape, with a length extended, was discovered on a sofa in

15   the living room.  *See* PC Certification at 4.  Saliva containing Jinaga's DNA was collected from

16   the underpants, and long, dark hairs, which were likely Jinaga's, as well as fragments of elastic

17   from the torn underpants, were on a length of the black tape, suggesting that the underpants and

18   tape were used to gag Jinaga.  *Id.* at 4 & 8. In the apartment complex's dumpster, investigators

19   found Jinaga's bed sheets and a bag containing a bottle of motor oil, a boot lace believed to be

20   the ligature used to strangle Jinaga, and a red terry-cloth bathrobe.  Am. Compl. at ¶ 69; *see* PC

21   Certification at 4–5.

22   The PC Certification stated that Plaintiff's DNA was discovered (i) mixed with Jinaga's

23   bloodstains on the bathrobe, (ii) on the length of black tape recovered from Jinaga's sofa, and

24   (iii) on a swab taken from Jinaga's neck during her autopsy.  *See* PC Certification at 8.  The PC

ORDER - 4

Certification further indicated that Plaintiff made or received 20 calls between 1:54 a.m. and 4:48 a.m. on November 1, 2008, seven of which were with a number associated with an ad for sexual services, and three of which were with Potts, during the period when Plaintiff indicated he was in bed with her.  *Id.* at 6–7.

According to the operative pleading, neighbor Johnson's DNA was found on the motor oil bottle and in a section of wet carpet near Jinaga's body.  Am. Compl. at ¶¶ 84 & 86.  On November 1, 2008, Johnson apparently attempted to cross the Canadian border without a passport.  *Id.* at ¶ 74.  He also hurt himself, while at a post-Halloween party, in "a way that seemed fake and odd" in an apparent effort to create an explanation for his injuries, which were consistent with those that would have been sustained during a sexual assault of Jinaga.  *Id.* at ¶ 75.  In addition, on November 1, 2008, Johnson visited a pawn shop, which was suspicious because Jinaga's phone and digital camera were missing from her apartment and never recovered.  *Id.* at ¶ 76.

Along with Johnson, the Amended Complaint lists a number of possible suspects, including Aaron Gurtler, one of Jinaga's former sexual partners, whose DNA was found at the crime scene, *id.* at ¶ 92, and Josiah Lovett, another apartment complex resident, whose DNA was found on the boot lace and the bathrobe found in the bag with the motor oil, *id.* at ¶ 96.  In the operative pleading, Redmond police personnel are accused of failing to investigate these other persons of interest "with any tenacity," *id.* at ¶ 100, and they are alleged to have focused on Plaintiff because he was "the only African American at the party" and an "outsider," *id.* at ¶ 101.  Plaintiff's 2004 statutory rape conviction was also a likely factor, *see id.* at ¶ 102, but the Amended Complaint also alludes to Redmond's retention of a "psychic medium" named Allison DuBois, which allegedly coincided with Plaintiff being deemed the "prime suspect," *id.* at ¶¶ 104–05.

ORDER - 5

B.      **The Detention, the Prosecution & the Prior Litigation**

On October 29, 2010, almost two years after Jinaga was killed, Plaintiff was charged with murder and booked into King County Jail.  *Id.* at ¶ 125; *see* Information (App. A).  Plaintiff's first trial started on February 14, 2017, and ended on April 19, 2017, with a hung jury.  Am. Compl. at ¶¶ 126–27; *see* Order Declaring Deadlock (App. E).  After a second trial in 2019, Plaintiff was acquitted.  Am. Compl. at ¶¶ 128–29; *see* Verdict (App. H).

During eight of the nine years of his pretrial detention at King County Jail, Plaintiff was housed in the Protective Custody Unit ("PCU"); the operative pleading alleges that this decision was based on assumptions about Plaintiff's non-existent gang affiliations.  Am. Compl. at ¶¶ 131-32.  Plaintiff alleges that, while in PCU, he would often be on "lockdown" in a solitary confinement cell, without access to a shower or exercise, for weeks at a time.  *Id.* at ¶ 133.  Plaintiff further alleges that he asked for medical and psychiatric services but did not receive any treatment for conditions that he says he developed while in custody: severe sleep apnea, depression, anxiety, and posttraumatic stress disorder.  *Id.* at ¶¶ 135–36.  Plaintiff also accuses unnamed King County Jail staff of sexually harassing and humiliating him.  *Id.* at ¶ 137.

In February 2016, about a year before his first trial began, Plaintiff filed a pro se civil rights complaint under 42 U.S.C. § 1983.  *See Fair v. King Cnty.*, Case No. C16-273 JLR (W.D. Wash.).  Based on a stipulation of the parties, the matter was dismissed with prejudice.  *See* Apps. J–L.  King County and DAJD Major Todd Clark were parties to the previous lawsuit, but DAJD Director John Diaz was not.[5]  *See* App. I.  The parties disagree about the extent to which Plaintiff is barred by the dismissal of his earlier claims from bringing his current action.

---

[5] According to the King County Defendants, Diaz succeeded Claudia Balducci as DAJD Director in mid-April 2019, shortly before Plaintiff was acquitted and released from pretrial detention.  *See* King Cnty.'s Mot. at 4 n.2.  Balducci was a defendant in the prior litigation, along with 42 other individuals and King County.  *See* App. I.  For purposes of analyzing the res judicata effect of the earlier action,

