IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| EMANUEL D. FAIR,<br><br>Plaintiff,<br><br>v.<br><br>KING COUNTY, a political subdivision of the State of Washington; CITY OF REDMOND, a municipal entity and political subdivision of the State of Washington; BRIAN COATS, in his personal capacity; and JEFF BAIRD, in his personal capacity,<br><br>Defendants. | NO. 2:21-cv-01706-JHC<br><br>THIRD AMENDED COMPLAINT<br><br>JURY DEMANDED |

COMES NOW the above-named Plaintiff, pursuant to Fed. R. Civ. P. 15(a)(2), by and through attorneys Ryan D. Dreveskracht and Corinne Sebren of Galanda Broadman, PLLC, and by way of claim alleges upon personal knowledge as to himself and his own actions, and upon information and belief upon all other matters, as follows:

## I. INTRODUCTION

1. Plaintiff Emanuel Fair was held in pretrial detention at the King County Correctional Facility from 2010 until his acquittal in 2019. For **nine years**, he remained in a jail cell as an innocent man.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

2. This is a civil rights action brought under 42 U.S.C. § 1983 and Washington State law for damages arising from Defendants City of Redmond; City of Redmond Police Department ("RPD") employee Brian Coats; King County Prosecuting Attorney's Office ("KCPAO"), an agency of King County; and King County Prosecutor Jeff Baird, a KCPAO employee ("Investigating Defendants," collectively)'s wrongful and discriminatory investigation, arrest, and prosecution of Plaintiff Emanuel Fair.

3. In 2010, Fair, a Black man, was charged with the November 1, 2008, murder of Arpana Jinaga. He was acquitted by a jury in June of 2019—but only after being held as a pretrial detainee in solitary confinement for nine years at the King County Correctional Facility ("KCCF"), in violation of his Fourteenth Amendment right to safe, humane, nonpunitive conditions of confinement.

4. This civil rights action brought under 42 U.S.C. § 1983 and Washington State law thus also arises from damages caused by Defendant King County's unconstitutional depravations of Fair's Fourteenth Amendment right to safe, humane, nonpunitive conditions of confinement.

5. Throughout the investigation and prosecution of Jinaga's murder, Investigating Defendants ignored and failed to gather evidence that did not align with their theory of the case, inappropriately questioned Fair in violation of his constitutional rights, treated Fair differently than white suspects in such an extreme manner that the treatment can only be viewed as racial discrimination, and generally performed their duties to such a poor standard that Fair suffered severe deprivations of his liberty and permanent harm.

6. The murder investigation leading up to Fair's charges and pretrial detention was so badly handled it can only be characterized as bizarre. Not only were all the white suspects afforded the benefit of the doubt while Fair was clearly not; but at one point RPD hired a self-described "psychic medium" by the name of Allison DuBois to aid in the investigation. At the time RPD hired



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

the psychic, Fair had recently become a new person of interest, supplanting earlier theories that centered around a different suspect, Jinaga's white neighbor, Cameron Johnson.

7. In brief, Investigating Defendants zeroed in on Fair to the exclusion of all other suspects for discriminatory reasons such as race and prior criminal history, and they employed a "gather facts that fit the theory" strategy.

8. The manner in which the Investigating Defendants conducted themselves, their employees, and their investigations caused Fair to be arrested and charged without probable cause for a murder he did not commit.

9. The manner in which the Investigating Defendants conducted themselves, their investigations, and their prosecution led to inexcusable delays in Fair's trial and prolonged pretrial detention.

10. Fair spent nearly a decade in the KCCF as an innocent man, in conditions of inhumane confinement that are well-known to have a detrimental effect on mental health. *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 380 (N.D.N.Y. 2020) (citing *Davis v. Ayala*, 576 U.S. 257 (2015)).

11. Fair's lengthy incarceration in a facility not designed for long-term detention constituted excessive force in violation of his constitutional rights.

12. Over the eleven-year ordeal of the investigation and prosecution of Jinaga's murder—two years of investigation wherein Fair became a primary suspect, two trials, and nine years of incarceration at the KCCF—Fair suffered severe distress and sustained permanent damage to his reputation, emotional wellbeing, livelihood, and relationships; he also incurred attorneys' fees to defend himself against the false charges and to assert his rights.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

## II. PARTIES

13. Plaintiff EMANUEL D. FAIR is a resident and citizen of King County, Washington.

14. Defendant KING COUNTY is a municipal corporation responsible for administering the Department of Adult and Juvenile Detention ("DAJD"), which operates two adult detention facilities: the Maleng Regional Justice Center in Kent and the KCCF in downtown Seattle. The KCCF is an adult corrections facility responsible for providing proper custody, control, and supervision for county, state, and federal inmates in King County. Defendant King County is responsible for providing a safe and healthy environment for detainees and inmates within its custody at the Jail, including appropriate and necessary conditions of confinement and medical and mental health care. Defendant King County is also responsible for administering the KCPAO, which operates the Most Dangerous Offenders Project ("MDOP"). MDOP, the brainchild of Defendant Baird, assigns lawyers to do detective work. According to King County's description of MDOP:

> The responding deputy [prosecutor] works as part of an investigation team, which includes the detectives, the medical examiner, and forensic scientists. The deputy responding to the homicide scene assumes immediate responsibility for the prosecution, preparing search warrants, coordinating the efforts of law enforcement and forensic scientists, and offering legal advice to investigators. This deputy's responsibility includes the charging decision and extends to all subsequent legal proceedings from arraignment through trial to sentencing.

At all times material to this Complaint, Defendant King County, by and through its employees, including Defendant Jeff Baird, had in effect certain explicit and *de facto* policies, practices, and customs which were applied to the acquisition of evidence, the direction of law enforcement investigation, and the submission of invalid or incomplete evidence against Plaintiff, and prosecution of Plaintiff.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

15. Defendant CITY OF REDMOND is a municipal corporation organized under the laws of the State of Washington. At all times relevant, the City of Redmond had executive and supervisory responsibility for the acts of the RPD agents and/or employees. At all times material to this Complaint, Defendant City of Redmond, by and through its employees had in effect certain explicit and *de facto* policies, practices, and customs which were applied to the acquisition of evidence, and the submittal of invalid or incomplete evidence, against Plaintiff and prosecution of Plaintiff. RPD is an agency of the CITY OF REDMOND.

16. Defendant BRIAN COATS was one of the RPD Detectives tasked with directing the investigation of Arpana Jinaga's murder, and was therefore responsible for implementing proper policies, procedure, and other managerial decisions as delegated to him by RPD related to the investigation.

17. Defendant JEFF BAIRD was a Senior King County Deputy Prosecuting Attorney who engaged in actions that were investigative or administrative in nature during the Jinaga murder investigation, including advising and directing police officers during the investigative phase of the criminal case. Defendant Baird was also responsible for enacting, administering, supervising, and ratifying polices, practices, and customs of the homicide investigation operations of MDOP. At all times material to this Complaint, Defendant Baird consulted with MDOP prosecutors and utilized MDOP resources provided through KCPAO to engage in law enforcement activities—such as advising police officers, conducting interviews, ordering and analyzing forensic analysis, ghostwriting documents, and generally investigating the Jinaga murder—which resulted in his biased decision to maliciously prosecute Fair for Arpana Jinaga's murder.

## III. FACTUAL ALLEGATIONS

18. In 2008, Arpana Jinaga was murdered in her home at the Valley View Apartments in Redmond, Washington. The murder occurred during the early hours of the morning on Saturday,



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

November 1, 2018, after she co-hosted a Halloween party with other residents of her apartment complex the night before.

19. Two years later in 2010, Plaintiff Emanuel Fair, a Black man with a criminal history, was charged with Jinaga's murder.

20. Fair had no prior personal connection with the victim—he met her at the Halloween party while he was attending as an invited guest of his friend Leslie Potts, one of the apartment complex's other residents.

21. Fair spent the next nine years awaiting trial at the KCCF. His first trial in 2017 ended in a hung jury. He was acquitted by a jury in June 2019.

## THE HALLOWEEN PARTY

22. Jinaga was one of four hosts of the Valley View Apartments Halloween party. The party occurred Friday, October 31, 2008.

23. Apartment complex residents and their friends, including Fair, helped to set up and decorate for the party. This is when Fair and Jinaga met.

24. Jinaga's apartment was open to all partygoers. Her front door was left open, and most partygoers went regularly in and out of her apartment on the third floor of the building. Guests had full access to her living spaces, including the bedroom and bathroom.

25. Fair acknowledged being in Jinaga's apartment at various times throughout the party. He reported using her bathroom and also going into her bedroom where she was showing things to partygoers on her computer.

26. Aside from these instances, Fair had no prior history of being at the apartment complex or any known connection to Jinaga.

27. The party was well-attended, with approximately forty to fifty people present at any given time.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

28. There was heavy drinking at the party and some guests got rowdy, but generally, the attendees all reported having a good time and none of the rowdiness seemed out of the ordinary.

29. The party wrapped up sometime between 3:00 a.m. and 4:00 a.m., which is around when witnesses reported seeing Jinaga going back up to her apartment.

30. Fair went to bed between 2:30 a.m. and 3:00 a.m., after listening to some music with apartment resident Cameron Johnson. He went back to his friend Leslie Potts' apartment and slept in her bed.

31. Potts' interviews shortly after the murder were consistent with this account. Other witness accounts of events are similarly consistent with this account.

32. The last witness to see anything related to Jinaga being awake at the party was a resident of the apartment complex. This resident did not attend the party, but returned home around 3:00 a.m., and reported seeing a man who "definitely wasn't Black" wearing an orange fleece jacket, approximately 5'11" to 6'3" in height, with an olive complexion and light stubble standing in Jinaga's doorway talking to someone inside. Fair is short and stocky in build, was not wearing an orange jacket, nor any other colored jacket, and is Black.

33. The morning after the party, on Saturday, November 1, 2008, starting sometime between 9:00 a.m. and 10:00 a.m., apartment complex residents and other partygoers, including Fair and Potts, helped to clean up the party by picking up trash, removing decorations, and throwing everything away in the complex's dumpster.

34. In her interviews shortly after the murder, Potts reported that she woke up before Fair at approximately 9:00 a.m., Fair woke up not long after her at approximately 10:00 a.m., and they both started cleaning up with other apartment complex residents. This account is not inconsistent with other witness accounts.

35. No one cleaning up the party reported seeing or hearing any suspicious activity.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

36. After the party, Fair stayed at the apartment complex with Potts for three days, generally hanging out, watching football, and socializing. During those three days, apartment residents reported Fair appeared relaxed and displayed no unusual behavior.

**THE MURDER**

37. Jinaga's body was found by a family friend, Jayarmaiah ("Jay") Bodicherla, and Jinaga's immediate neighbor, Cameron Johnson, on Monday, November 3, 2008.

38. Jinaga's father had asked Jay to look in on her after growing concerned she was not returning calls. Cameron Johnson was near Jinaga's apartment when Jay arrived, and Johnson helped identify Jinaga's apartment when Jay asked where she lived.

39. When Jay and Johnson approached the apartment, the door swung open after knocking. They noticed Jinaga's door was splintered around the jam and the lock was broken.

40. They found her body in the bedroom, naked but covered with a cloth. They immediately went outside to call the police.

41. Investigators arrived at the scene and noted that there was a heavy scent of bleach in the apartment and apparent bleach stains on the carpet. Her body from the waist down was covered in what was later determined to be motor oil. Her fingers and fingernails were cleaned and then covered with toilet bowl cleaner. A comforter with brownish red stains was in the bathtub. A removed tampon was found near the body. There were burn marks from an apparent attempt to set fire to the body and the apartment. All of this was evidence that the assailant had attempted to cover up Jinaga's murder.

42. When questioned immediately after finding her body, Cameron Johnson reported hearing moaning sounds, which he thought were sex sounds, coming from Jinaga's apartment around 3:00 a.m., but nothing further. He said he attempted to call her at approximately 10:00 am



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

the next day, but she did not answer. His account of this call was later proven to be false; he made two calls to her around 3:00 a.m. the night of the party and not the next day at 10:00 a.m.

43. Jinaga's other immediate neighbor, Kyle Rose, reported awaking around 8:00 a.m. on November 1, 2008, and hearing growling sounds that he thought were either Jinaga being sick or having sex. He also heard what he thought was a cabinet door banging shut, a thud on the floor, soft footsteps, and then a little later, the sound of water running, which he took as a sign that Jinaga was okay.

44. A resident of the apartment complex, Jeffrey Perras, witnessed a tall man who "definitely wasn't Black," with an olive complexion and an orange jacket speaking to Jinaga outside her apartment alone around 3:00 a.m. This was the last known sighting of her.