# III

## DISCUSSION

**A.    Applicable Standard**

Although the Redmond Defendants and the King County Defendants refer to Rule 12(c), they do not ask for judgment on the pleadings, and so the Court construes their motions as seeking dismissal under Rule 12(b)(6).  In ruling on a Rule 12(b)(6) motion to dismiss, the Court must assume the truth of the plaintiff's allegations and draw all reasonable inferences in the plaintiff's favor.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  A complaint challenged by a Rule 12(b)(6) motion need not provide detailed factual allegations, but it must offer "more than labels and conclusions" and contain more than a "formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint must show more than mere speculation of a right to relief.  *Id.*  A complaint may be lacking for one of two reasons: (i) absence of a cognizable legal theory, or (ii) insufficient facts under a cognizable legal claim.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).  The question for the Court is whether the facts in the complaint sufficiently state a "plausible" ground for relief.  *Twombly*, 550 U.S. at 570.  If the Court dismisses the complaint or portions of it, it must consider whether to grant leave to amend.  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

**B.    Individual Defendants**

With a couple exceptions—Redmond Detective Brian Coats and DPA Baird—the operative pleading does not allege with particularity what each individual defendant did or failed to do in connection with Plaintiff's prosecution and/or pretrial detention.  Ron J. Harding is

---

Plaintiff does not appear to dispute that the relevant subset of parties in the current case are identical to or in privity with the parties in the previous matter.  *See* Pl.'s Resp. at 18 (Dkt. # 69).

alleged only to have retrieved Jinaga's bedsheets.  Am. Compl. at ¶ 70.  Terry Morgan supposedly initiated contact with Allison DuBois, the psychic medium.  *Id.* at ¶ 104.  Jan Fuller was "tasked with recovering information from Johnson's scrubbed phone," but "was unsuccessful."  *Id.* at ¶ 90.  Greg Mains was originally assigned as the lead detective, but then replaced by Detective Coats.  *See id.* at ¶¶ 65–66.  Plaintiff fails to explain how these activities were negligent, outrageous, malicious, or motivated by racial animus.  As for Lenworth Knowles, Greg Patrick, Lon Shultz, David Sowers, Ann Marie Fein, Shawn McCrillis, and Kristi Wilson/Miller, the operative pleading alleges only that they were assigned to the murder investigation and "therefore responsible for implementing proper policies, procedure, and other decisions as delegated to [them]" by the Redmond Police Department.  *Id.* at ¶¶ 20 & 22–27.

As to DAJD Director Diaz and Major Clark, the Amended Complaint indicates that they "supervised, administrated, and managed all King County employees and corrections facilities at the time of [Plaintiff's] injuries, and [were] responsible for ensuring the presence and implementation of proper policies, procedures, and training."  *Id.* at ¶¶ 15–16.  Although Diaz and Clark are sued only in their personal capacities, no allegation is made concerning how they themselves were deliberately indifferent to Plaintiff's medical, mental health, or other needs.  Nor has Plaintiff pleaded any facts to support a plausible claim that Diaz or Clark acted negligently or outrageousness in connection with Plaintiff's pretrial detention.  The Court therefore GRANTS both the Redmond Defendants' motion and the King County Defendants' motion with respect to all individual defendants except Detective Coats and DPA Baird, and DISMISSES Plaintiff's claims against Harding, Knowles, Mains, Patrick, Shultz, Sowers, Fein,

McCrillis, Wilson/Miller, Morgan, Fuller, Clark, and Diaz[6] without prejudice and with leave to amend.

### 1.    <u>Prosecutorial Immunity</u>

DPA Baird invokes prosecutorial immunity as an absolute bar to all of Plaintiff's claims against him.  The existence of absolute prosecutorial immunity is evaluated based on "the nature of the function performed, not the identity of the actor who performed it."  *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)).  DPA Baird bears the burden of showing that he is entitled to such immunity because he was "acting in a prosecutorial role."  *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 912 (9th Cir. 2012); *see also id.* ("absolute immunity is an extreme remedy, and it is justified only where 'any lesser degree of immunity could impair the judicial process itself'" (quoting *Kalina*, 522 U.S. at 127)).  DPA Baird cannot meet his burden because Plaintiff does not challenge actions that he took in his role as an advocate for the State of Washington.

Nothing in the operative pleading suggests that DPA Baird is being sued for making a charging decision, seeking a high amount of bail ($5 million), or otherwise performing the "traditional functions" of a prosecuting attorney.  *See Kalina*, 522 U.S. at 125 & 129 (with regard to both common law and statutory claims, absolute immunity applies when prosecutors are "performing traditional functions," including "the preparation and filing" of "charging documents" like an "information" and a "motion for an arrest warrant").  Rather, the Amended

---

[6] In light of its ruling, the Court need not address whether DAJD personnel are entitled to absolute quasi-judicial immunity.  The Court notes, however, that Plaintiff's claims against Director Diaz, Major Clark, and Does 11–20 relate to the conditions of confinement, not the duration or fact of confinement, *see* Am. Compl. at ¶¶ 165–76, and thus, Plaintiff does not make the type of claim that would be barred by quasi-judicial immunity.  *See Engebretson v. Mahoney*, 724 F.3d 1034, 1039–40 (9th Cir. 2013).  As for quasi-judicial immunity, the King County Defendants' motion is DENIED, but without prejudice to renewing the argument if Plaintiff amends his pleading to allege claims against DAJD personnel as to which such immunity might apply.

ORDER - 9

Complaint alleges that DPA Baird engaged in investigative or administrative activities during the murder investigation, including providing advice to police officers, questioning residents of the apartment complex, processing the crime scene, and making himself "an integral part of the investigative team." Am. Compl. at ¶¶ 30, 64, 68 & 163; *see also Burns v. Reed*, 500 U.S. 478, 492–96 (1991) (absolute immunity does *not* extend "to the prosecutorial function of giving legal advice to the police"). To the extent DPA Baird asserts that the Amended Complaint does not provide with sufficient particularity the details of his investigative or administrative conduct, such argument does not warrant dismissal with prejudice on absolute immunity grounds; at most, it would support a dismissal with leave to amend. The motion to dismiss based on prosecutorial immunity is DENIED.