45. Forensic analysis of Jinaga's computer determined she finished a session on her computer at 3:29 a.m., at 6:00 a.m. there was an attempted change to the administrator account, and at 8:01 a.m. there was a failed login attempt to the administrator account.

46. These accounts of Jinaga's last known activities were consistent with the medical examiner's reports—investigators determined that Jinaga's time of death occurred sometime between 3:30 a.m. and 8:00 a.m. the morning of November 1, 2008.

47. The medical examiner ruled Jinaga's cause of death to be asphyxiation by strangulation. There was evidence on the body that she struggled, including significant bruising and chipped teeth. There was also evidence of sexual assault, though rape could not be determined. Her tampon had been removed and found on the floor near her body and she was found naked.

The death was determined to be a sexually motivated murder.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

## THE MURDER INVESTIGATION

48. Investigators from RPD and Defendant MDOP Prosecutor Jeff Baird arrived on the scene on Monday, November 3, 2018, and began questioning residents and processing the crime scene.

49. Detective Greg Mains was assigned as lead detective in the case.

50. Shortly thereafter, however, RPD supervisors decided to transfer the case to Defendant Detective Brian Coats, who had never worked, much less led, a case of this complexity before.

51. Defendants did not request or partner with a more experienced homicide detective team from neighboring agencies such as Bellevue Police Department, Kirkland Police Department, Seattle Police Department, or related Sherriff's Offices.

52. Though no partnerships with neighboring homicide departments were formed, Defendants did rely on Defendant Jeff Baird and MDOP personnel throughout the investigation for advice and participation in the investigatory efforts as evidenced by multiple email exchanges, witness interview transcripts, deposition testimony, and narrative incident reports written by RPD officers. MDOP resources utilized included engaging a KCPAO employed investigator for electronic device forensic analysis; and engaging a KCPAO employed investigator and MDOP prosecutors for assistance with interviews, advice on interrogation techniques, drafting warrants and probable cause affidavits, and evidence analysis.

53. In the investigation's initial days, investigators primarily took photos and videos of the apartment and apartment complex, questioned and identified witnesses, residents, and partygoers, and collected evidence from Jinaga's apartment and the apartment complex. Eventually, investigators searched the apartment complex's only dumpster and found what would



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

become some of the most crucial evidence in the case: Jinaga's bed sheets, and a bag containing a bottle of motor oil, a boot lace suspected to be the ligature used to strangle Jinaga, and a bath robe.

54. Officers did not secure, monitor, guard, or retrieve all the evidence from, the dumpster until November 5, 2008. It took three days for Investigating Defendants to secure the dumpster even though Defendant Coats and RPD Detective Harding retrieved Jinaga's bedsheets from it after an initial search on November 3, 2008. The bag containing the motor oil, suspected ligature, and bath robe was not retrieved until November 5.

55. Officers and detectives on the scene did not have a policy of changing gloves between evidence sample collections or between rooms or locations.

56. Jinaga's neighbor, a white man named Cameron Johnson, quickly emerged as the lead suspect in the case as inconsistencies in his story began to surface.

57. For example, Johnson lied to police about his activities the night of the murder. He told investigators he heard sounds coming from her apartment at 3:00 a.m., but neglected to tell them he had also made phone calls to Jinaga at 3:00 a.m. When asked about the calls he merely stated, "oh crap" and then was resolute that he did not remember details or know why he called her.

58. Johnson drove to Canada and attempted to cross the border without a passport on November 1, 2018, the day of the murder, for what he described to detectives as a desire to generally "explore." According to RPD detectives who conducted a cursory investigation into this attempted border crossing, Johnson was turned back by Canadian officials after he attempted to "blow through" the gates.

59. Johnson also displayed injuries consistent with injuries an attacker would have sustained during the sexual assault and strangulation of Jinaga, but he did not have a convincing explanation for those injuries. He merely stated he went to another Halloween party the next day



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

and wrestled with a guy he had never met before, a man named David Miller. Upon questioning, Miller stated Johnson approached him to wrestle, Johnson did not put up a very good effort, and then Johnson hurt himself in a way that seemed fake and odd to Miller and his friends. Investigators did not get any medical evaluation or report of Johnson's injuries.

60. Detectives found a printout in Johnson's car of the location of local pawn shops dated November 1, 2008, and timestamped around 10:30 a.m. the morning of the murder. Jinaga's phone and digital camera were missing from her apartment and never recovered by RPD.

61. More closely than Fair, Johnson matched a witness's description of a man seen at Jinaga's doorstep around 3:00 a.m. in the morning, the last time anyone saw evidence of her being awake at the party.

62. Johnson sent texts and made multiple calls to women, including Jinaga, around 3:00 a.m., the morning of the murder.

63. Johnson was known to have a sexual attraction to Jinaga.

64. Johnson had an account on adultfriendfinder.com, a website used to find sexual partners. So did Jinaga. They both had recently accessed the site.

65. Johnson had multiple pictures of Jinaga saved on his computer.

66. A witness stated Johnson exhibited jealous behavior when Jinaga was talking to other men the night of the Halloween party.

67. Johnson had a history of emotional outbursts, emotional instability, jealous behavior, and violent behavior, much of that history related to Johnson's relationships with women.

68. Johnson's DNA was found on the motor oil bottle in the bag found in the dumpster.

69. Johnson's DNA was found on a roll of duct tape found in Jinaga's living room that investigators believed was used to gag Jinaga during her murder.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

70. Johnson's latent palm prints were recovered from the exterior of a sliding glass door which investigators discovered was left ajar in Jinaga's apartment the day her body was found.

71. The lightbulb directly outside Johnson's apartment had been tampered with the night of the party.

72. A lighter with a sticky substance on it, consistent with motor oil, was found in Johnson's apartment, though investigators failed to collect or process it. Investigators also failed to look for evidence of a missing boot lace, or collect any shoes, when searching Johnson's apartment despite notes made about the boot lace found in the same bag as the motor oil, and despite that boot lace being consistent with the type of ligature that could have been used to strangle Jinaga.

73. After Johnson was questioned by RPD detectives a second time about his activities the night of the murder, and he was caught in the lie about the calls made to Jinaga at 3:00 a.m., he was released. Johnson's belongings, including his phone, were returned to him during the second interview without being examined by investigators.

74. The day before this second interview, Johnson's uncle, Nat Gasperetti, a detective at the Seattle Police Department, called Detective Mains to talk about his nephew. Email communications show that RPD detectives Defendant Coats and Detective Harding also spoke with Nat Gasperetti about Johnson's involvement in the case. Defendant Baird and MDOP prosecutor Erin Ehlert knew about these communications. The details of these communications were never documented in any report.

75. Shortly after his second interview with detectives, Johnson scrubbed his phone of call and text data, before turning it into police after a search warrant was issued, which detectives noted as being suspicious.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

76. Jan Fuller was the RPD employee tasked with recovering information from Johnson's scrubbed phone. She used a sample or "demo" software program in her attempts at recovery, but was unsuccessful.

77. Also shortly after this second interview, Johnson's father retained the services of criminal defense lawyer John Henry Browne on Johnson's behalf. Browne is one of the most preeminent private defense lawyers in Washington state and is known for garnering a lot of media support for his high-profile cases.

78. Defendant Baird knew John Henry Browne. Email communications between Browne and Defendant Baird show that the investigation and prosecutors went to considerable lengths to cater to Johnson once he retained Browne as an attorney.

a. For example, despite new physical evidence that demonstrated Johnson's DNA was associated with the roll of duct tape thought to be linked to the crime, and no new evidence linking Fair to the crime, prosecutors offered Johnson an immunity deal in exchange for an interview—the terms of the deal being that nothing Johnson said in interviews with detectives could be used against him.

b. According to Fair's defense attorney, Ben Goldsmith, a public defender at the King County Department of Public Defense, this type of immunity deal is virtually unheard of.

c. No such offer of immunity was extended to Fair.

d. The first interview under this immunity deal consisted of interjections from Browne offering up explanations for Johnson's bizarre answers in addition to friendly and gentle questioning by RPD detectives, including Defendant Coats. Defendant Baird attended the interview.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

e. To further illustrate the lengths investigators went to accommodate Browne and his client Johnson, the following email was sent to Browne by Defendant Baird in July 2010.

Message

**From:** Baird, Jeff [/O=KCMAIL/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=BAIRDJE]
**Sent:** 7/20/2010 5:54:15 PM
**To:** 'John Henry Browne' [johnhenry@jhblawyer.com]
**CC:** Ehlert, Erin [/O=KCMAIL/OU=First Administrative Group/cn=Recipients/cn=ehlerter]
**Subject:** Cameron Johnson

John,

Congrats on your new client, Mr. Barefoot! I hope you have left some room in your autobiography for him; he sounds like quite a character.

Regarding another client: thanks again for allowing the Redmond PD guys to interview Cameron Johnson. I think it was very helpful for a number of reasons, and I hope that Mr. Johnson felt some small bit better afterwords. We just received some results from a private DNA laboratory -- your client was excluded as any possible source of DNA from a swab taken from Ms. Jinaga's neck at autopsy, and another suspect is included as a possible source.

Due in part to that result, we are moving toward charging this other person with Jinaga's murder. Before we do so, may we interview Mr. Johnson one more time? Almost any time in August except for the last week would work for us. I realize it may be a considerable inconvenience to Mr. Johnson, but we would like to discuss a number of things with him, including the possibility that he may be labeled "another suspect" by the defense, and his role, if any, in the trial, and an opportunity to talk to him before charging would be very much appreciated.

It would also be very useful to have Mr. Johnson's credit card records for Oct 31-November 2 of 2008. If you recall, he agreed to provide them during our first interview, because they might shed light on whether and when he stopped anywhere to purchase gas or anything else during that time. They may have little value, but because he agreed to provide them in a recorded interview I'd like to obtain them, and it would be much better to get them from him rather than via subpoena or warrant.

I hope you are having a good summer.

Jeff

f. Shortly after that email was sent, but before Fair was charged with Jinaga's murder in October 2010, a second interview subject to the immunity agreement was conducted with Johnson. This second immunity interview consisted almost entirely of Defendants Baird and Coats feeding Johnson potential innocent explanations for why his DNA was found on the motor oil bottle and offering opportunities to Johnson to give them more incriminating evidence against Fair.

g. Johnson could not confirm any of the offered innocent explanations or present any new evidence against Fair despite Defendant Baird's and Defendant Coats' best efforts to get him to do so.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

h. Defendant Coats in this second immunity interview, in an apparent attempt to get Johnson to give investigators any information that would implicate Emanuel, went so far as to tell Johnson: "And anything you can do to shake a memory loose that could help you be a better witness for us and not be such an asset for the defense when this goes to trial, 'cause right now, that's what you are. You are the reasonable doubt for the guy that we're gonna take to trial."

i. Johnson offered up several more inconsistencies to his earlier statements and vague and odd responses in these immunity interviews. However, investigators could not use any of these statements against him due to the immunity agreement they had extended. Contrast this with the fact that any inconsistencies in statements from later-in-time interviews that could be used as circumstantial evidence supporting a theory of Fair's culpability were used against Fair.

j. The only new evidence that had emerged against Fair at the time of the second immunity interview was a partial DNA profile found in such trace amounts that it had to be sent to a specialized lab with sensitive equipment to detect any results. The lab could not exclude Fair as a match from the partial trace profile. No DNA profiles besides Fair's and Johnson's were compared against it.

k. Investigators in their interrogations of Fair never fed him innocent explanations for why his trace DNA might be associated with certain items. Nor did investigators communications with each other indicate they were looking for plausible innocent explanations to benefit Fair, of which there are many.

79. Other persons of interest in the case emerged as well.

80. One person of interest included a man Jinaga had a sexual relationship with—Aaron Gurtler. Gurtler did not attend the party, but he made inconsistent statements to investigators, had



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

no alibi for early hours of the morning, and his DNA, including semen, was on crucial pieces of evidence linked to the crime scene. Gurtler also had familiarity with DNA, medical knowledge, and crime scene knowledge. At the time of the murder, Gurtler was attending nursing school, and he had formerly participated in police and firefighting training programs at West Sound Technical School, which he dropped out of. According to deposition testimony of investigators, Gurtler was never considered a suspect because, according to Defendant Coats, Gurtler did not have "the demeanor for it."

81. Another person of interest was partygoer Neil Marshall, a guest of another resident who many guests mentioned as being sexually aggressive toward Jinaga and other women, and who displayed violent behavior that night.

82. There was also Brian Bundridge and Kenneth Kokko, both members of the same motorcycle club as Jinaga. They both had prior criminal history of sexual crimes and a communication history with Jinaga.