### 2.      Qualified Immunity

Qualified immunity has been asserted on behalf of DPA Baird and Detective Coats with respect to Plaintiff's § 1983 claim for malicious prosecution. Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original). As for a claim brought under 42 U.S.C. § 1983, an individual defendant is entitled to qualified immunity if either of the following criteria is satisfied: (i) the alleged facts do not show a constitutional violation; or (ii) the constitutional right allegedly violated was not "clearly established" at the time of the events at issue. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

### a.      Constitutional Violation

In arguing that Plaintiff has not pleaded a constitutional violation, Defendants cavalierly summarize Plaintiff's allegations as merely nit-picking how the murder investigation was performed. Such grievances would not, of course, support a § 1983 claim, but Plaintiff pleads

ORDER - 10

far more than has been credited by Defendants.  To prevail on a § 1983 claim for malicious

prosecution, Plaintiff must show that a defendant "prosecuted [him] with malice and without

probable cause, and that they did so for the purpose of denying [him] equal protection or another

specific constitutional right."  *See Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir.

2004) (alterations in original, quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th

Cir. 1995)).  *Awabdy* reiterates the principle that no substantive due process right exists under the

Fourteenth Amendment to be free from prosecution without probable cause.  *Id.* at 1069.  Thus,

to succeed on a malicious prosecution claim under § 1983, a plaintiff must prove that "the

defendants acted for the purpose of depriving him of a 'specific constitutional right,'" albeit not

necessarily one protected by the Fourth Amendment.  *Id.*  In *Awabdy*, the Ninth Circuit

concluded that the Plaintiff had stated a § 1983 malicious prosecution claim by alleging that the

defendants conspired to deprive him of his First Amendment free speech rights by unlawfully

interfering with his campaign for reelection to the City Council of Adelanto, as well as his right

to equal protection under the Fourteenth Amendment by intentionally causing the prosecutor to

bring an unfounded embezzlement charge against him because of racial animus against Arab

Americans.  *Id.* at 1065 & 1069–70.

*Awabdy* supports the conclusion that the facts set forth in the Amended Complaint state a

plausible § 1983 malicious prosecution claim.  Plaintiff alleges that DPA Baird and Detective

Coats caused him to be prosecuted without probable cause based on racial animus, thereby

depriving him of his Fourteenth Amendment right to equal protection.[7]  According to the

---

[7] Contrary to DPA Baird's contention, Plaintiff does not raise a "negligent" investigation claim under § 1983.  In addition, although the authorities cited by DPA Baird support the proposition that negligence is not actionable under § 1983, they are factually and procedurally distinguishable, and do not support dismissal with prejudice.  In both *Goodwyn v. Kincheloe*, No. 85-7046, 1986 WL 17850 (4th Cir. Oct. 14, 1986), and *Carter v. Bone*, No. C/A No. 309-779, 2010 WL 558598 (D.S.C. Feb. 10, 2010), the claim at issue was premised on negligence (rather than willfulness or reckless indifference, as pleaded in this matter, *see* Am. Compl. at ¶ 143), and the motion at issue was for summary judgment.  In *Williams v.*

Amended Complaint, when interviewing witnesses, detectives asked about or focused on race only when discussing Plaintiff, and they treated more generously than Plaintiff various White suspects like Johnson,[8] Gurtler, and Lovett.  *Id.* at ¶¶ 156(a)–(h).  Detective Coats, who signed the PC Certification, is accused of saying that Plaintiff was the target of the investigation because he was "the only African American at the party" and an "outsider."  *Id.* at ¶ 101 & 110.  Detective Coats, who "had never worked, much less led, a case of this complexity before," is alleged to have developed his hypothesis about the motive for Jinaga's murder: that Plaintiff wanted sex from her, after consulting a "psychic medium."  *Id.* at ¶¶ 66 & 111.  When asked about the significance of Plaintiff's prior conviction for statutory rape, Detective Coats supposedly indicated, "If you've done it before, you'll do it again."  *Id.* at ¶ 158.

Plaintiff further criticizes Detective Coats for omitting the following potentially exculpatory information from the PC Certification:  (i) Lovett's DNA was found on the boot lace believed to be the ligature used to strangle Jinaga, (ii) Johnson's DNA was found on the motor oil bottle found in the dumpster and a wet area of carpet near Jinaga's motor-oil-covered body, (iii) the DNA of unidentified males was found on a tampon discovered near Jinaga's body, as well as on the roll of tape associated with gagging Jinaga, and (iv) the presence of Plaintiff's DNA might be innocently explained by his attendance at the party preceding her death and his

---

*City of Albany*, 936 F.2d 1256 (11th Cir. 1991), the Eleventh Circuit did not clearly describe the procedural posture, but the negligent investigation claim appears to have been dismissed on a motion for summary judgment involving qualified immunity.  *Id.* at 1258 & 1260–61.  Finally, in *Bryant v. City of Goodyear*, No. CV-12-319, 2013 WL 1897129 (D. Ariz. May 6, 2013), although the § 1983 negligent investigation claim and four other federal claims were dismissed, the Plaintiffs were given leave to amend.  *Id.* at *13-15.

[8] Plaintiff contrasts how investigators questioned him (in an "unmarked car" without advising him of his constitutional rights) with how they interviewed Johnson, who was accompanied in the interrogation room by his father and attorney, was offered immunity during certain sessions, and was allowed at times to provide crucial information while the camera was turned off.  *See* Am. Compl. at ¶¶ 156(c) & (g).

1    assistance with party clean-up efforts the following morning.  *Id.* at ¶¶ 118–24.  Finally, Plaintiff

2    reproaches Detective Coats for misrepresenting,[9] in the PC Certification, the DNA evidence

3    linking Plaintiff to the crime, which the operative pleading characterizes as being "in such trace

4    amounts that the samples had to be sent to specialized labs for analysis" and "not an exact

5    match" or "*not a match at all*," but indicating merely that Plaintiff's DNA could not be excluded

6    as a match.  *Id.* at ¶¶ 116–17 (emphasis in original).  Neither DPA Baird nor Detective Coats

7    argue that, assuming the truth of these allegations, Plaintiff could not establish a constitutional

8    violation for purposes of the first prong of the *Saucier* test.