83. A couple other members of the motorcycle club were known to have past sexual or romantic relationships with Jinaga, such as Ethan McCooper and Jacob Carlson.

84. The DNA on the bootlace found in the bag with the motor oil and Jinaga's robe was linked to Josiah Lovett, a resident of the apartment complex. Lovett did not attend the Halloween party but was home at the time of the murder.

85. Dennis Rabitoy, another resident of the apartment complex who did not attend the party but was present the night of the murder, committed suicide shortly after Jinaga's death.

86. Antonio De Assis, a resident of the apartment complex and party attendee, took what at least one witness thought was a weird and uncomfortable number of pictures of Jinaga the night of the party.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

87. Many unidentified DNA samples, including male DNA samples, were recovered from the crime scene. However, several of the persons of interest listed above did not have their DNA tested against the sample evidence collected. For example, a DNA sample was not collected from Dennis Rabitoy, the apartment resident who committed suicide shortly after Jinaga's murder. Aaron Gurtler's DNA was never tested against certain unknown DNA profiles. And only Fair and Johnson's DNA was ever sent to specialized labs with sensitive equipment that could identify trace or touch DNA for analysis. Defendant Coats testified that Defendant Baird made all the decisions on which DNA samples to send for additional testing and what labs to use. The samples sent to specialized labs operated under contracts with KCPAO and were paid for by KCPAO, including during the investigative phase of the case pre-charge.

88. None of the persons of interest listed above were investigated with any tenacity—certainly not with the amount of vigor or follow-through that was exercised with Fair. None were Black.

89. Fair only emerged as a person of interest after he was identified by detectives as one of the partygoers in a photograph. **When asked how Fair became a target of the investigation, Fair was described by Defendant Coats as "the only African American at the party" and an "outsider," which were apparently things to especially note as cause for suspicion**.

90. A background check also revealed Fair had a criminal history consisting mostly of juvenile offenses involving minor possession of drugs and carrying an unlicensed weapon. Of course, most concerning to investigators was a 2004 statutory rape charge that Fair entered an *Alford* plea to—accepting the plea agreement while maintaining his innocence. The criminal history of other white potential suspects was either not checked or determined to be irrelevant.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

91. MDOP prosecutors Defendant Baird and Ehlert, who had been involved in the investigation from the start, developed a special interest in targeting Fair as a suspect after he was identified by RPD as being "an outsider" or "odd man out" and after reviewing the unsubstantiated allegations of a police report associated with his *Alford* plea.

92. With Detective Mains about to retire, Defendant Baird and Ehlert worked to refocus the investigation on finding incriminating evidence against Fair. An email from Detective Harding to Baird in February 2009 referred to the case coming "back to life" after Defendant Baird gave him new direction. Defendant Coats and Detective Harding were assigned to investigating Emanuel.

93. Notwithstanding MDOP's pursuit of Fair, during his brief tenure as Lead Detective before his retirement in April 2009, Detective Mains along with his partner Detective David Sowers, had gathered a significant amount of evidence that implicated Johnson. Detective Mains considered Johnson the most promising primary suspect. Detective Mains prepared several draft probable cause affidavits that would have recommended charging Johnson for the murder before he retired. Detective Mains also drafted lengthy lists of the evidence that pointed to Johnson's culpability.

94. At the time of Mains' retirement, Fair's DNA was associated with a piece of tissue, a roll of duct tape, and Jinaga's robe. Johnson's DNA was associated with a motor oil bottle linked to the crime and his palm prints were identified on the outside of Jinaga's sliding glass door that was left ajar at the crime scene. Johnson's and Jinaga's balconies were side by side. Despite the circumstantial DNA evidence associated with Fair, Detective Mains testified he still viewed Johnson as the primary suspect. Detective Mains drafted no probable cause affidavits or evidence lists related to any other suspect beside Johnson. His probable cause affidavit drafts recommending Johnson for the charge were never used.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

95. After Detective Mains retired, a leadership gap in the investigation occurred. Detective Harding was appointed Lead Detective. However, Detective Harding never functionally occupied the role because he left the RPD shortly after he was appointed.

96. Rather than calling for mutual aid help from neighboring departments to fill the role with an experienced homicide investigation detective or homicide team, MDOP prosecutors were relied upon to fill the role.

97. At no point did Defendant Baird or MDOP prosecutor Ehlert recommend that RPD call for mutual aid from a more experienced homicide unit despite that it is a common practice in complex homicide investigations, and despite that at least Defendant Baird had experience working on homicides that utilized mutual aid assistance. Instead, MDOP wasted no time taking over directing the investigation and pressing their agenda to target Emanuel.

98. Defendant Coats, who had virtually no homicide experience and certainly no experience investigating a homicide of this complexity, was appointed to the role of Lead Detective despite his lack of experience.

99. Detective Coats testified there was no policy or training related to the transfer of roles to Lead Detective. He also testified that nothing was done by either Detective Mains or Detective Harding to pass off information or materials to him about the case as a result of the transfer. Instead, by the time he was appointed Lead, Defendant Coats testified that Defendant Baird was, "way up there" on the detectives' chain of command, "leading the investigation if not orchestrating it" and that Defendant Baird "vetted" investigatory "instructions and assignments."

100. Defendant Coats also testified that by the time he was appointed Lead, "a lot of the meat and potatoes of the investigation, so to speak, had already occurred." Defendant Coats testified: "I would refer to my role at that point as more of a point of contact for the – between the police department and the King County Prosecutor's Office."



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

101. Testimony and documentary evidence consistently demonstrates that Defendant Coats followed KCPAO's direction on what investigatory assignments to complete, who to interview, what forensic analysis to request, what searches to perform, what documents to send to KCPAO, when to draft and submit certain reports, when to question witnesses or make arrests, who to charge with the crime, and when to sign the certificate of probable cause charging Fair that Defendant Baird drafted. Testimony from other investigators, including Defendant Coats' RPD supervisors, as well as records and emails received through discovery, support Defendant Coats' testimony.

102. Evidence shows that the "meat and potatoes" of the investigation up to the point of Detective Mains' retirement and MDOP prosecutors' takeover as investigative leads consisted of a substantial amount of evidence that implicated Johnson, including physical evidence. It also shows that at the time of Detective Mains' retirement there remained a significant amount of evidence to forensically analyze, and open leads to follow related to potential suspects, including leads related to Aaron Gurtler, a white man with known sexual history with Jinaga who had no alibi for the time of death, as well as other residents of the apartment building with no confirmed alibis or DNA samples collected. Preliminary DNA results had also returned from items potentially significant to the crime scene, including unidentified DNA extracted from the site of a bruise on Jinaga's wrist where she was thought to be restrained and on a tampon string thought to be removed from Jinaga's body during the crime—both of which Fair was excluded as a match for.

103. Nonetheless, Fair quickly became the new prime suspect, though the reasons for motive remained unclear and he, unlike many of the other suspects, had an alibi, albeit one that investigators did not credit. Again, Leslie Potts, whose apartment Fair was staying in, confirmed that Fair went to sleep in her apartment and remained until sometime between 9:00 a.m. and 10:00 a.m when he helped her and other apartment residents with party cleanup.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

104. It is clear from testimony and case records that as soon as MDOP prosecutors stepped in to lead the investigation, and Defendant Coats was appointed as point of contact with the prosecutors, the investigatory efforts turned toward specifically targeting Fair as a suspect.

105. RPD Detective Sowers, who previously worked alongside Detective Mains, testified that after Mains retired, Detective Sowers no longer was actively assigned to the Jinaga case, but was temporarily brought back on in late August 2009 to conduct an interview with Defendant Baird of a witness thought to have information on Fair. It turned out the witness had never met Fair and provided no incriminating information against him. But Detective Sowers testified that when he conducted the interview with Defendant Baird, he noticed that "suddenly they had a high interest in [Fair]" and that Defendant Coats was "really pushing" on Fair as a suspect.

106. This sudden high interest in Fair occurred despite that new DNA evidence showed that Cameron Johnson's DNA was associated with the roll of duct tape linked to the crime; Aaron Gurtler's DNA was a match to the semen found on a towel and a bedsheet in Jinaga's bedroom, which was the scene of the crime; and Josiah Lovett, a white resident of the apartment complex, had DNA associated with the shoelace thought to be the ligature used to strangle Jinaga.

107. Fair's DNA was also associated with the duct tape, but while investigators interpreted that result as evidence of Fair's culpability, they refused to do the same for Johnson.

108. The only "new" DNA evidence against Fair discovered at the time Detective Sowers noted investigators were pushing Fair as the new primary suspect, was that a partial trace DNA profile was detected on Jinaga's robe. This "new" result was that 1 in 6 persons were a match for the partial trace DNA profile and that Fair could not be excluded as a "possible contributor." But this evidence simply confirmed DNA results received back in January 2009 that already identified the same thing.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

109. The targeting of Fair included Defendant Baird directing an MDOP investigator named Chuck Pardee to give Defendant Coats advice about interrogation techniques and sit in on Defendant Coats' interrogation of Fair. MDOP investigator Pardee was not asked to provide interrogation technique advice or sit in on interrogations with any other witness or suspect except Fair.

110. Frustration with being unable to identify clear evidence or a motive implicating Emanuel led RPD to contact a psychic medium by the name of Allison DuBois to aid with the investigation. RPD Commander Terry Morgan initiated the contact with Dubois. Multiple consults were exchanged with the psychic. RPD, including Defendant Coats, relied on her to help them find Jinaga's missing phone and camera and consulted her about the potential of Fair as a suspect.

111. Investigators also consulted with FBI profilers during the course of the investigation. However, despite that a profiler told investigators that "Emanuel could do a better job explaining away his DNA than Cameron" and that if they had to pick one suspect, it would be Johnson, Investigating Defendants continued to target Fair.

112. In other words, Investigating Defendants leaned into the suggestion of a psychic medium because it supported their theory of the case that Fair was culpable, while ignoring the suggestion from an FBI profiler that supported a theory that Cameron Johnson was culpable.

113. Defendant Coats not only followed the MDOP prosecutors' lead and deferred to their judgment and assignments in the same manner he would a supervisor, but actively participated in targeting Fair as the new primary suspect with little to no oversight from RPD supervisors.

114. Deposition testimony and the record show that RPD delegated its oversight of the investigation to Defendant Baird as the experienced senior prosecutor of MDOP and Defendant



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Baird acted in an authoritative manner over the investigation despite that he was not technically within the RPD's chain of command.

115. RPD detectives' and supervisors' testimony as well as documentary evidence shows that no supervisor reviewed the activities of the MDOP prosecutors' direction of the investigation. There is no evidence that supervisors in KCPAO or RPD other than Defendant Baird signed off on investigative activities or reports, ensured investigators' reports were being completed and submitted to all relevant parties in a timely manner, ensured effective communication was occurring between MDOP and RPD, or reviewed and signed off on evidence received such as lab results. In fact, there is no evidence that any supervisory oversight, other than Defendant Baird's, occurred over the MDOP's involvement in the investigatory aspects of the case whatsoever.

116. Similarly, there is no evidence that there were KCPAO or RPD policies, procedures, or training that existed that governed the relationship, roles, responsibilities, and limitations of MDOP prosecutors operating as investigators in a homicide case.

117. There is also no evidence that any individual within KCPAO or RPD raised concerns about the disparate treatment Emanuel received from investigators. Nor is there any evidence that any individual, including supervisors, raised concerns over MDOP's high level of involvement in the investigation or the fact that once MDOP took over the investigation and Defendant Coats was appointed as Lead Detective, open investigatory leads were ignored, and evidence that previously pointed to Johnson as the lead suspect was discarded in favor of the new theory against Fair.

118. Plaintiff's expert Sue Peters, a decorated former homicide detective of the King County Sheriff's Office, has opined and has testified at length in deposition about the investigatory leads that were not followed up on. As a non-exhaustive example, she opines that investigators



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

failed to investigate and track Johnson's exact whereabouts on his drive to Canada in the hours immediately after the murder. She opines that the investigators failure to follow these leads were not consistent with the duties and responsibilities of a homicide investigator and that this failure resulted in the premature charge and prosecution of Fair.

119. Expert Peters also testified that it cannot be assumed that Defendant Baird and MDOP had all the pertinent information about the case when Baird made the decision to charge Fair.

120. Indeed, RPD detectives and supervisors testified consistently that much of the information and evidence related to the investigatory leads occurred via verbal communication and that there were no policies that defined when and how those reports were given to anyone, including to MDOP investigators not located in the RPD offices.