9        Rather, DPA Baird and Detective Coats contend that Plaintiff cannot establish the

10   requisite lack of probable cause because he is precluded by collateral estoppel from challenging

11   these rulings of the King County Superior Court:  (i) Judge Palmer Robinson's order granting

12   DPA Baird's motion for a finding of probable cause and fixing bail (App'x B); (ii) Judge

13   Mariane Spearman's oral ruling denying a motion to dismiss that was brought during the first

14   criminal trial (App'x D); and (iii) Judge Douglass North's oral ruling denying a "halftime"

15   motion in the second criminal trial (App'x F).  In making this argument, Defendants do not cite

---

16       [9] DPA Baird argues that Plaintiff's allegations must meet the heightened pleading standard for
     fraud.  *See* Fed. R. Civ. P. 9(b).  Neither of the cases cited by DPA Baird are factually analogous.  *See*
17   *Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007) (reversing the district court's denial of leave to
     amend a fraud claim relating to a failed tax shelter scheme, which the defendants allegedly sold to the
     Plaintiff even though they knew it would be considered unlawful by the Internal Revenue Service);
18   *Aquilina v. Certain Underwriters at Lloyd's Syndicate #2003*, 407 F. Supp. 3d 1051 (D. Haw. 2019)
     (dismissing, with leave to amend, putative class action claims brought under Hawaii's deceptive trade
19   practices acts that arose out of an allegedly deceptive scheme of "steering" homeowners into purchasing
     worthless "surplus lines" insurance policies).  At least one district court has rejected the notion that, when
20   a malicious prosecution claim alleges false reporting, it must comply with Rule 9(b).  *See Holland v. City
     of San Francisco*, No. 19-cv-2545, 2020 WL 1322925, at *2 (N.D. Cal. Mar. 21, 2020).  To the extent,
21   however, that Rule 9(b) applies, Plaintiff has pleaded with the requisite particularity how the PC
     Certification was allegedly misleading and who participated in crafting it: Detective Coats, allegedly with
22   the advice of DPA Baird.  Unlike with Detective Coats, Plaintiff has not attributed to DPA Baird any
     expression of racial animus, but Plaintiff need not prove a race-based motive to prevail on his common
     law claims.  As for his § 1983 claim, Plaintiff may plead malice, intent, and "other conditions of a
23   person's mind" in a general and conclusory fashion.  *See* Fed. R. Civ. P. 9(b).

ORDER - 13

1   or acknowledge *Awabdy*,[10] which contradicts their position.  In *Awabdy*, the Ninth Circuit

2   observed that a prima facie finding of probable cause may be rebutted by a showing that the

3   _____

4       [10] Instead, they rely on Washington law, asserting that state law on collateral estoppel applies
when deciding, in a federal action involving a § 1983 claim, the preclusive effect of a prior state court
ruling.  None of the cases they cite, however, relied on a preliminary finding of probable cause (rather
than a conviction, final judgment, or decision on appeal) to bar a § 1983 malicious prosecution claim
involving an equal protection violation.  *See Haring v. Prosise*, 462 U.S. 306 (1983); *Ayers v. City of
Richmond*, 895 F.2d 1267 (9th Cir. 1990); *Davis v. Clark Cnty.*, 966 F. Supp. 2d 1106 (W.D. Wash.
2013); *see also Haupt v. Dillard*, 17 F.3d 285 (9th Cir. 1994); *Thompson v. Copeland*, No. C14-1769,
2015 WL 6738861 (W.D. Wash. July 24, 2015); *Fontana v. City of Auburn*, No. C13-245, 2014 WL
4162528 (W.D. Wash. Aug. 21, 2014).  Even if Washington law applies, the showing necessary for
collateral estoppel has not been made.  *See Hanson v. City of Snohomish*, 121 Wn.2d 552, 562, 852 P.2d
295 (1993) (indicating that collateral estoppel requires identical parties or privity, identical issues, a
previous final judgment on the merits, and a finding that application of the doctrine would not work an
injustice).  First, the issues are not identical.  In ruling on "halftime" motions, Judges Spearman and North
were assumed the truth of the State's allegations and drew all reasonable inferences in the State's favor.
*See* App'x D (Dkt. # 67-4 at 18); App'x F (Dkt. # 67-6 at 7).  In contrast, in deciding the pending motions
to dismiss, the Court must assume the truth of plaintiff's allegations and draw all reasonable inferences in
his favor.  *Usher*, 828 F.2d at 561.  Plaintiff pleads that the State's allegations were false or misleading,
and thus, the Court cannot treat as collaterally binding decisions that presumed the State's allegations
were true.  *See Morley v. Walker*, 175 F.3d 756, 761 (9th Cir. 1999) (observing that "deliberately or
recklessly" misstating or omitting facts material to probable cause is "not objectively reasonable," and
that courts are "not equipped at [the Rule 12(b)(6)] stage" to resolve disputes about whether
misrepresentations were made).  Judges Spearman and North made their rulings almost seven and nine
years, respectively, after Plaintiff was charged with Jinaga's murder, based on a different quantum of
evidence than when the prosecution began.  *See id.* (recognizing that the timing of a state court's probable
cause determination is an important factor in deciding whether to give it preclusive effect (citing Haupt,
17 F.3d at 289)).  Judge Robinson's finding of probable cause was closer to the relevant time, but it was
based entirely on the PC Certification, which Plaintiff criticizes as exaggerating the quality of the DNA
evidence linking him to the crime and failing to disclose exculpatory information that might have caused
Judge Robinson to form a different opinion.  Second, the previous probable cause rulings were not
"final."  *See Cunningham v. State*, 61 Wn. App. 562, 567, 811 P.2d 225 (1991) (adopting the following
test for finality:  (i) whether the prior decision was adequately deliberated; (ii) whether it was firm, rather
than tentative; (iii) whether the parties were fully heard; (iv) whether the court supported its decision with
a reasoned opinion; and (v) whether the decision was subject to appeal or in fact was reviewed on appeal
(citing Restatement (Second) of Judgments § 13 cmt. g (Am. L. Inst. 1982))).  None of the rulings at issue
were set forth in a written, reasoned opinion, and the denial of a "halftime" motion may not be appealed,
*see* Wash. Sup. Ct. Cr. R. 8.3(c)(3).  Both Judges Spearman and North were essentially "outvoted" as to
what a "rational juror" could find "beyond a reasonable doubt" from the evidence adduced at trial; the
first jury was deadlocked 11-to-1 to acquit, and the second jury found Plaintiff not guilty.  *See* App'x D
(Dkt. # 67-4 at 19); App'x F (Dkt. # 67-6 at 7); App'x H (Dkt. # 67-8); Am. Compl. at ¶¶ 127 & 129
(Dkt. # 27).  Finally, application of the collateral estoppel doctrine would work an injustice.  The
Redmond Defendants' view that Plaintiff has twice had an opportunity to challenge probable cause and
twice failed is myopic, and their assertion that Plaintiff would suffer no injustice is unsupported by the
authorities they cite.  Indeed, *Rickert v. City of Poulsbo*, No. C07-5477, 2008 WL 271643 (W.D. Wash.
Jan. 29, 2008), contradicts their position.  *See id.* at *6–8 (concluding that the plaintiff was "*not
collaterally barred from raising the issue of probable cause*," reasoning that, although the plaintiff's
motion to suppress had been denied, the charges against him were still dismissed, and the "prior criminal