121. Instead, testimony shows that investigators used their discretion to determine whether something was pertinent to the investigation and warranted reporting either verbally or in written format. Defendant Coats testified that sometimes he would give verbal reports to Defendant Baird if he was in the office, but he also testified that Defendant Baird "didn't have a desk in our area, so whoever was around and needed the information" would be who he reported information to. Other RPD detectives' testimony confirms this practice. There was no single RPD personnel designated as the point person through whom all information would flow or to whom all information would be reported. Instead, as Defendant Coats testified, the investigation treated Defendant Baird as the point person despite that Defendant Baird was not on-site, was not trained in law enforcement or police department standards, and was not subject to RPD policies, procedures, or supervision.

122. Defendant Coats and other RPD detectives also admitted to not including certain information in their reports that could have been pertinent to the investigations. Defendant Coats



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

also testified that there was no record of what materials were sent to MDOP and when. He testified that Defendant Baird was responsible for maintaining the case file.

123. Email communications from Defendant Baird indicate his frustration with RPD detectives about the investigation. These communications show that Defendant Baird made assumptions about the thoroughness of the RPD investigation that turned out to be incorrect. These communications also refer to incidents of Baird's frustration with trying to find information about the investigation and gather reports. Emails of Defendant Baird asking for reports or documents occurred throughout the investigation leading up to Fair's charge—some of those reports never materialized.

124. Defendant Coats certainly did not receive all the information about the case, including pertinent information, before signing the Affidavit of Probable Cause used to charge Fair with murder. For example, Detective Coats testified that the first time he learned about Johnson's palm prints being identified on Jinaga's sliding glass door was at the 2017 trial. He testified that he has not ever reviewed all the reports and evidence in the Jinaga case.

125. Other RPD detectives, including supervisors, similarly testified to being in the dark about details of the investigation.

126. In short, RPD and MDOP investigators had wide discretion with respect to what they communicated with each other about the investigation and how they communicated. MDOP prosecutors had no access to RPD computer systems and vice versa. There were no policies at KCPAO or RPD governing when written reports versus verbal reports were appropriate, who had to receive the reports, what was required to go into a report, and which reports or investigative steps required supervisor review and sign off.

127. Testimony shows that RPD deferred to the training detectives received through the police academy for report writing procedures, but of course, MDOP prosecutors received no such



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

training, nor could they be required by RPD to report their investigative steps into a system they could not access.

128. This wide discretion in what, when, and how to communicate details about the investigation allowed bias to manifest and flourish. Individual investigators decided for themselves what information was pertinent and they decided for themselves the manner and timing of their communication about such details. As a result, leads got dropped, certain information was ignored or lost, and no one person ever knew what the totality of the circumstances were.

129. MDOP prosecutors acting as detectives, in partnership with Defendant Coats, who eagerly and without independent analysis agreed with the prosecutors' theory of the case, were allowed to build the case they wanted to prosecute, ignore the leads they did not want to follow so new evidence would not emerge to implicate a different suspect, and gather only the information they needed to prosecute their case.

130. These investigators did all of this outside of any meaningful oversight because RPD deferred supervision to Defendant Baird.

131. There is no evidence that Defendant Baird's supervisor at KCPAO, Dan Satterberg, ever monitored Defendant Baird's investigative activities. The record also shows that Satterberg delegated supervisory and final decision-making authority over the investigative activities of MDOP prosecutors to Defendant Baird. This is evidenced by, among other things, the fact that out of more than ten thousand emails received through discovery from KCPAO related to this case, only six emails during the pre-charge investigative stages of the case included Satterberg at all. None of those six emails asked for approval over investigative actions taken by MDOP prosecutors in the case.

132. Fair was the suspect Investigating Defendants wanted. An indigent Black man with priors who had a public defender rather than a white suspect to whom the balance of evidence



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

pointed but who had the financial resources to be represented by John Henry Browne. There is simply no explanation for the disparate way Fair was treated in this investigation aside from bias against his race and criminal history, two traits which are, as a matter of common knowledge, linked.

133. Communications between MDOP and RPD investigators non-exhaustively illustrate investigators biased attitude towards Fair—note that none of these communications included any supervisor other than Defendant Baird, and none of these emails were responded to with any concern over tone or content:

a. An email from Defendant Baird to MDOP prosecutor Ehlert, MDOP investigator Chuck Pardee, and MDOP paralegal Kelly Rosa, that called Emanuel a "typical sociopath."

b. An email from Defendant Coats to prosecutors Defendant Baird and Ehlert that states: "It seems like the opinion of people who attended the party . . . is that CJ [Cameron Johnson] is the right guy for this. . . . If these people . . . knew about Fair's past offenses and past/present lifestyle, they probably wouldn't be so quick to jump on the CJ bandwagon. . ."

c. See image below.


**From:** Baird, Jeff [mailto:Jeff.Baird@kingcounty.gov]
**Sent:** Tuesday, September 22, 2009 8:59 AM
**To:** Ehlert, Erin; Brian Coats
**Subject:** Q: How can you tell Emanuel Fair is lying?

A: His lips are moving.

Good morning.

d. See image below.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

**From:** Rosa, Kelly [/O=KCMAIL/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=ROSAKE]
**Sent:** 8/12/2009 1:03:49 PM
**To:** Ehlert, Erin [/O=KCMAIL/OU=First Administrative Group/cn=Recipients/cn=ehlerter]; 'Brian Coats' [BCOATS@REDMOND.GOV]
**CC:** Baird, Jeff [/O=KCMAIL/OU=First Administrative Group/cn=Recipients/cn=bairdje]; Pardee, Chuck [/O=KCMAIL/OU=First Administrative Group/cn=Recipients/cn=pardeech]
**Subject:** RE: Interview of Fair

E is two-timing some ladies. It would be interesting to sit at the jail and see who comes for his visiting hours.... On of them is said to be carrying his babay.

Kelly Heaphy Rosa
King County Prosecuting Attorney's Office
Criminal Division, MDOP
206-296-9670

134. Contrast the vitriolic tone of these investigators talking about Emanuel with their discussions of potential white suspects Cameron Johnson and Aaron Gurtler, both of whom made inconsistent statements to police, had no alibi, had known sexual interest in Jinaga and relationships with her, and had DNA evidence linked to the crime:

a. Email from Defendant Baird to MDOP prosecutor Ehlert during the investigation:

> We may never be able to prove exactly how Cameron Johnson's DNA ended up on the oil bottle -- he couldn't provide any explanation for it. But I think these items of evidence suggest that an innocent explanation is the most plausible.

b. MDOP prosecutor Ehlert in a publicly broadcasted interview said that although she believed Cameron Johnson "lied to us," she did not think he committed the murder because "[h]e is kind of a normal guy that just has a job."

c. See image below. This is an excerpt from an email from Defendant Baird to Defendant Coats dated August 2009, nearly one year after the murder, and after MDOP redirected focus of the case towards Fair. In it, Defendant Baird admits Aaron Gurtler's alibi was never investigated and discusses obtaining his alibi to "bolster" Gurtler's innocence. Ultimately, Gurtler's alibi was never confirmed. In fact, records demonstrate that Gurtler's statements about his whereabouts at the time of the murder were inconsistent. No search warrants were ever issued for Gurtler and he was never considered a suspect. Defendant Baird never made reference to bolstering Fair's innocent explanations—he only ever communicated his intent to search for Fair's culpability.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

- I think we need to meet Gurtler and discuss his role in this case before charging, so that he is not first approached by the press or hostile defense attorneys, and/or decides he needs an attorney himself. As we discussed, let me know when you may be meeting him, here or elsewhere, and I'll try to be there.

- we need to confirm Gurtler's alibi for the night of the murder; I know Mains spoke to him but a telephone call to confirm, after we talk to Gurtler, and a heads-up about the importance of his testimony would be a good idea.

- We discussed getting phone records for Gurtler and Lovett. I don't think it is necessary to get Lovett's, who is alibi'd by his wife and who lives in the apartment complex anyway so cell site data would be of little use…But Gurtler's phone records might help bolster his alibi, even if the cell site data is no longer available. As we discussed, I would greatly prefer obtaining these records by using an "administrative subpoena" or whatever it is called whereby you obtain his signature consenting to the release of the records, rather than having to do a search warrant explaining why we're so interested in Gurtler's whereabouts at the time of the murder…

135. Defendant Baird and his colleague, MDOP prosecutor Ehlert, used their influence and position as de facto detectives in the investigation to redirect the focus of the investigation towards Fair and away from suspects like Johnson, who was a white "normal guy with a job" with a Seattle Police Department detective uncle and a high profile criminal defense attorney in his corner. They also directed the investigation away from potential suspects like Aaron Gurtler, who Defendant Coats testified was not considered a suspect because he did not have "the demeanor for it." They did this in partnership with Defendant Coats, who shared their biases. And their targeting of Fair was conducted pursuant to the policies, practices, and customs in place at RPD and KCPAO with no meaningful oversight.

**PROBABLE CAUSE & ARREST**

136. Despite all the evidence pointing to other possible suspects—suspects who were not Black—Investigating Defendants ultimately decided to charge Fair with the murder of Jinaga.

137. RPD Detectives first arrested and questioned Fair based off an outstanding warrant he had for failing to update his address with his probation officer.

138. RPD Detectives, including Defendant Coats, staked out Fair, intentionally arrested him on his birthday for an unrelated DOC warrant for a minor community custody violation, put him into an unmarked car, questioned him without reading him his rights, and then booked him



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

for his probation violation. In an email from Defendant Coats to Defendant Baird, Defendant Coats noted that humiliating Fair by arresting him on his birthday was "icing on the cake."

139. Subsequently, investigators got a warrant to search Fair's friend's mother's house, where he had been staying, and they seized personal property and property containing DNA evidence. Nothing of relevance to the investigation was discovered or collected by this search. For example, Defendant Baird directed Fair's shoes be tested for evidence of blood—none was detected.

140. During the search of Johnson's apartment and car, investigators seized almost nothing, including items that were expressly listed on the warrant. No search warrants for other potential suspects, including Aaron Gurtler, were requested or issued.

141. Investigating Defendants' explanation for motive, after consulting with a psychic, and ignoring advice from a consulting FBI profiler, was that Fair wanted sex from Jinaga. There was no evidence to support this explanation.

142. Investigating Defendants' theory was that Fair violently kicked through Jinaga's locked front door in the early morning hours after the Halloween party, sexually assaulted her, strangled her to death, and attempted to cover up the crime by, among other things, throwing evidence in the dumpster outside, pouring motor oil over her body, attempting to set fire to the apartment and body but failing, and leaving the scene to go back downstairs to his friend Potts' apartment. There was no direct evidence to support this theory.

143. Investigating Defendants' theory further went that Fair was not in Potts' apartment that night as both she and Fair reported, and Fair slipped away from the apartment complex three days later because Jinaga's body was found. There was no evidence to support this theory; there was, however, direct evidence to refute it.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

144. In sum, there was no direct or physical evidence to support Investigating Defendants' theory. There was no eyewitness testimony to support Investigating Defendants' theory. There was, however, an easy preponderance of evidence to disprove it.

145. The only evidence used to purportedly establish probable cause—outside of Fair's race and prior *Alford* plea—was circumstantial "trace" DNA evidence.

146. The Affidavit of Probable Cause is blatantly misleading in that it makes it appear that *only* Fair's DNA was found on items linked to the crime.

147. Defendant Coats has admitted under oath that the language in the Probable Cause Affidavit makes it appear that *only* Fair's DNA was found on items linked to the crime.

148. Both Defendant Coats and Defendant Baird have admitted under oath that other individuals' DNA was found on items of evidence linked to the crime.

149. The Affidavit of Probable Cause omitted, however, that some of the DNA evidence that ostensibly linked Fair to the crime was found in such trace amounts that the samples had to be sent to specialized labs for analysis.

150. The Affidavit of Probable Cause omitted that the DNA evidence ostensibly linked Fair and sent to specialized labs was not an exact match. ***In fact, it was not a match at all*****—lab technicians *simply could not exclude* Fair as a match**.

151. The Affidavit of Probable Cause omitted that the DNA evidence supposedly linking Fair to the crime scene was found in an unsecured dumpster at the apartment complex. The Affidavit also omitted that Fair admitted to throwing trash into that same dumpster, along with other apartment complex residents, during clean-up of the Halloween party.

152. The Affidavit of Probable Cause omitted that DNA evidence allegedly linking Fair to the crime scene that was found in Jinaga's apartment or on her body was found alongside other **identified** and unidentified male DNA samples that the Investigating Defendants largely ignored.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

For example, it omitted that Josiah Lovett's DNA was found on the bootlace suspected of strangling Jinaga; that Johnson's DNA was found on the motor oil bottle and duct tape in the apartment; and that Gurtler's DNA was found on several items in Jinaga's bedroom, including the sheet that covered her dead body.