1  criminal prosecution was "induced by fraud, corruption, perjury, fabricated evidence, or other

2  wrongful conduct undertaken in bad faith." 368 F.3d at 1067. The *Awabdy* Court further held

3  that, to the extent a judge's preliminary probable cause ruling was premised on fabricated

4  evidence or other wrongful conduct by state or local officials, the doctrine of collateral estoppel

5  does not bar a § 1983 Plaintiff from relitigating probable cause. *Id.* at 1068. In light of *Awabdy*,

6  the Court must conclude that Plaintiff is not collaterally estopped by the decisions of Judges

7  Robinson, Spearman, or North from asserting that he was prosecuted without probable cause.

**b.**    **"Clearly Established" Right**

8       A constitutional right is "clearly established" if existing controlling precedent, *i.e.*, a

9  decision of the Supreme Court or the Ninth Circuit, has "placed the . . . constitutional question

10  beyond debate." *See Russell v. Lumitap*, 31 F.4th 729, (9th Cir. 2022) (quoting *Kisela v.*

11  *Hughes*, 138 S. Ct. 1148, 1152 (2018)). Qualified immunity ensures that, before individuals face

12  suit under § 1983, they had notice (or "fair warning") of the unlawfulness of their conduct, and

13  thus, a constitutional right is considered "clearly established" only if the contours of the right are

14  "sufficiently clear that a reasonable official would understand that what he is doing violates that

15  right." *Hope v. Pelzer*, 536 U.S. 730, 739–40 (2002) (quoting *Anderson v. Creighton*, 483 U.S.

16  635, 640 (1987)). This "fair warning" does not require that the "very action" at issue be

17  previously deemed unlawful, but that the unlawfulness be "apparent" given the preexisting law.

18  *Id.* at 739 (quoting *Anderson*, 483 U.S. at 640); *see Sandoval v. County of San Diego*, 985 F.3d

19  657, 680 (9th Cir. 2021) ("State '[o]fficials can still be on notice that their conduct violates

20  adjudication did *not* end in a *final* judgment on the merits" (emphasis added)). Another way to
21  summarize events is that Plaintiff was twice tried and essentially twice acquitted, which substantially
    undermines the persuasive effect of the state court's probable cause rulings. This analysis also applies to
22  Plaintiff's common law claim of malicious prosecution, as to which Washington law governs. *See United*
    *Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (observing that a federal court exercising
    supplemental jurisdiction over state-law claims must apply state law to them, citing *Erie R. Co. v.*
23  *Tompkins*, 304 U.S. 64 (1938)).

established law even in novel factual circumstances'—i.e., even without a prior case that had 'fundamentally similar' or 'materially similar' facts." (alteration in original, quoting *Wilk v. Neven*, 956 F.3d 1143, 1148 (9th Cir. 2020))).

*Awabdy* was decided in 2004, before Jinaga's murder and before the prosecution at issue began, and in *Awabdy*, the Ninth Circuit applied the guidance of a Supreme Court decision issued in 1994. *See* 368 F.3d at 1068–69 (citing *Albright v. Oliver*, 510 U.S. 266 (1994)). *Awabdy*, which Defendants failed to mention in their briefs even though it is cited in the operative pleading, *see* Am. Compl. at ¶ 161, is the type of controlling precedent envisioned in *Saucier* and its progeny, and it provided the requisite notice to DPA Baird and Detective Coats, more than four years before they engaged in the claimed actions at issue, that their alleged conduct constituted a constitutional violation. Both pending motions are DENIED with respect to qualified immunity, but without prejudice to raising the issue again in a motion for summary judgment or at trial in a manner consistent with this Order.