153. The Affidavit of Probable Cause omitted mention of Cameron Johnson's palmprints found on a sliding glass door left ajar at Jinaga's apartment.

154. **In fact, the Affidavit of Probable Cause omitted all mention of Cameron Johnson or other suspects.**

155. The Affidavit of Probable Cause omitted that DNA samples of several unidentified males were also found on many pieces of evidence *that were at least, if not more, closely linked to the scene of the crime than Fair's samples*. To illustrate, the removed tampon found near her body had three separate unidentified male DNA profiles on it. Additionally, the Affidavit of Probable Cause omitted that an unidentified DNA profile was found on Jinaga's wrist where she was thought to have been restrained during the attack. Emanuel was excluded as a match for this DNA profile.

156. The Affidavit of Probable Cause omitted that pieces of evidence allegedly connecting Fair directly to the crime, like a roll of duct tape believed to be used to gag Jinaga, *contained other males' DNA samples, including Cameron Johnson's*.

157. The Affidavit of Probable Cause omitted that Fair admitted to being one of the many partygoers inside Jinaga's apartment the night of the Halloween party, that he admitted to using her bathroom, and being in her bedroom, such that one would reasonably expect his trace DNA to be in all of these places.

158. The Affidavit of Probable Cause included information that linked Fair to a condom wrapper despite that there was no evidence this condom ever existed let alone could be linked to



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Emanuel—it came from an unreliable witness statement given over a year after the murder and after Emanuel's criminal history and status as a suspect was made known, and lab results demonstrated that no condom residue was found on Jinaga's body or anywhere else at the scene.

159. Defendant Baird, who is white, wrote the Affidavit of Probable Cause used to charge Fair for the crime of murder in the first degree.

160. Defendant Coats, who is white, signed and attested to the Affidavit of Probable Cause despite not having written it.

161. The Affidavit of Probable Cause, written by Defendant Baird and signed and attested to by Defendant Coats, intentionally excluded exculpatory material and included intentionally misleading or purely speculative information.

162. If the Affidavit of Probable Cause had not omitted the information listed above, probable cause would not have been found.

163. If the Affidavit of Probable Cause had not included the misleading information listed above, probable cause would not have been found.

164. That probable cause would not have been found if misleading and omitted information had not been included is perhaps best illustrated by the fact that Detective Mains, upon his retirement, considered Johnson to be the primary suspect and not Fair.

165. The only new physical evidence against Fair discovered since Detective Mains' retirement was the partial trace profile identified on the neck swab that could not exclude Fair as a potential contributor. However, this trace profile was consistent with touch or transfer DNA, and photographic evidence from the night of the party showed Fair in close enough proximity to Jinaga that this result had an innocent explanation. However, new physical evidence against Johnson was discovered after Mains' retirement that linked Johnson to the crime—Johnson's DNA was



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

confirmed to be associated with the duct tape roll. And new physical evidence was discovered related to unidentified DNA that expressly excluded Fair as a match.

166. The entirety of this homicide case rested on DNA evidence.

167. No eyewitnesses saw the murder. The consensus of partygoers the night of the murder and a consulting FBI agent was that Johnson was most likely the murderer as opposed to Fair. Fair did not know Jinaga prior to that night and had no relationship with her. No one at the party described Fair as being sexually aggressive, exhibiting possessive behavior towards Jinaga, or spending significant time with her. However, witnesses did say those things about Johnson, who had a documented sexual interest in Jinaga that she had rebuffed. And although Fair made inconsistent statements about his phone calls the night of the murder, so did Johnson, and only Johnson called the victim that night and scrubbed data from his phone.

168. That the Affidavit of Probable Cause stated that only Fair's DNA was linked to the crime and cited the duct tape roll but omitted that Johnson's DNA was found on that same duct tape roll is such an egregious misrepresentation and omission that it shocks the conscious.

169. Even ignoring the fact that much of the evidence in the Affidavit of Probable Cause was misleading or unreliable, probable cause would not have been found solely if the other physical evidence linked to the crime had been included. If it had been included, the Affidavit of Probable Cause would have stated that Fair, who had been all over the apartment during the party, had DNA associated with a bath robe found in the dumpster, a duct tape roll found in the living room, and Jinaga's neck; that Johnson had DNA associated with the same duct tape roll, a bottle of motor oil found in the dumpster, and palm prints on the door found left ajar; that Gurtler had DNA from semen associated with the bedsheet Jinaga was found covered with and a towel in her bedroom where she was found; and that unidentified DNA that excluded Fair was found on Jinaga's wrist and on a tampon found next to the body.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

170. It follows that if the Affidavit of Probable Cause had mentioned this evidence, some information about the connection of the other identified individuals would necessarily have been included to provide context. Had any background information been included on Johnson or Gurtler, it would have opened the door to the fact that they both had at least as much, if not far more, opportunity and motive to commit the crime as Fair.

171. At the time of Fair's charge, Defendant Baird had been a prosecuting attorney in King County for almost thirty years. Defendant Baird testified he started right after graduating law school in 1981 and only ever worked as a King County prosecutor.

172. Defendant Baird knew what totality of the circumstances meant. He knew there would be no probable cause if he did not omit certain facts and include misleading facts that would make Fair seem more culpable. Defendant Baird also knew there was no totality of the circumstances yet—leads remained unfollowed, alibis remained unconfirmed, and the DNA evidence left more questions than answers. However, Defendant Baird also knew that for all practical purposes, he was the lead detective on the case and had been since Detective Mains left. Defendant Baird was the only investigator who had as complete a picture as existed about the case.

173. And although Defendant Baird could not have known every detail of the case because much of it had never been documented in writing, instead being communicated between detectives verbally outside Bairds' presence, records demonstrate that Defendant Baird knew about all the physical evidence noted as omitted above.

174. Records show that Defendant Baird also knew about Gurtler's inconsistent statements and that Gurtler did not have an alibi.

175. Records show that Defendant Baird knew about most, if not all, of the incriminating evidence about Johnson. For example, Defendant Baird knew about Johnson's unplanned trip to Canada and that no investigation had been done to track his purchases or the confirm the timeline



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

and movements on that trip. He knew of Johnson's suspicious but unexamined injuries after the murder. He knew that Johnson lied about his phone calls to Jinaga, lied about how well he knew Jinaga, lied about being sexually interested in her, made inconsistent statements if not outright lies about the timeline the night of the murder, and scrubbed his phone data to hide something.

176. Nonetheless, Defendant Baird and his colleague Ehlert wanted to press charges against Fair. Defendant Baird had already assured Johnson's attorney, Browne, in the July 2010 email that he was moving forward with a charge, and it would not be against Johnson. Further, the immunity deal struck with Browne all but assured he would get no more evidence from Johnson unless new physical evidence came in.

177. The MDOP prosecutors also knew RPD had bungled the investigation from the start. There is email correspondence from Defendant Baird to MDOP staff and even RPD detectives expressing his frustration with evidence that was not collected and his concerns about evidence contamination.

178. Defendant Baird and Ehlert knew that sending more evidence out for testing carried a risk of uncovering information about suspects other than Fair that would be bad for an already weak case. Evidencing this is the fact that the later stages of the investigation only sent Fair and Johnson's DNA sample for comparisons, no new DNA samples were collected from apartment residents that could have been potential suspects, and no search warrants were ever issued for other potential suspects, including Gurtler.

179. Investigating Defendants had targeted their man, they wanted Fair in jail, and the strength of their biases against Fair made them think that a jury would agree with the weak evidence they brought to trial.

180. **This is a pattern of MDOP murder investigations—to bring weaker cases against Black defendants for murder than white defendants**. Plaintiff's expert Dr. Tony



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Greenwald opined that KCPAO data demonstrates that Black defendants charged with murder in King County get acquitted at higher rates than white defendants. This data at least is persuasive evidence that MDOP prosecutors are willing to charge Black persons with murder on weaker evidence than White persons.

181. At the time of Fair's charge, Defendant Baird knew Defendant Coats did not have enough information about the case to draft the Affidavit of Probable Cause. For example, some of the lab reports were ordered by, and sent directly to, MDOP rather than RPD, and Defendant Baird and Ehlert were the investigators who were communicating directly with the forensics labs.

182. Defendant Baird also knew that if he signed the Affidavit of Probable Cause, he would lose immunity under the prosecutorial immunity doctrine. Instead, hoping that protection would provide cover for the doctored affidavit he authored, Defendant Baird asked Defendant Coats to sign it.

183. But to be clear, Defendant Baird authored the Affidavit of Probable Cause as the lead investigator in the case, not in his role as a prosecutor. His preparation of this document went far beyond providing mere legal advice or editing for clarity. Prosecutorial immunity should provide no cover for the judicial deception he perpetrated here.

184. In October 2010, just prior to submitting the charge, Defendant Baird also directed Defendant Coats to write up a report about the investigation and send it as supporting documentation for the Affidavit of Probable Cause. Defendant Coats had not submitted any written reports related to the case since May 2009, when he was appointed Lead Detective, despite completing numerous investigative steps, primarily at the direction of Defendant Baird.

185. At Defendant Baird's direction, after Defendant Coats knew Fair would be charged with the crime and knowing his report would be used as supporting documentation for Fair's charge, Defendant Coats wrote up more than a year's worth of his investigation. Defendant Baird



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

not only appeared to accept this, but appeared to encourage it, as he had never requested a report from Detective Coats prior. Instead, Defendant Baird directed Defendant Coats to write up the report at the time most convenient for bringing the charge.

186. Records show, and Defendant Coats admitted under oath, that his post-hoc report left out details that make other suspects, primarily Johnson, appear guilty. Defendant Baird knew this but accepted the report and used it to support the Affidavit of Probable Cause without questioning its contents or requesting revision of the report's omissions.

187. Neither Detective Coats' report nor the Affidavit of Probable Cause that Defendant Baird wrote received supervisory review, nor did policy require supervisor review of the sufficiency of the probable cause certificate at that time.

188. Though Dan Satterberg was consulted for approval of the final charging decision, as described above, he did not execute any oversight during the investigation itself; instead delegating his authority to Defendant Baird to operate MDOP.

189. Defendant Coats testified to not knowing the totality of the circumstances of this case—he admitted he did not review all the reports, he admitted he did not review some of the pertinent physical evidence. Yet, Defendant Coats signed the Affidavit of Probable Cause without making any substantive changes to what Defendant Baird drafted.

190. Defendant Baird and Defendant Coats both testified that exculpatory information did not need to be included in the Affidavit.

191. Fair was charged on October 29, 2010, and booked into the KCCF for Jinaga's murder. Fair is the only suspect who was ever charged for her murder.

## PRETRIAL DETENTION AND TRIALS

192. Fair remained in pretrial detention at KCCF until his first jury trial finally commenced on February 14, 2017.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

193. The first trial ended in a hung jury. The jury member who was adamant that Fair should be convicted and ended up hanging the jury later described his reasoning: Fair "looked like a thug" because he was "large," "Black," and "had tattooed hands." Other jurors determined there was insufficient evidence for a conviction. These other jurors refused to convict Fair on his race and appearance alone, and the process started over.

194. The second trial commenced nearly two years later.

195. Fair was acquitted of all charges in 2019.

196. The conditions of Fair's confinement during the **nine years** that Fair was in KCCJ custody as an innocent man can only be described as inhumane.

197. Fair spent at least eight of the nine years awaiting trial in the KCCJ's Protective Custody Unit ("PCU"), meant for short-term incarceration for inmates that need to be protected from the general population.

198. Fair was housed in the PCU because of assumptions made about his gang affiliations (he had none) because he was Black and was accused of committing a violent crime.

199. During this time, Fair would often be on "lockdown" in his solitary confinement cell—without access to a shower or exercise—for weeks at a time.

200. During the winter months, Fair's solitary confinement cell was so cold that he would have to use his socks as makeshift gloves just to sleep at night.

201. During this time Fair developed severe sleep apnea, which if untreated can cause high blood pressure, stroke, heart failure, diabetes, and ADHD. *Dortch v. Davis*, No. 11-0841, 2014 WL 1125588, at *5 (S.D. Ill. Mar. 21, 2014). Although KCCF employees and their supervisors were well-aware of this serious medical condition—because Fair explicitly asked for medical intervention—he was never treated, and he has sustained permanent damage as a result.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

202. During this time Fair also developed depression, anxiety, and posttraumatic stress disorder, and related serious mental illnesses. Like his sleep apnea, KCCF employees and their supervisors were well-aware of these serious mental health conditions—they were aware because Fair explicitly asked for psychiatric intervention—he was never treated, and he has sustained permanent damage as a result.