## C.   Governmental Defendants

### 1.   King County

King County accuses Plaintiff of bringing another lawsuit against the same defendants for the same incarceration and argues that Plaintiff is barred by the dismissal of his earlier lawsuit from pursuing the claims pleaded against it (and its personnel) in this action. This contention lacks merit. Res judicata refers to the preclusive effect of former litigation. *Robi v. Five Platters, Inc.*, 838 F.2d 318, 321 (9th Cir. 1988). Res judicata has two conceptual categories: (i) claim preclusion; and (ii) issue preclusion, also called "collateral estoppel." *Robi*, 838 F.2d at 321 & n.2; *see also Frank v. United Airlines, Inc.*, 216 F.3d 845, 850 n.4 (9th Cir. 2000) ("Rather than using the terms 'res judicata' and 'collateral estoppel,' the Supreme Court has generally used the terms 'claim preclusion' and 'issue preclusion.'"); *Ross v. Alaska*, 189 F.3d

1107, 1110 n.2 (9th Cir. 1999).  The key distinction between the two types of preclusion is that

matters never litigated may be barred by claim preclusion, while only matters actually litigated

may be barred by issue preclusion.  *See Frank*, 216 F.3d at 850 n.4; *Ross*, 189 F.3d at 1110 n.2.

King County invokes claim preclusion.  Plaintiff's previous lawsuit concerned King

County Jail's use of waist restraints and handcuffs, the combination of which Plaintiff believed

had exposed him to the risk of attack from other inmates, and the tightness of which Plaintiff

asserted had injured his wrists, for which he received allegedly deficient medical care.  *See*

App'x I.  In the pending action, Plaintiff does not repeat the waist restraint and handcuff

grievances; his current claims relate to solitary confinement, cold cell conditions, failure to treat

his sleep apnea and mental health conditions, and alleged sexual harassment.  King County

suggests that Plaintiff should be prevented from pursuing these claims because Plaintiff could

have, but failed to, raise them in the earlier litigation.  This contention concerns the preclusive

effect of a decision by a federal court exercising federal-question jurisdiction, and it is therefore

governed by federal common law.  *See Media Rts. Techs., Inc. v. Microsoft Corp.*, 922 F.3d

1014, 1021 n.6 (2019).

Under federal common law, claim preclusion bars a party from pursuing claims that

"were raised or could have been raised in [a] prior action."  *Id.* at 1020.  In the Ninth Circuit,

however, claim preclusion "does *not* apply to claims that accrue after the filing of the operative

complaint" in the previous suit.  *Id.* at 1021 (emphasis added); *see also id.* at 1022 n.8 (clarifying

that the filing of the operative complaint, not the entry of judgment, is the relevant date for

purposes of claim preclusion).  In other words, Plaintiff is not barred from pursuing in this action

"claims that were not in existence and could not have been sued upon—*i.e.*, were not legally

cognizable—when the allegedly preclusive action was initiated."  *Id.* at 1021.  In addition, as

recognized by the Ninth Circuit, "[a] substantially single course of activity may continue through

the life of a first suit and beyond," and "[t]he basic claim-preclusion result is clear: a new claim or cause of action is created as the conduct continues." *Id.* at 1022 (quoting 18 Edward H. Cooper, FED. PRAC. & PROC. JURIS. § 4409 (3d ed. 2022 update)).

Plaintiff remained in pretrial detention for more than two additional years after the previous case was dismissed with prejudice. *See* Judgment in C16-273-JLR (Apr. 7, 2017) (App'x L); Verdict (June 11, 2019) (App'x H). King County has offered no evidence that Plaintiff waived or somehow released it or its corrections officials from future claims. Plaintiff may proceed on his claims relating to the conditions of confinement continuing, and events occurring, after August 1, 2016, when the operative pleading in Case No. C16-273 JLR was filed. *See* App'x I. In arguing to the contrary, King County cites no supporting authority.[11] The King County Defendants' motion is DENIED with respect to res judicata.

> **2.** **City of Redmond**

>> **a.** **Monell Liability**

The City of Redmond may not be held liable under § 1983 on a respondeat superior theory. *See Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978); *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002). Instead, governmental Section 1983 liability must turn on one of four theories: (i) a policy or longstanding practice or custom from which the alleged constitutional violation resulted; (ii) an unconstitutional action by an official with final policy-making authority; (iii) ratification by an official with final policy-making authority of a subordinate's unconstitutional conduct; or (iv) a failure to adequately train employees that amounts to "deliberate indifference" about the constitutional right at issue.

---

[11] Indeed, in the most recent decision cited in the King County Defendants' reply, the Ninth Circuit rejected a res judicata argument. *See Grondal v. United States*, 21 F.4th 1140, 1164 (9th Cir. 2021).

*See, e.g.*, *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005); *see also City of Canton v. Harris*, 489 U.S. 378 (1989).  The Amended Complaint attempts to plead the first (policy or practice), third (ratification), and fourth (failure to train) theories of *Monell* liability.

The operative pleading identifies policies or practices that the Redmond Police Department ("Redmond PD") did not have or allegedly did not follow; Redmond PD apparently did not require the changing of gloves between sample collections or locations, the securing of evidence like the apartment complex's dumpster or neighbor Johnson's phone, or any partnering with agencies more experienced in homicide investigation.[12]  *See* Am. Compl. at ¶¶ 67, 70–71, 89, 147, 149 & 151.  The Amended Complaint further asserts that acts or omissions consistent with Redmond PD's practices were ratified by policymakers.  *Id.* at ¶ 160.  Plaintiff does not, however, explain how the alleged deficiencies in the way Redmond PD handled this or any other murder investigation stemmed from racial animus or had a purpose of denying equal protection of the law, and he has not sufficiently pleaded the first (policy or practice) or third (ratification) grounds for a *Monell* claim against the City of Redmond.