203. During his incarceration, Fair was also sexually harassed and humiliated by KCCF staff. One of the KCCF staff tasked with passing out medication, for example, would make Fair stick his finger in his mouth and twirl it around to simulate oral sex before he was allowed his medication. This occurred numerous times, within eyesight of other inmates who would laugh, taunt, and harass Fair.

## IV. JURISDICTION AND VENUE

204. This action arises under Washington State law and the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

205. Venue is proper in the Western District of Washington pursuant to 28 U.S.C.§ 1391(b)(1) and (b)(2). King County is located in this District, and the events and omissions giving rise to the claims in this action occurred in this District.

## V. STATUTORY COMPLIANCE

206. More than sixty (60) days prior to the commencement of this suit, Plaintiff filed claims for damages on both the City of Redmond and King County in compliance with RCW 4.92.100.

207. Any prerequisites to the maintenance of this action imposed by RCW 4.92 have been satisfied accordingly.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

## VI. FIRST CAUSE OF ACTION – 42 U.S.C. § 1983 – CLAIMS RELATED TO MALICIOUS PROSECUTION AND JUDICIAL DECEPTION – INVESTIGATING DEFENDANTS

208. Plaintiff incorporates all paragraphs above.

209. The misconduct described in this Count was objectively unreasonable and undertaken with willfulness and reckless indifference to the rights of others for which an award of punitive damages is warranted.

### ***Monell* Claims – Defendants King County and City of Redmond**

210. Defendant King County, through MDOP as administered and operated by the KCPAO, had a policy, established practice, and custom of assigning prosecutors to act as *de facto* detectives in homicide investigations, which they were also assigned to as prosecuting attorneys—a policy which removes a vital check and balance mechanism within the criminal justice system between detectives and prosecutors. Defendant King County failed to provide sufficient training to control for bias in such investigations. This policy and failure to train had the obvious result of the malicious prosecution of Fair, accomplished via submission of a probable cause affidavit that contained misleading or omitted material information that constituted judicial deception.

### **Policy, Established Practice, and Custom (Defendant King County)**

211. Defendant King County's MDOP policy allows prosecutors, who are not trained in police work or crime scene investigation, to "play detective." Instead of evaluating the legal merits of a case after facts are methodically gathered by trained and supervised homicide investigators, this policy allows MDOP prosecutors to use their unchecked discretion, outside of the supervisory and disciplinary controls of a police department investigation unit, to target and direct the homicide investigation. It allows these prosecutors to focus on the suspect they want to prosecute and ignore investigatory leads or suspects that present evidence contrary to the prosecutors' preferred narrative of the case.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

212. As described in paragraphs 136–191 above, the Affidavit of Probable Cause used to support the charge against Fair contained omissions and misrepresentations that were made deliberately or with a reckless disregard for the truth that were material to the finding of probable cause, constituting judicial deception.

213. As also described in the paragraphs above, these material omissions and misrepresentations were motivated by bias against Fair on the basis of his race and criminal history.

214. Plaintiff's experts have opined this policy had the obvious unconstitutional consequence of a biased investigation and prosecution that targeted those, like Fair, who are Black and/or have a prior criminal history.

215. Defendant King County knew or should have known its policy, established practice, and custom of assigning prosecutors to act as *de facto* detectives in homicide investigations created a substantial risk that individuals like Fair would be constitutionally harmed from malicious prosecution and judicial deception. It would be obvious to any prosecutor that the MDOP policy collapses checks and balances and allows bias to manifest on numerous levels:

a. Probable cause is based on a totality of the circumstances. This is borne out of the common sense understanding that in a vacuum, any person of interest when solely focused upon can be made to appear guilty. Accordingly, Plaintiff's experts opine that it is crucial in any homicide investigation for roles and responsibilities to be clearly defined; all evidence and investigatory leads to be methodically gathered pursuant to police practice and department standards and principles; and all evidence gathered to be funneled through one point person and supervisors within the law enforcement department running the investigation., with additional layers of supervisory oversight. This process ensures that multiple investigators at a high level of experience and training can confirm not only that there *is* a totality of the circumstances, but that under



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

the totality of the circumstances, there is sufficient probable cause to recommend a charge. As Plaintiff's experts opine, MDOP's policy functionally collapses these layers of checks and balances into one layer of review—that of the assigned KCPAO prosecutor.

b. MDOP's policy allows prosecutors to have virtually unlimited discretion in the manner in which they conduct investigative activities because they are neither trained in, nor subject to, homicide investigation standards or police department practices and policies.

c. MDOP's policy allows prosecutors to use this discretion to control the evidence in a homicide case from its inception and manufacture the case they want to prosecute based on unconstitutionally biased motivations.

d. This virtually unlimited discretion MDOP prosecutors have creates an obvious and substantial risk of the constitutional harm of malicious prosecution and judicial deception. Because KCPAO and RPD are different organizations, Plaintiff's expert Tony Greenwald, Ph.D., a nationally recognized expert on institutional bias has opined that "discretion is a contaminant of decision-making" that allows "undesired influence from multiple possible sources of bias." He has opined that "[t]he investigative procedures of King County Prosecutors' office and Redmond Police Department in Emanuel Fair's case approximate the contamination potential that would be displayed at the University of Washington Medical Center if surgeons conducted their abdominal surgeries without washing hands and without wearing surgical gloves."

e. MDOP's policy prohibits meaningful oversight of a homicide investigation. There is no official chain of command between prosecutors acting as de facto detectives and police detectives. As happened here, because KCPAO and police departments have



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

separate functions and operate as separate organizations under different sets of standards, policies, and procedures, there is no mechanism for horizontal supervisory or disciplinary control between them. Nor, practically, can there be absent significant structural changes to both entities.

f. This lack of oversight over MDOP prosecutors' investigative activities within a police department creates an obvious and substantial risk of the constitutional harms of malicious prosecution and judicial deception. When there is a lack of oversight, prosecutors acting as investigators are allowed to exercise their substantial discretion unchecked. There is simply no method of ensuring that standards of homicide investigation practices or police department policies are being met. There is no method to ensure that the totality of the circumstances of the case and the probable cause determination that stems from it is not manufactured and manipulated by biases against a suspect. There is no one to ensure that the assertions in the Affidavit of Probable Cause and other documentation provided in support of it are true and complete.

g. MDOP's policy prevents effective communication between investigators in a homicide investigation and assures information will be siloed. There is no integrated access to communications, meetings, records, and reporting systems between KCPAO and police departments. Any materials, reports, or other  and communications KCPAO receives are sent to them at the discretion of the police. In addition, verbal communication is necessarily limited by physical proximity and entirely discretionary.

h. This discretionary and siloed communication with no clear chain of command between prosecutorial and police investigators creates an obvious and substantial risk of constitutional harm of malicious prosecution and judicial deception. When homicide investigators cannot communicate effectively to relay material information and are



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

using only wide discretion to relay information, not only is bias allowed to manifest, but the true totality of the circumstances is lost. Instead, investigators have wide discretion to control what the totality of circumstances becomes based on the bias that manifests in an investigative process devoid of sufficient policy and procedures to control for it.

i. MDOP's policy does not limit prosecutors to providing legal advice or limit prosecutors' role in any way. Accordingly, because there are no limits to their roles, an MDOP prosecutor can take a leadership role within an investigation and use their wide discretion outside of police department oversight to target a preferred suspect based on biases of race or criminal history and focus investigatory efforts on that person.

j. This lack of limitations on MDOP prosecutors' role in an investigation creates an obvious and substantial risk of the constitutional harms of malicious prosecution and judicial deception. When an MDOP prosecutor takes a leadership role and becomes the point person and supervisor through which all information funnels but are not subject to police practice standards and oversight, and police do not have access to the prosecutor's records or reports, that MDOP prosecutor has unchecked control over the flow of information. As a result, when an MDOP prosecutor takes a leadership role and is given power to direct the investigation's focus, that MDOP prosecutor has unchecked control over what becomes the totality of circumstances of the case. Finally, when an MDOP prosecutor takes a leadership role and is granted authority to draft and submit documents used in support of a homicide charge, that MDOP prosecutor has unchecked ability to manipulate evidence to support their theory of the case.

216. Defendant King County knew of these risks of unconstitutional harm to individuals under investigation by MDOP, including the risk to Emanuel Fair, prior to Fair's prosecution.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Multiple prosecutors from around Washington State expressed concerns to KCPAO about MDOP prosecutors investigating homicides and not being limited to providing legal advice. These concerns included the loss of prosecutorial immunity as a result of prosecutors acting outside the scope of the prosecutorial role, and that there would be a danger of bias where prosecutors are building a case to fit a prosecution outcome rather than analyzing the legal sufficiency of trained detectives' investigative work.

217. Moreover, the evidence cited in paragraph 180 above indicates that MDOP has a pattern of bringing weaker evidentiary cases against Black individuals than white individuals in homicide cases indicating MDOP perpetrates the same constitutional harms against similarly situated defendants to Fair.

218. Even if Defendants King County and Baird did not have knowledge of the risks of harm created by their policies, established practices, and customs, the risks were obvious in light of reason and the basic general knowledge that these Defendants are supposed to have. Plaintiff's experts, such as former-prosecutor-turned-law professor Maybell Romero, have opined that KCPAO's policy, established practice, and custom of sending attorneys into the field to masquerade as detectives—or, even worse, law enforcement supervisors—would more likely than not result in unconstitutional conduct. In fact, Plaintiff's experts have opined that it would be obvious to any criminal justice professional acting in his or her professional capacity that this policy, established practice, and custom would result in unconstitutional conduct.

219. Defendant King County's policy, established practice, and custom of assigning prosecutors to act as *de facto* detectives in homicide investigations was the moving force behind Fair's harms related to malicious prosecution and judicial deception.

a. MDOP was integral to, and took charge of, the Jinaga murder investigation from its earliest days. As alleged above, among other things, Defendant Coats testified that



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Defendant Baird led and orchestrated the investigation despite Coats being named "Lead Detective." Defendant Coats testified he sent his reports to MDOP for review and they did not get sign off from his RPD supervisors. Defendant Coats testified that MDOP was responsible for maintaining the running file for the case and he did not know what materials or other detectives' reports MDOP received from RPD. Defendant Coats' supervisors, including Lieutenant Doug Shepard and Commander Terry Morgan, confirmed Defendant Coats' testimony. Records show that MDOP prosecutor Erin Ehlert acted as a point person in the investigation at various times, particularly when Defendant Baird was unavailable. Records show that MDOP investigator Chuck Pardee was relied upon to investigate leads and advise on interrogation techniques, and other MDOP staff were relied upon to investigate leads. Investigative materials, such as lab reports, and details of witness interviews were sent directly to MDOP to the extent that RPD detectives, including Defendant Coats as lead detective, and RPD supervisors on the case testified to never having seen certain reports or documents containing pertinent and material evidence. RPD detectives testified that they relied heavily on verbal communication in the investigation, but MDOP prosecutors, who were not on site in the RPD office, were not privy to such communications.

b. As a direct result of Defendant King County's policy, MDOP prosecutors' biases were allowed to manifest and flourish by way of the nearly unlimited amount of discretion the policy allowed them in conducting and directing investigative activities.

c. As a direct result of Defendant King County's policy, MDOP prosecutors, with Defendant Baird at the helm, directed and orchestrated the murder investigation from its earliest days. Defendant Baird and Ehlert, used their unchecked discretion and



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

influence on the investigation to redirect the focus of the investigation to target their preferred suspect, Emanuel Fair, based on his race and prior criminal history.

d. As a direct result of Defendant King County's policy, the Jinaga murder investigation relied on MDOP throughout the investigation to such an extent that Defendant Baird was the de facto lead detective on the Jinaga murder investigation. Moreover, other MDOP employees, including Ehlert and Pardee, were relied upon in the investigation for investigative advice, forensic analysis, and evidence analysis.

e. As a direct result of Defendant King County's policy, Defendant Baird and Ehlert were allowed to encourage other investigators, including Lead Detective Defendant Coats, to share in their biases against Fair and maintain the investigation's focus on Fair by using disparaging and biased language in their communications about him.

f. As a direct result of Defendant King County's policy, Defendant Baird and Ehlert treated Fair differently and more harshly than other white suspects. Among other things, they employed a MDOP investigator with expertise in interrogation techniques to only question Fair, they intentionally arranged to have Fair arrested on his birthday, they interpreted any shred of evidence as implicating Fair whether it was reliable or not but offered innocent explanations for similar types of circumstantial evidence related to white suspects, they ignored advice from the FBI and witness statements that stated Johnson was the most likely suspect, they had every possible item of evidence collected from Fair and did not even issue search warrants for potential white suspects, they questioned witnesses about Fair's alibi multiple times whereas they never verified alibis of white suspects, and they offered Johnson an immunity deal for interviews but never extended the same offer to Fair.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

g. As a direct result of Defendant King County's policy, Defendant Baird and Ehlert used their unsupervised discretion to create siloes of information such that no investigator, including the Lead Detective Defendant Coats, knew all of the pertinent information about the case.

h. As a direct result of Defendant King County's policy, the totality of the circumstances and the probable cause that stemmed from it was manufactured to promote MDOP prosecutors' biased agenda to target and charge Emanuel. Email communications and investigatory methods, as demonstrated in paragraphs above, consistently show that prosecutors were looking for ways to incriminate Fair but disfavored or explained away any potentially exculpatory evidence or alternative suspect theories, and failed to investigate or direct the investigation of leads that could have uncovered exculpatory information.

i. As a direct result of Defendant King County's policy, Defendant Jeff Baird was permitted to act without meaningful oversight in the role of lead detective to recommend a charge of murder against Fair, choose the documents submitted in support of the charge, and author a manipulated Affidavit of Probable Cause that contained material omissions and misrepresentations to use in support of the charge.

j. As a direct result of Defendant King County's policy, the check and balance system of oversight collapsed into one level of review—Defendant Baird's. There is no evidence that any supervisory review or oversight of the extent of MDOP prosecutors' investigative activities occurred. Defendant Baird was allowed to act as his own supervisor. He was allowed to both recommend the charge to the prosecutor's office from the police side and evaluate his own recommendation from the prosecutorial side.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Accordingly, no one in a supervisory role meaningfully questioned his biased process or methods, or stopped them from causing harm to Fair.