In contrast, in alleging a failure to train, the operative pleading speaks directly about the equal protection component of a § 1983 malicious prosecution claim.  The Amended Complaint states that the City of Redmond and Redmond PD's supervisory personnel "failed to properly train and supervise employees on how to conduct racially unbiased investigations."  *Id.* at ¶ 156.  It accuses Redmond PD personnel of referencing race only when questioning witnesses about Plaintiff and of treating White suspects more favorably than Plaintiff.  *Id.* at ¶¶ 156(a)–(h).  It

---

[12] The City of Redmond denies that it had a policy or practice of not partnering with other law enforcement organizations, referencing its Answer for support.  Redmond's Mot. at 8 (citing Answer at ¶ 67 (Dkt. # 34) (indicating that Washington State Patrol and Federal Bureau of Investigation personnel assisted with the investigation at issue)).  Conflicting facts contained in a responsive pleading cannot, however, form the basis of a Rule 12(b)(6) dismissal.  *See Usher*, 828 F.2d at 561.

also contends that the "disparate treatment" Plaintiff received resulted from a failure to adequately train Redmond PD employees to perform racially unbiased investigations, and that such failure amounted to "deliberate indifference" concerning Plaintiff's constitutional rights. *See id.* at ¶ 157.

The City of Redmond argues that Plaintiff has not alleged a pattern of violations that would have provided notice of a need for further training.  Plaintiff responds that no pattern is required because "the unconstitutional consequences of failing to train" were "patently obvious." Pl.'s Resp. at 14 (Dkt. # 59) (quoting *Hyde v. City of Willcox*, 23 F.4th 863, 874–75 (9th Cir. 2022) (quoting *Connick v. Thompson*, 563 U.S. 51, 64 (2011))).  When viewed in the light most favorable to Plaintiff, the operative pleading sufficiently pleads a plausible claim that the lack of training about how to conduct racially unbiased investigations had "patently obvious" unconstitutional consequences.  *See Ross v. City of Oakland*, No. 14-cv-800, 2014 WL 4744191, at *4 (N.D. Cal. Sep. 22, 2014) (finding "plausible that the City's failure to train was so obviously deficient that it could be subject to liability under § 1983 as a result of a single incident," namely the erroneous attempted-murder conviction of the Plaintiff, which resulted from *inter alia* an officer's direction to the victim to identify the plaintiff in a photo montage). The City of Redmond's motion to dismiss is GRANTED as to the policy-or-practice and ratification claims, and those theories of *Monell* liability are DISMISSED without prejudice and with leave to amend; the motion is DENIED with respect to failure to train.

### b.   **Public Duty Doctrine**

A plaintiff may not base a claim of negligence on an intentional act but may sue for negligent acts leading up to the intentional tort.  *See Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537, 546, 442 P.3d 608 (2019).  For example, in *Beltran-Serrano*, the plaintiff, who was shot multiple times by a police officer, could proceed on a negligence claim against the City of

Tacoma for the officer's alleged failure to use reasonable care during the interaction with the plaintiff that preceded the shooting. *Id.* at 544–48.  To maintain an action for negligence, a plaintiff must first demonstrate that the defendant owed the plaintiff a duty of care.  *See, e.g.*, *Honcoop v. Wash.*, 111 Wn.2d 182, 188, 759 P.2d 1188 (1988).  In the context of claims against governmental entities, Washington courts use a "focusing tool" known as the public duty doctrine, which recognizes that governments are tasked with certain duties that are not actionable in tort, and which ensures that "governments do not bear greater tort liability than private actors." *Beltran-Serrano*, 193 Wn.2d at 549.

The public duty doctrine defines four instances in which a governmental entity may be found to owe a statutory or common law duty to a particular member of the public: (i) legislative intent, (ii) failure to enforce, (iii) the rescue doctrine, or (iv) a special relationship. *See Cummins v. Lewis Cnty.*, 156 Wn.2d 844, 853 & n.7, 133 P.3d 458 (2006).  If one of these four "exceptions" does not apply, then no liability may be imposed for a public officer's negligent conduct, based on the reasoning that a duty was not owed specifically to the individual plaintiff, rather than the public in general. *Id.* at 852.  The Redmond Defendants contend that Plaintiff has not pleaded facts to support one of the four "exceptions" to the public duty doctrine, and that, as a result, Plaintiff cannot further pursue his negligence claim.  Plaintiff argues that the public duty doctrine does not apply, but *Beltran-Serrano* seems to contradict his assertion, and the Court will analyze the negligence claim through the lens required by the public duty doctrine.

The first three "exceptions" do not apply, and the only "exception" on which Plaintiff might rely is a "special relationship."  In cases predating *Beltran-Serrano*, Washington courts articulated these requirements for establishing a "special relationship" that would create an actionable duty on the part of a governmental entity:  (i) the plaintiff had direct contact or privity with a public official, thereby setting the plaintiff apart from the public; (ii) the public official

gave "express assurances" to the plaintiff; and (iii) the plaintiff justifiably relied on such express assurances to his or her detriment. *See Cummins*, 156 Wn.2d at 854.  In *Beltran-Serrano*, however, the Washington Supreme Court appeared to loosen the standard, and required merely that the defendant have an "affirmative interaction" with the plaintiff.  193 Wn.2d at 551.  The *Beltran-Serrano* court reasoned that "every individual owes a duty of reasonable care to refrain from causing foreseeable harm in interactions with others." *Id.* at 550 (citing Restatement (Second) of Torts § 281, cmt. e (Am. L. Inst. 1965)).  Such "duty applies in the context of law enforcement and encompasses the duty to refrain from directly causing harm to another through affirmative acts of misfeasance," rather than nonfeasance. *See id.* (citing *Robb v. City of Seattle*, 176 Wn.2d 427, 295 P.3d 212 (2013)).  In *Beltran-Serrano*, the negligence claims at issue arose out of the officer's "direct interaction" with the plaintiff, rather than a "breach of a generalized public duty" to, for example, "provide police services, enforce the law, and keep the peace." *Id.* at 551–52.