220. Defendant King County made a deliberate choice to create the MDOP unit and establish its policy, established practice, and custom of assigning prosecutors to act as *de facto* detectives from among various choices that could have protected against the constitutional harms stemming from malicious prosecution and judicial deception.

a. For example, a memorandum of agreement ("MOA") between KCPAO and police departments could have been executed that sets forth policies and procedures to protect against risks of constitutional harm. As implied by the paragraphs outlining risks of harm above, MDOP's policy could have included the execution of such an MOA that placed limitations on MDOP prosecutors' activities and roles within police investigations, established certain standards and procedures MDOP prosecutors are expected to follow to limit their discretion, and established procedures for supervisory review and oversight.

b. At the very least, MDOP's own policy could have included such limitations and guidelines to demonstrate that King County even considered protections against constitutional harm.

c. No such MOA or policy existed between the KCPAO and RPD (or any other police department for that matter).

d. In fact, no formal written policy existed that governed *any* of the investigative activities of MDOP until October 2012, two years after Emanuel was charged.

e. Even then, the 2012 formal policy contains none of the protections that would be needed to prevent constitutional harms—there are no provisions that govern, for



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

example, cross-organizational roles, responsibilities, access to reports or investigative materials, communications, limitations, or oversight.

221. Defendant King County was at least deliberately indifferent to the risk that Fair would suffer unconstitutional harm in the form of a biased investigation and prosecution.

a. As described in paragraphs above, the targeting of Fair and the biases MDOP prosecutors and staff displayed against him as a result of the County's policy shocks the conscious. Racial prejudice and bias against criminal history, which is linked to racial prejudice, is the only reasonable explanation for the disparate treatment Fair received at the hands of MDOP prosecutors masquerading as detectives.

b. Defendant Baird testified that he created MDOP as a unit within KCPAO in the early 1990s. By the time the Jinaga murder investigation began, MDOP had operated for more than a decade. That Defendant King County had its Perry Mason policy operating for that long without any protections against the obvious and substantial risks of constitutional harm listed above shocks the conscience.

c. Prosecutors have an enormous amount of power. The broad protections they have under the prosecutorial immunity doctrine afford individuals prosecuted by them very limited avenues to seek redress and accountability for biased prosecutions and prosecutorial misconduct. Defendant King County knows this. Yet, the MDOP unit of the KCPAO extended this broad grant of power even further to extend control and influence over investigations of crimes that carry the most dire consequences for those convicted. As this case demonstrates, even a mere charge without a conviction can, and does, result in individuals being incarcerated for years. Fair was incarcerated for almost a decade during the most formative years of his adulthood. His life was negatively impacted in unimaginable ways. Defendant King County's bare policy that allows prosecutors this



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

much influence and control over homicide investigations, without any limitations, is, at the very least, a flagrant misuse of power.

222. Defendant King County's policy, established practice, and custom of assigning prosecutors to act as *de facto* detectives was a proximate cause of the harm and suffering Emanuel Fair experienced from the violation of his constitutional rights.

**Ratification (Defendant King County)**

223. All of the acts and omissions taken in regard to Fair were in accordance with Defendant King County's established policies and practices and were ratified by Defendant Jeff Baird, who had the delegated authority over MDOP's investigative activities by King County Prosecutor Daniel Satterberg.

224. As described in paragraph 131 above, the delegation of authority to Defendant Baird is evidenced by the record, including over 10,000 emails from KCPAO during the investigative phase of the Jinana murder that fail to show a single instance of MDOP prosecutors requesting or seeking approval for their investigative steps from anyone other than Defendant Baird.

225. At all times material to this Complaint, Defendant Jeff Baird acted as the creator/founder, policymaker, and supervisor for the MDOP program.

226. At all times material to this Complaint, and as established through deposition testimony, Defendant Jeff Baird acted under the supervision of Prosecutor Satterberg, who held the final decision making authority for KCPAO, only for actions taken pursuant to his prosecutorial role.

**Failure to Train (Defendants King County and Redmond Police Department)**

227. Defendants King County and City of Redmond had a duty to properly train and supervise its employees, including RPD and KCPAO employees.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

228. Defendants King County and City of Redmond failed to properly train and supervise its employees concerning the rights of citizens, thereby causing its employees to engage in unlawful conduct in the investigation, arrest, and prosecution of Plaintiff Emanuel Fair as described above.

229. Defendant King County's and Defendant City of Redmond's failure to properly train and supervise its employees reflected deliberate indifference to the constitutional rights of Emanuel Fair and caused injury.

230. Defendant City of Redmond and its RPD Policymakers and Supervisors failed their duty to properly train and supervise employees on acceptable methods of investigation. For example, consulting a psychic medium to aid with a homicide investigation is objectively unreasonable. Consulting a psychic medium to aid with a homicide investigation when there are significant leads, evidence yet to be retrieved and processed, and a prime suspect is especially egregious. Here, investigators acting under color of law consulted Allison Dubois, a psychic medium, to consult and aid in the Jinaga homicide investigation when there were significant leads, evidence yet to be retrieved and processed, and a prime suspect—Cameron Johnson. Officers at several levels were engaged in the decision to use the psychic's services and multiple consultations with the psychic occurred. No officers were discharged or reprimanded as a result of this practice. This practice was objectively unreasonable such that it reflected deliberate indifference to and violated the constitutional rights of, at least, Emanuel Fair.

231. Defendants King County and City of Redmond failed to properly train and supervise employees on how to conduct racially unbiased investigations.

a. Investigators questioning witnesses asked about, or pointed out, the race of certain individuals connected to the investigation exclusively when they were discussing Emanuel Fair.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

b. Not all of this questioning related purely to identification, much of it appeared specifically designed to highlight Fair's race apropos of nothing.

c. Moreover, despite that Cameron Johnson was the lead suspect at the time of his questioning, investigators failed to collect and process Cameron Johnson's phone when he was brought in; they ultimately waived off the fact that he attempted to "blow through" the Canadian border in his car the same day Jinaga was murdered; they considered DNA connecting him to the crime scene, including his DNA on the motor oil bottle found in the dumpster, to be too circumstantial; they allowed Johnson's father and attorney to accompany him into the interrogation room; they allowed the camera to be turned off during crucial moments of testimony; and they granted Johnson immunity during certain questioning sessions.

d. All of this suggests Johnson was given every benefit of the doubt.

e. Other white suspects such as, but not limited to, Neil Marshall, Josiah Lovett, and Aaron Gurtler were given similar, if not more generous, treatment—their testimony was generally credited as being true; investigators only went to cursory lengths to verify their statements, collect evidence from them or their or their friends or family's homes, and perform other investigatory follow up; and DNA connecting them to the scene of the crime was explained away or considered too circumstantial.

f. Two white suspects investigators considered, Brian Bundridge and Kenneth Kokko, had personal connections to the victim and a history of sexual crimes, but were not pursued as their connections to the crime scene was considered too weak.

g. In contrast, Emanuel Fair was captured by investigators, brought into an unmarked car for questioning without being read his rights; his statements were generally not credited as being true; his friends' home was searched and property seized; statewide alerts were



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

put out naming him as a suspect in a homicide case; and most importantly, his DNA connections to the crime scene were not considered too circumstantial despite being just as simple, if not more simple, to explain away than other suspects' DNA connections to crime scene.

h. Multiple email exchanges between Investigating Defendants, including Defendants Baird and Coats, demonstrate the malice against Fair. Two non-exhaustive illustrations of these exchanges follow:

---

**From**: Brian Coats [BCOATS@REDMOND.GOV]
**Sent**: 8/6/2009 3:22:29 PM
**To**: Baird, Jeff [/O=KCMAIL/OU=First Administrative Group/cn=Recipients/cn=bairdje]; Ehlert, Erin [/O=KCMAIL/OU=First Administrative Group/cn=Recipients/cn=ehlerter]; Pardee, Chuck [/O=KCMAIL/OU=First Administrative Group/cn=Recipients/cn=pardeech]
**Subject**: Fair update

Fair is supposed to arrive at the Twilight Martini Lounge in Belltown between 8:30 and 9:00 this Saturday where he's hosting his own birthday party. DOC and the Marshalls are planning on conducting surveillance that day. It looks like a relatively easy place to watch and there appears to be only one way in and out. I sent the warrant crew some photos of the joint I took yesterday. This looks like a great opportunity to get him and to grab him on his B-day is icing on the cake. I'll keep you posted.

Brian

---

**From:** Baird, Jeff [mailto:Jeff.Baird@kingcounty.gov]
**Sent:** Tuesday, September 22, 2009 8:59 AM
**To:** Ehlert, Erin; Brian Coats
**Subject:** Q: How can you tell Emanuel Fair is lying?

A: His lips are moving.

Good morning.

i. RPD employees were not sufficiently trained or supervised to document the investigative steps they took in a timely manner. RPD employees, including Defendant Coats, submitted reports on their investigation months or even a year or more after the facts they were reporting were gathered. Some reports, including Defendant Coats', were not submitted until the decision to charge was already made. Moreover, these



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

detective reports failed to document many investigative steps the RPD employees took, including interviews, evidence collection, the execution of search warrants, and forensic result analysis. As evidenced by deposition testimony, supervisors were not required to sign off the submitted reports within a certain timeframe, or at all, and there was no review process to ensure reports were being submitted in a timely manner. In this case, because many of the reports were submitted after Fair had been targeted for the murder charge, investigative leads and evidence that related to non-Black persons of interest or suspects are missing from reports, while information related to Fair is documented meticulously and in fact, is over-represented given the totality of evidence in this case. Plaintiff's experts, including Anthony Greenwald, Ph.D., a social psychologist, researcher, and professor at the University of Washington who is nationally recognized for his work on discriminatory bias, have opined that submitting reports in a criminal investigation post hoc, in an untimely and an incomplete manner more likely than not will result in a biased representation of the facts, as it did here.

j. These examples are but a few that describe the clearly disparate treatment Emanuel Fair received at the hands of Investigating Defendants. The obvious difference between Fair and the other suspects was race. Fair's race was regularly referenced throughout the investigation for no apparent purpose other than to generally note it as a factor to be considered.

k. Fair's criminal history was also used against him unconstitutionally. Plaintiff's experts have opined that criminal history and racial bias are intricately linked. As evidenced by email exchanges and deposition testimony, Investigating Defendants determined that *allegations* made against Fair years earlier somehow made him culpable for the Jinaga murder despite that they never spoke to the individual who made the allegations



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

or to the prosecutor who agreed to an *Alford* plea and reduced charges in the subsequent prosecution, and despite that Fair had a court record dated shortly before the murder on March 19, 2008, that stated: "Mr. Fair did manage to complete a sexual deviance evaluation. He was not considered a predator by the evaluator, and no treatment was required."

232. The disparate treatment Fair received at the hands of Defendants King County and City of Redmond was discriminatory. These Defendants' failure to train and supervise employees on how to conduct racially unbiased investigations was objectively unreasonable such that it reflected deliberate indifference to and violated the constitutional rights of Emanuel Fair.