In *Mancini v. City of Tacoma*, 196 Wn.2d 864, 479 P.3d 656 (2021), the Washington Supreme Court extended tort liability to negligence in the execution of a search warrant. *Id.* at 880.  In *Mancini*, officers executed a search warrant at the wrong apartment, which belonged to the plaintiff, and the Supreme Court reasoned that the plaintiff's negligence claim was not based on "the City's duty [running] solely to the public at large" or on "an abstract duty to the nebulous public," but on a "specific duty enforceable by [the plaintiff] in tort." *Id.* at 885–86.  Relying on *Mancini* and *Beltran-Serrano*, the court in *Gill v. Magan*, No. C19-860, 2021 WL 928174 (W.D. Wash. Mar. 10, 2021), concluded that a plaintiff, who was subjected to an erroneous

forced-entry search of her home and arrested at gunpoint, could sue for negligence in applying for the search warrant. *Id.* at \*8–9.[13]

*Beltran-Serrano*, *Mancini*, and *Gill* support the conclusion that the public duty doctrine does not prevent Plaintiff from pursuing a negligence claim. The Redmond Defendants contend they did not have the requisite "affirmative interaction" with Plaintiff, but that assertion runs contrary to the allegations of the operative pleading. One or more members of Redmond PD is alleged to have interrogated Plaintiff in "an unmarked car" without giving him *Miranda* warnings. Am. Compl. at ¶ 156(g). One or more members of Redmond PD somehow obtained Plaintiff's DNA. *See* App'x A. And, one member of Redmond PD, Detective Coats, prepared the PC Certification used to seek bail in the amount of $5 million and keep Plaintiff in custody for almost nine years. *Id.* To the extent Plaintiff alleges that the murder investigation was performed in a negligent manner (rather than with race-based malice), he has plausibly pleaded that a duty was owed specifically to him, as distinct from the public. The Redmond Defendants' motion to dismiss Plaintiff's negligence,[14] intentional infliction of emotional distress (outrage),[15]

---

[13] The Redmond Defendants contend that *Gill* is "an overextension of *Mancini*," and that "no Washington court has endorsed the rule *Gill* ascribes to Washington state law claims." Redmond's Reply at 11. In affirming other rulings in *Gill*, the Ninth Circuit noted that the plaintiff proceeded to trial on a common law negligence claim, but the jury found against her. *Gill v. City of Seattle*, No. 21-35635, 2022 WL 4546918, at \*1 n.1 (9th Cir. 2022). The subsequent history of *Gill* reflects the proper functioning of the adversarial process, and the Redmond Defendants' conclusory criticism of *Gill* does not warrant disregard of the decision.

[14] The King County Defendants do not seek dismissal based on the public duty doctrine. A related question, which none of the parties have addressed, is which entities are the proper defendants with respect to Plaintiff's negligence claims. To the extent Plaintiff's theory of liability is negligence (rather than willfulness, malice, or intent), the individual Defendants were arguably acting within the scope of their employment. Thus, Plaintiff is DIRECTED to show cause why his negligence claim should not be dismissed without prejudice as to all individual Defendants, leaving the City of Redmond and King County as the sole defendants, sued for vicarious liability under a respondeat superior theory.

[15] The Redmond Defendants assert that, "[a]bsent a direct interaction, the public duty doctrine bars individual tort claims (including negligence and outrage claims) based on an alleged duty owed to the public in general." Redmond's Reply at 11–12. The two cases they cite, however, predate *Beltran-Serrano*, and neither of them supports the proposition that the public duty doctrine applies to intentional

ORDER - 23

and negligent infliction of emotional distress claims, based on the public duty doctrine, is

DENIED.

## IV

### CONCLUSION

For all these reasons, the Court ORDERS:

(1)     The Redmond Defendants' (Dkt. # 43), is GRANTED in part and DENIED in part as follows:

(a)     All claims against individual defendants Harding, Knowles, Mains, Patrick, Shultz, Sowers, Fein, McCrillis, Wilson/Miller, Morgan, and Fuller are DISMISSED without prejudice and with leave to amend;

(b)     Plaintiff's § 1983 claim for malicious prosecution against the City of Redmond is DISMISSED with respect to the policy-or-practice and ratification theories of *Monell* liability, but without prejudice and with leave to amend; and

(c)     The motion is otherwise DENIED.

(2)     The King County Defendants' motion (Dkt. # 67), is GRANTED in part and DENIED in part as follows:

(a)     All claims against individual defendants Clark and Diaz are DISMISSED without prejudice and with leave to amend; and

(b)     The motion is otherwise DENIED.

---

torts like outrage.  *See Osborn v. Mason Cnty.*, 157 Wn.2d 18, 134 P.3d 197 (2006); *see also Fuller v. Lee*, No. C13-563, 2014 WL 6982519, at *11–12 (W.D. Wash. Dec. 9, 2014).  The public duty doctrine is a means for determining whether an actionable duty exists to establish negligence, and it has no relevance with respect to intentional torts.  Aside from any applicability of the public duty doctrine, neither the Redmond Defendants nor the King County Defendants have addressed, and thus the Court need not decide, whether Plaintiff has adequately pleaded facts to support his negligence, outrage, or negligent infliction of emotional distress claims.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

(3)      Plaintiff must show cause within fourteen (14) days of the date of this Order why his negligence and negligent infliction of emotional distress claims should not be treated as asserted solely against the City of Redmond and King County based on the doctrine of respondeat superior.  Any amended pleading must be electronically filed within fourteen (14) days of the date of this Order.  Any responsive pleading or motion must be filed in accordance with Federal Rule of Civil Procedure 15(a)(3).

(4)      The stay of discovery imposed by the Order entered January 23, 2023 (Dkt. # 82), is LIFTED.  The trial date and related deadlines set forth in the Minute Order entered August 17, 2022 (Dkt. # 66), remain in effect.  Plaintiff shall either identify and join, or voluntarily dismiss, Doe defendants by May 15, 2023.

(5)      The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 13th day of April, 2023.

John H. Chun
United States District Judge

ORDER - 25