233. Defendants King County and City of Redmond failed to properly train and supervise employees on how to appropriately consider the prior criminal history of suspects in investigations. Defendant Coats specifically stated that Emanuel Fair's prior statutory rape conviction was significant to his decision to consider Fair as a suspect. In fact, when asked what the significance of a suspect's prior conviction for a sex offense in the context of the Jinaga case was to the investigation, Coats stated: "If you've done it before, you'll do it again." Coats's statement is demonstrative of the attitude investigators had throughout the investigation—that Fair was guilty. Email communications between RPD investigators and MDOP investigators, including Defendants Coats and Baird, indicate that they improperly relied on Emanuel's prior criminal allegations and history to implicate him in Jinaga's murder. Investigators proceeded to fit the facts to their theory of the case. Defendant King County's and Defendant City of Redmond's failure to train and supervise employees on how to appropriately consider the prior criminal history of suspects in investigations was objectively unreasonable such that it reflected deliberate indifference to and violated the constitutional rights of Emanuel Fair.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

234. Defendants King County and City of Redmond failed to properly train and supervise employees on what constitutes sufficient probable cause. The omissions of material facts including potential exculpatory evidence in the Affidavit of Probable cause was objectively unreasonable such that it reflected deliberate indifference to and violated the constitutional rights of Emanuel Fair.

235. Re-alleging and incorporating all paragraphs above, Defendants King County and City of Redmond, acting under color of state law, engaged in the aforementioned actions throughout the course of the Jinaga murder investigation and maliciously prosecuted Fair in a manner that reflected deliberate indifference to and violated the constitutional rights of Emanuel Fair such that it caused him harm.

**<u>Individual Capacity Claims – Defendants Jeff Baird and Brian Coats</u>**

236. In addition to the specific discriminatory conduct mentioned in paragraphs above, which Plaintiff incorporates fully here, Defendants Jeff Baird and Brian Coats made false accusations and otherwise unlawfully conspired against Fair with the result that criminal proceedings were wrongfully initiated against him in violation of his Fourth and Fourteenth Amendment rights. These Defendants purposefully, knowingly, or with reckless indifference towards Emanuel Fair's rights, caused the state to institute proceedings against him because of his race and background. *See, e.g., Awabdy . City of Adelanto*, 368 F.3d 1062 (9th Cir. 2004) ("[A] § 1983 malicious prosecution plaintiff must prove that the defendants acted for the purpose of depriving him of a "specific constitutional right," but have not limited that right to one protected by the Fourth Amendment.") (quotation omitted). Moreover, Defendants Baird and Coats intentionally omitted exculpatory evidence from the Affidavit of Probable Cause and "intentionally or recklessly omitted facts required to prevent technically true statements in the



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

affidavit from being misleading," in violation of the Fourth Amendment. *Liston v. Cnty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997), *as amended* (Oct. 9, 1997) (quotation omitted).

237. Re-alleging and incorporating all paragraphs above, Defendants Jeff Baird and Brian Coats, acting under color of state law, engaged in the aforementioned actions throughout the course of the Jinaga murder investigation and maliciously prosecuted Fair in a manner that reflected deliberate indifference to and violated the constitutional rights of Emanuel Fair such that it caused him harm.

238. In addition to his own acts and omissions, Defendant Jeff Baird, acting under color of state law and in his capacity as supervisor over the MDOP, is liable for the discriminatory acts and omissions of his subordinates. In establishing and supervising the MDOP, Defendant Jeff Baird set in motion a series of acts by his subordinates which he knew, or reasonably should have known, would result in the deprivation of Emanuel Fair's constitutional rights. Moreover, Defendant Jeff Baird directed his subordinates to take actions, as set forth herein, that he knew or reasonably should have known would deprive Emanuel Fair of his constitutional rights.

239. Defendant Jeff Baird's supervisory conduct was so closely related to the deprivations of Emanuel Fair's constitutional rights as to be the moving force that caused Emanuel Fair's injuries as alleged herein.

240. Though prosecutorial immunity applies to § 1983 claims, state prosecutors like Defendant Baird, are only absolutely immune when performing functions "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976). Performing acts generally considered functions of the police and advising police officers during the investigative phase of a criminal case fall outside the role of the prosecutor and are not subject to absolute immunity. Defendant Baird was an integral part of the investigative team and participated in the Jinaga murder investigation in a manner that reflected deliberate indifference to



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

and violated the constitutional rights of Emanuel Fair. Defendant Baird wrote the Affidavit of Probable cause submitted in support of the charge of Murder against Emanuel Fair that included misleading information and omitted exculpatory information material to the charge. Defendant Baird is thus not absolutely immune from suit.

## VII. SECOND CAUSE OF ACTION – 42 U.S.C. § 1983 – CLAIMS RELATED TO FAIR'S CONDITIONS OF CONFINEMENT – DEFENDANT KING COUNTY

241. The acts and failure to act described above were done under color of law and are in violation of 42 U.S.C. § 1983, depriving Plaintiff of his civil rights.

242. At the time Fair was detained by King County, it was clearly established in the law that the Fourteenth Amendment imposes a duty on jail officials to provide humane conditions of confinement, including adequate medical and mental health care, and to take reasonable measures to guarantee the safety of the inmates.

243. Being subjected to unnecessary physical and mental pain and suffering is simply not part of the penalty that criminal offenders pay for their offenses against society. As a result, municipalities and Jail officials are liable if they know that an inmate or inmates face a substantial risk of serious harm and callously disregard that risk by failing to take reasonable measures to abate it.

244. Here, Defendant King County knew that Fair faced a substantial risk of harm due to his untreated medical and mental health conditions, as well as his inhumane conditions of confinement, yet callously disregarded that risk by failing to take reasonable measures to abate it.

245. Having an inmate in custody creates a duty of care that must include enough attention to medical and mental health concerns that inmates with obvious symptoms receive medical attention. King County corrections officers had numerous opportunities to meet their



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

responsibilities to help Fair, but no one did. One cannot avoid responsibility by putting one's head in the sand.

246. Here, King County corrections officers knew of and callously disregarded the excessive risk to inmate health and safety caused by King County's inadequate formal and informal policies, including a lack of training, funding, and supervision.

247. King County corrections officers knew of this excessive risk to inmate health and safety because it was obvious and because numerous other inmates had been injured as a result of these inadequacies in the past.

248. Defendant King County was responsible for a policy, practice, or custom of maintaining a longstanding constitutionally deficient facility with regard to safety, medical and mental health care, and training protocols, which placed inmates like Fair at substantial risk of continued harm.

249. There was little to no supervision of Fair because Defendant King County maintained a known policy and custom of understaffing—leaving one jailer responsible for the care and wellbeing of the entire PCU at a time. According to the U.S. Department of Justice's Bureau of Justice Statistics, the standard for the average jailer-inmate ratio in the United States around the time of Fair's incarceration was one to four.[1] KCCF was egregiously deficient.

250. King County corrections officers were subjectively aware that Fair was in need of medical and mental healthcare. Given the circumstances outlined above, a reasonable jailer and/or healthcare provider would have been compelled to infer that a substantial risk of serious harm existed. Indeed, King County corrections officers did infer that a substantial risk of serious harm existed, but failed to take any steps to alleviate this risk.

---

[1] ZHEN ZENG, JAIL INMATES IN 2016 (2018), *available at* https://www.bjs.gov/content/pub/pdf/ji16.pdf.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

251. Defendant King County had a policy, custom, and practice of denying treatment, such as prescribed medication; these policies, customs, and practices posed a substantial risk of serious harm to the inmates in the jail, including Fair, and Defendant King County knew that its policies, customs, and practices posed this risk.

252. As a direct and proximate result of the deliberate indifference of Defendant King County, as described above and in other respects as well, Fair has sustained serious and permanent injuries.

253. Defendant King County has shown reckless and callous disregard and indifference to inmates' rights and safety, and is therefore subject to an award of punitive damages to deter such conduct in the future.

## VIII. THIRD CAUSE OF ACTION – MALICIOUS PROSECUTION

254. Plaintiff re-alleges and incorporates all paragraphs above.

255. The misconduct described in this Count was objectively unreasonable and undertaken with willfulness and reckless indifference to the rights of others for which an award of punitive damages is warranted.

256. Investigating Defendants' conduct constitutes malicious prosecution.

257. Investigating Defendants instituted a criminal action against Plaintiff, charging him with the murder of Arpana Jinaga.

258. Investigating Defendants acted maliciously, with reckless indifference to Plaintiff's rights in instituting this action without probable cause.

259. Investigating Defendants omitted material facts and potential exculpatory evidence in their affidavit of probable cause.

260. Had these omissions not occurred, there would have been no probable cause to initiate the criminal proceeding.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

261. As a proximate result of the acts and omissions of Investigating Defendants, Plaintiff Emanuel Fair suffered severe personal injuries.

## IX. FOURTH CAUSE OF ACTION – NEGLIGENCE – DEFENDANTS KING COUNTY AND CITY OF REDMOND

262. Plaintiff re-alleges and incorporates all paragraphs above.

263. Defendants King County and City of Redmond had a duty to exercise ordinary care in the performance of their duties and to act as other reasonably careful persons would under the same or similar circumstances.

264. The actions of Defendants King County and City of Redmond described above fell below the standard of care in the performance of their duties.

265. Defendants King County and City of Redmond did not act as other reasonably careful persons would under the same or similar circumstances.

266. As a proximate cause of the actions of these Defendants' negligence, Emanuel Fair suffered long-lasting and permanent injuries. He also suffered unimaginable emotional pain and suffering, embarrassment, and terror.

267. As a direct and proximate result of the breaches, failures, and negligence of Defendants King County and City of Redmond, as described above and in other respects as well, Plaintiff has incurred and will continue to incur general and special damages in an amount to be proven at trial.

## X. FIFTH CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – DEFENDANTS KING COUNTY AND CITY OF REDMOND

268. Plaintiff re-alleges and incorporates all paragraphs above.

269. Defendant King County's and Defendant City of Redmond's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

270. Defendant King County's and Defendant City of Redmond's conduct and material omissions were intentional, outrageous, and extreme such that it caused Plaintiff severe emotional distress.

271. As a direct and proximate result of the acts of these Defendants as complained of herein, Plaintiff suffered great emotional anguish, loss of liberty, and he continues to suffer. Plaintiff incurred legal expenses in defending against the prosecution in an amount to be determined at trial.

## XI. SIXTH CAUSE OF ACTION – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – DEFENDANTS KING COUNTY AND CITY OF REDMOND

272. Plaintiff re-alleges and incorporates all paragraphs above.

273. Defendants King County and City of Redmond negligently inflicted emotional distress upon Plaintiff by breaching duties owed to Plaintiff, as explained above, and such breaches proximately caused Plaintiff harm and injury in the form of emotional distress.

274. The emotional distress caused by these Defendants and suffered by Plaintiff is within the scope of foreseeable harm of Defendants' negligent conduct.

275. Plaintiff has manifested symptoms of this emotional distress.

276. As a direct and proximate result of the acts of Defendants King County and City of Redmond as complained of herein, Plaintiff suffered great emotional anguish, loss of liberty, and he continues to suffer. Plaintiff incurred legal expenses in defending against the prosecution in an amount to be determined at trial.

## XII. PRAYER FOR RELIEF

277. Damages have been suffered by Plaintiff and to the extent any state law limitations on such damages are purposed to exist, they are inconsistent with the compensatory, remedial



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

and/or punitive purposes of 42 U.S.C. § 1983, and therefore any such alleged state law limitations must be disregarded in favor of permitting an award of the damages prayed for herein.

278. WHEREFORE, Plaintiff requests a judgment against all Defendants:

(a) Fashioning an appropriate remedy and awarding general, special, and punitive damages, including damages for pain, suffering, terror, loss of consortium, and loss of familial relations, and loss of society and companionship under Washington State law and pursuant to 42 U.S.C. §§ 1983 and 1988, in an amount to be proven at trial;

(b) Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, or as otherwise available under the law;

(c) Declaring the defendants jointly and severally liable;

(d) Awarding any and all applicable interest on the judgment; and

(e) Awarding such other and further relief as the Court deems just and proper.

DATED this 31st day of October, 2024.

GALANDA BROADMAN, PLLC

s/Ryan D. Dreveskracht
Ryan D. Dreveskracht, WSBA #42593
s/Corinne Sebren
Corinne Sebren, WSBA # 58777
Attorneys for Plaintiff
P.O. Box 15146 Seattle, WA 98115
(206) 557-7509 Fax: (206) 299-7690
Email: ryan@galandabroadman.com
Email: corinne@galandabroadman.com