UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EMANUEL D. FAIR, | CASE NO. 2:21-cv-01706-JHC |
| Plaintiff, | ORDER RE: EXPERT WITNESSES |
| v. | |
| KING COUNTY, a political subdivision of the State of Washington; CITY OF REDMOND, a municipal entity and political subdivision of the State of Washington; BRIAN COATS, in his personal capacity; JEFF BAIRD, in his personal capacity, | |
| Defendants. | |

# I

## INTRODUCTION

This matter comes before the Court on the parties' motions to exclude expert witness testimony. Dkts. ## 156, 158, 185. Defendants City of Redmond and Brian Coats (collectively, the Redmond Defendants) seek to exclude the testimony of Plaintiff Emanuel D. Fair's experts (1) Susan Peters, (2) Russ Hicks, and (3) Brian Landers. Dkt. # 156. Defendants King County and Jeff Baird (collectively, the King County Defendants) seek to exclude the testimony of Fair's experts (1) Dr. Anthony Greenwald, (2) Martin Horn, and (3) Maybell Romero. Dkt. # 158. Fair

seeks to exclude the testimony of Dr. Marko Yakovlevitch, an expert jointly proffered by the Redmond and King County Defendants.  Dkt. # 185.  Fair also seeks to exclude the testimony of Dr. Theodore Kessis and Frank Vanecek, experts proffered by the Redmond Defendants.  *Id.*  The Court has reviewed the materials filed in support of and in opposition to the motion, pertinent portions of the record, and the applicable law.  Being fully advised, the Court enters the following Order. [1]

## II
### BACKGROUND

In 2010, Fair was charged with the murder of Arpana Jinaga.  *See* Dkt. # 147 at 2 ¶ 3.[2]  After nine years in pretrial detention at King County Jail, Fair was acquitted.  *Id.*  In the Third Amended Complaint (TAC), Fair brings civil rights claims under 42 U.S.C. § 1983 and Washington law against Defendants King County, the City of Redmond, Senior King County Deputy Prosecutor Jeff Baird, and Redmond Police Detective Brian Coats.  *Id.* at 2 at ¶¶ 2–3.

In 2008, Jinaga was murdered in her apartment in Redmond, Washington.  *Id.* at 5 ¶ 18.  The evening before her death, Jinaga co-hosted a Halloween party with around 50 attendees, including Fair.  *Id.* at 6–7 ¶¶ 22, 27.  Partygoers had full access to Jinaga's apartment.  *Id.* at 6 ¶ 24.  Fair was inside Jinaga's apartment at various times during the party; he used Jinaga's bathroom and entered her bedroom while she was there with other guests.  *Id.* ¶ 25.  Fair had not known Jinaga or been at the apartment complex before the party.  *Id.* ¶ 26.

King County, through the King County Prosecuting Attorney's Office (KCPAO), operates the Most Dangerous Offenders Project (MDOP).  *Id.* at 4 ¶ 14.  Under MDOP, the

---

[1] The Redmond and King County Defendants request oral argument.  *See* Dkts. # 156, 158.  Based on the Court's review of the parties' briefing and the applicable law, the Court finds oral argument unnecessary.

[2] The information in the Background section derives from Fair's Third Amended Complaint.  *See generally* Dkt. # 147.

ORDER RE: EXPERT WITNESSES - 2

1    deputy prosecutor "works as part of an investigation team, which includes the detectives, the

2    medical examiner, and forensic scientists." *Id.* The prosecutor's responsibilities include "the

3    charging decision and extends to all subsequent legal proceedings from arraignment through trial

4    to sentencing." *Id.* Through MDOP, King County Prosecutor Jeff Baird was part of the

5    homicide investigative team. *Id.* at 5 ¶ 17.

6         The medical examiner determined that Jinaga died from asphyxiation caused by

7    strangulation. *Id.* at 9 ¶ 47. When a family friend discovered Jinaga, her naked body was

8    covered with motor oil, and her fingernails had been cleaned and then covered with toilet bowl

9    cleaner. *Id.* at 8 ¶ 41. Burn marks in the vicinity suggested a failed attempt to set a fire to cover

10   up the murder. *Id.* A roll of duct tape, believed to have been used to gag Jinaga, was also found

11   in her apartment. *Id.* at 32–33 ¶¶ 152, 156. In the apartment complex's dumpster, investigators

12   found Jinaga's bed sheets and a bag containing a bottle of motor oil, a boot lace believed to be

13   the ligature used to strangle Jinaga, and a red terry-cloth bathrobe. *Id.* at 10–11 ¶ 53.

14        Fair's DNA was linked to a piece of tissue, the roll of duct tape, and Jinaga's robe. *Id.* at

15   19 ¶ 94. Jinaga's neighbor Cameron Johnson's DNA was found on the motor oil bottle in the

16   bag in the dumpster and on the roll of duct tape. *Id.* at 12 ¶¶ 68–69. The TAC lists several other

17   possible suspects, including Aaron Gurtler, one of Jinaga's former sexual partners, whose DNA

18   was found at the crime scene, and Josiah Lovett, another neighbor, whose DNA was found on

19   the boot lace and the bathrobe found in the bag with the motor oil. *Id.* at 32–33 ¶ 152. Fair

20   accuses police personnel of failing to investigate these other persons of interest "with any

21   tenacity." *Id.* at 18–19 ¶¶ 88–90. He says that investigators focused on him because he was "the

22   only African American at the party" and an "outsider." *Id.* He also says that his prior statutory

23   rape conviction was a significant factor in the investigators' decision to consider him the prime

24   suspect. *Id.* at 58 ¶ 233.

According to Fair, investigators would ask only race-related questions of witnesses when discussing him, and much of the questioning "was designed to highlight Fair's race apropos of nothing." *Id.* at 54–55 ¶¶ 231(a)–(b). Investigators also treated white suspects more favorably and credited the statements of white suspects "as being true [,]" "only . . . cursor[ily] . . . verif[ied] their statements, collect[ed] evidence from them or their . . . friends or family's homes, and perform[ed] other investigatory follow up." *Id.* at 55 ¶ 231(e). Also, DNA linking white suspects "to the scene of the crime was explained away or considered too circumstantial." *Id.*

On October 29, 2010, nearly two years after Jinaga's death, Fair was charged with her murder and booked into King County Jail. *Id.* at 39 ¶ 191. Fair's first trial began in February 2017 and ended with a hung jury. *Id.* at 39–40 ¶¶ 192–93. After a second trial in 2019, Fair was acquitted. *Id.* at 40 ¶¶ 194–95.

During eight of the nine years of his pretrial detention at King County Jail, Fair was housed in the Protective Custody Unit (PCU). *Id.* at 40 ¶¶ 197–98. Fair alleges that this decision was based on assumptions about his non-existent gang affiliations. *Id.* While in the PCU, Fair would often be on "lockdown" in a solitary confinement cell, without access to a shower or exercise, for weeks at a time. *Id.* at 40 ¶ 199. Fair alleges that he asked for medical and psychiatric services but did not receive any treatment for conditions that he says he developed while in custody: severe sleep apnea, depression, anxiety, and post-traumatic stress disorder. *Id.* at 40–41 ¶¶ 201–02. Fair also accuses unnamed King County Jail staff of sexually harassing and humiliating him. *Id.* at 41 ¶ 202. He says that King County also has a "known policy" of leaving one jailer in charge of "the care and wellbeing of the entire PCU[.]" *Id.* at 62 ¶ 249.

The Redmond Defendants seek to exclude testimony from (1) Susan Peters, Fair's police practices expert; (2) Russ Hicks, Fair's law enforcement training and standards expert; and (3) Brian Landers, Fair's law enforcement ethics and bias expert. Dkt. # 156. The King County

Defendants seek to exclude testimony from (1) Dr. Anthony Greenwald, Fair's bias and data analysis expert; (2) Martin Horn, Fair's corrections expert; and (3) Maybell Romero, Fair's prosecution expert.  Dkt. # 158.  Fair seeks to exclude testimony from (1) Dr. Marko Yakovlevitch, the Redmond and King County Defendants' medical expert, (2) Dr. Theodore Kessis, the Redmond Defendants' DNA expert; and (3) Frank Vanecek, the Redmond Defendants' police practices expert.  Dkt. # 185.

### III

#### DISCUSSION

A.    Legal Standards

Federal Rule of Evidence 702 controls the admissibility of expert testimony.  Under Rule 702, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" provided that

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In sum, courts must ensure "'that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1055 (9th Cir. 2024) (quoting *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022)).  Courts have "broad discretion" in making such evidentiary rulings.  *Hyer*, 118 F.4th at 1055 (citing *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1065 (9th Cir. 2017)).

Expert testimony is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert I*"), 509 U.S. 579, 589 (1993) (citing Fed. R. Evid. 702(a)).  "The relevancy bar [for expert testimony] is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'"  *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir.1995)).

The Supreme Court has outlined several factors to use in determining whether expert testimony is reliable.  These factors include "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific community." *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (citing *Daubert I*, 509 U.S. at 592–94).  But this list of factors is not exhaustive nor intended to be applied in every case.  *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).  A court "not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (internal quotations omitted).  The reliability inquiry is "fact-specific" and depends on the subject matter of the testimony and the witness's particular area of expertise.  *See Vanguard Logistics Servs. (USA) Inc. v. Groupage Servs. of New England, LLC*, No. CV180517DSFGJSX, 2022 WL 17369626, at *2 (C.D. Cal. Oct. 4, 2022) (citing *Hankey*, 203 F.3d at 1168).  In some cases, the "relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire Co.*, 526 U.S. at 150.

The proponent of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence.  *See Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir.

1996); *see also Qualey v. Pierce Cnty.*, No. 3:23-CV-05679-TMC, 2025 WL 254810, at *3

(W.D. Wash. Jan. 21, 2025).  Courts liberally construe Rule 702 in favor of admissibility.  *See*

*Daubert I*, 509 U.S. at 588; *see also Chinn v. Whidbey Pub. Hosp. Dist.*, No. C20-995 TSZ, 2021

WL 5200171 (W.D. Wash. Nov. 9, 2021).

B.      The Redmond Defendants' Motion to Exclude

        1.      Fair's Request to Strike

        The Redmond Defendants' motion exceeds the 4,200-word limit set forth in Local Rule

7(e)(4).  The Redmond Defendants say that they believed that the Court's December 17, 2024

order allowing the King County Defendants to file an overlength brief applied to them.  Dkt.

# 176 at 1.  But the Court's December 17, 2024 order specifically allows King County and Jeff

Baird to file an overlength brief.  Dkt. # 153.  It says nothing about the Redmond Defendants.

*Id.*  The Redmond Defendants' brief also includes multiple images with text that was not

included in the final word count.  *See* Dkt. # 156 at 5–7, 11–14 (pictures of portions of DNA

analysis reports and deposition transcripts).  Even though these words are contained in pictures,

they still count towards the brief's word limit.[3]  *See Centro Veterinario y Agricola Limitada v.*

*Aquatic Life Scis., Inc.*, No. 2:23-CV-00693-LK, 2024 WL 915911, at *1 (W.D. Wash. Mar. 4,

2024) (stating that this District's "*word count rules do not exclude words that appear in*

*images.*") (emphasis added).

        Fair requests that the Court strike the overlength portion of the Redmond Defendants'

brief, which includes the arguments related to expert witnesses Russ Hicks and Brian Landers.

Dkt. # 172 at 2.  The Court grants Fair's request.  The Court strikes and will not consider the

---

[3] The Court estimates that the word count for the Redmond Defendants' brief, including the text from the images, is more than 7,000 words.  *See generally* Dkt. # 156.  This is roughly 3,000 words over the permitted word limit.  LCR 7(e)(4).

overlength portion of the Redmond Defendants' brief, including the arguments about Hicks and Landers.  *See* LCR 7(e)(6) ("The court may refuse to consider any text, including footnotes, which is not included within the word or page limits."); *see also Travelers Cas. & Sur. Co. of Am. v. Decker*, No. 2:24-CV-00253-TL, 2024 WL 5040433, at *1 (W.D. Wash. Dec. 9, 2024) ("This District maintains strict word-count limits with respect to court filings").  The Court will consider only the Redmond Defendants' arguments about Fair's police practices expert Susan Peters.

      2.     Susan Peters

Peters served 29 years in law enforcement and was a major crimes detective with the King County Sheriff's Office from September 1991 to May 2011.  Dkt. # 157-1 at 11.  She has authored over 75 search warrants, arrest warrants, and certifications for probable cause.  *Id.*  The Redmond Defendants seek to exclude Peters's Opinion #1, contending (1) she deliberately discounts the DNA evidence linking Fair to the murder; (2) her opinion is not the product of, and does not reflect, a reliable application of principles and methods to the facts; and (3) her opinion centers on a core legal issue—i.e., whether there was probable cause to charge Fair with Jinaga's murder.  Dkt. # 156 at 14.  The Redmond Defendants also assert that Peters's Opinions ## 2–4 should be excluded because none of them would assist a factfinder in understanding the evidence or determining a factual issue.  *Id.* at 16.  Lastly, the Redmond Defendants contend that Peters's Opinion #5 should be excluded because it is not relevant, nor do her conclusions reflect a reliable application of principles and methods to the facts here.  *Id.* at 17.  The Court addresses each argument below.

*Discounting the DNA Evidence.*  Peters's first opinion states that "the Certification for [Determination of] Probable Cause did not reflect best police practices and indeed fell well below the standards of practice in law enforcement criminal investigation."  Dkt. # 157-1 at 13.

The Redmond Defendants contend that Peters's conclusion should be excluded because she overlooks the DNA samples that link Fair exclusively to the crime. Dkt. # 156 at 11. Fair responds that Peters reviewed the DNA evidence, and she acknowledges the DNA evidence at multiple points in her report. *See* Dkt. # 172 at 5 (citing Dkt. # 157-1 at 16, 21–28).

Peters's report (1) notes "the significan[ce] of the duct tape roll . . .use[d] to link [Fair's] DNA to the crime; (2) says that Fair's DNA had been found "[m]ixed with Jinaga's bloodstains on the red terrycloth robe"; and (3) notes that Fair's DNA was found on a swab taken from Jinaga's neck during the autopsy. *See* Dkt. # 157-1 at 16, 18, 21–28. These are just some of the examples of Peters acknowledging the DNA evidence uncovered during the investigation. Nothing in Peters's report indicates that she failed to consider the DNA evidence linking Fair to the homicide in formulating her opinion. Rather, her report shows that she reviewed the DNA evidence, and that her opinion is based on her review of that evidence as well as other evidence collected during the investigation. To the extent that the Redmond Defendants disagree with how Peters interpreted the DNA evidence, this is more appropriately addressed via cross-examination at trial. *Emblaze Ltd. v. Apple Inc.*, 52 F. Supp. 3d 949, 954 (N.D. Cal. 2014) ("The inquiry into admissibility of expert opinion is a 'flexible one,' where shaky 'but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.'") (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)).

*Principles & Methods.* The Redmond Defendants also challenge the reliability of Peters's principles and methods in formulating Opinions ## 1 and 5. Dkt. # 156 at 15–17. As stated above, Opinion # 1 concerns best police practices in the Certification for Determination of Probable Cause. Dkt. # 157-1 at 13–28. Opinion # 5 states that the investigative standards during the Jinaga homicide investigation "fell way below the generally accepted standard of police practices." *Id.* at 37–40. The Redmond Defendants say that Peters fails to identify the

methods, principles, or research she used in forming her opinion.  Dkt. # 156 at 15–17.  They also contend that Peters fails to say how her experience led to the conclusions she reached or how her experience is a sufficient basis for her opinion.  *Id.*

Fair responds that "[t]he record is replete with examples of Peters explaining her experience as a homicide detective in King County, including her experience working with [MDOP] prosecutors, why it is relevant to this case, how she has applied her experience to her opinions, her methods, the materials she reviewed, and that she based her opinions on her review and study of such records, as well as her training, education, and experience."  Dkt. # 172 at 6 (citing Dkt. # 157 at 11–13).

Fair has the stronger argument here.  At multiple points in her expert report, Peters explains the basis for her opinions, including her "knowledge, education, police training, and law enforcement experience as an officer and detective."  Dkt. # 157-1 at 13.  Peters also says that her opinion is also based on her "careful review and evaluation of the case material."  *Id.* at 12.  Sometimes, as here, the reliability inquiry centers on the experts' personal knowledge or experience.  *See Kumho Tire Co.*, 526 U.S. at 150; *see also Dasho v. City of Fed. Way*, 101 F. Supp. 3d 1025, 1034 (W.D. Wash. 2015) (noting the reliability of a police practices expert whose method "is to analyze a given factual scenario against his training, his experience, and standards of police conduct to determine whether the standards have been observed").  To that end, Peters analyzed the actions taken by investigators during the homicide investigation and compared those actions against her 29 years of experience as a law enforcement officer and general standards of police conduct.

*Ultimate Issue of Law.*  The Redmond Defendants contend that Peters offers an opinion on an ultimate issue of law—i.e., whether there was probable cause to charge Fair with murder.  Dkt. # 156 at 14.  They say this is not the proper subject of expert testimony.  *Id.*  Fair counters

that Peters's opinion offers no statements about whether there was probable cause to charge Fair

with murder.  Dkt. # 172 at 7.  He says that Peters's report only speaks to the ways the probable

cause certificate failed to meet police practices standards.  *Id.*

The Court does not see any instances in which Peter opines as to whether probable cause

existed to charge Fair with Jinaga's murder.  *See* Dkt. # 157-1 at 13-28.  Nor do the Redmond

Defendants cite any such instances in their briefing.  *See* Dkt. # 156 at 14–15.  Peters's

conclusions center on whether the Redmond Defendants actions reflect best police practices or

satisfy the general standards of practice in law enforcement criminal investigations.  *See* Dkt. #

157-1 at 13–28.  As other courts in this Circuit have said, "[Q]ualified experts may testify about

police practices and whether the actions of a police officer in a given situation comport with law

enforcement standards."  *Bynes v. Olmstead*, No. 2:21-CV-01537-DJC-AC, 2024 WL 3275662,

at *5 (E.D. Cal. July 2, 2024) (citing *M.R. v. City of Azusa*, No. CV 13-1510-DMG-VBKx, 2014

WL 12839737, at *8 (C.D. Cal. Oct. 1, 2014)); *see also Silva v. Chung*, No. CV 15-00436 HG-

KJM, 2019 WL 2195203, at *1 (D. Haw. May 21, 2019) ("Qualified experts . . . may testify

about police practices and whether the particular actions of a police officer in a given situation

comports with law enforcement's standards.").

*Helpfulness of Peters's Opinions.*  Peters's Opinions ## 2–4 focus on police practices

during an investigation, including evidence collection and report writing.  *See* Dkt. # 157-1 at

28–37.  As stated above, Opinion # 5 focuses on the investigation practices during the Jinaga

homicide investigation.  *Id.* at 37–40.  The Redmond Defendants argue that Opinions ## 2–4 are

unhelpful because Peters's conclusions do not pertain to any cause of action in Fair's lawsuit.

Dkt. # 156 at 16.  They say that none of these opinions would help a factfinder understand the

evidence or determine a factual issue.  *Id.*  The Redmond Defendants also assert that Opinion # 5

is irrelevant to any cause of action in this lawsuit.  *Id.* at 17.

1        Fair contends that Opinions ## 2–4 are relevant to his *Monell*[4] claims.  Dkt. # 172 at 7.

2    And he asserts that Opinion # 5 is relevant to "the knowledge Defendant Coats had about the

3    facts included in the probable cause affidavit, whether he knew what the totality of the

4    circumstances of the case was in order to attest to probable cause, and whether, given his

5    admitted lack of knowledge of the facts, he was deliberately indifferent to [Fair's] constitutional

6    rights in attesting to a document that caused Emanuel to be detained for murder."  *Id.* at 8.  He

7    says that Opinion # 5 is relevant to his failure-to-train or supervise claims under § 1983.  *Id.*

8        The Court agrees with Fair that Peters's opinions are relevant to his *Monell* claims.  For

9    example, Fair alleges in the TAC that the "City of Redmond and its RPD Policymakers and

10   Supervisors failed [in] their duty to properly train and supervise employees on acceptable

11   methods of investigation."  Dkt. # 147 at 54 ¶ 230.  Peters's report outlines general police

12   investigative standards and procedures (i.e., "basic homicide investigative steps") and applies

13   these standards to the actions taken during the Jinaga investigation.  *See, e.g.*, Dkt. # 157-1 at

14   28–31 (discussing police report writing techniques and documentation standards and applying

15   them to the actions taken during the Jinaga homicide investigation).  Thus, Peters's opinions on

16   such matters directly relate to Fair's *Monell* claims.  *Cf. McGough v. Penzone*, No. CV-18-

17   01302-PHX-DJH, 2021 WL 1575054, at *5 (D. Ariz. Apr. 22, 2021) (excluding a police

18   practices expert's testimony when his report contained only "generalized references" and did not

19   discuss "policies or procedures or what a hypothetical reasonable officer would have done in [the

20   defendant-police officer's] position"); *see also Jimenez v. City of Chi.*, 732 F.3d 710, 721 (7th

21   Cir. 2013) (stating  that an "expert's testimony could be relevant to [the] jury in determining

22

23

24   _____

         [4] *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

whether officers deviated from reasonable police practices") (internal citation omitted).

C.    The King County Defendants' Motion to Exclude

1.    Anthony Greenwald, Ph.D.

The King County Defendants seek to exclude the testimony of Fair's bias and data analysis expert Dr. Anthony Greenwald, Ph.D.  *See* Dkt. # 158.  They assert that Dr. Greenwald's opinions should be excluded because they are not based on sufficient facts and data or a reliable methodology.  *Id.* at 4.  They contend that (1) Dr. Greenwald's report lacks any facts to show Baird acted in a racially biased manner towards Fair; and (2) Dr. Greenwald's analysis of King County's prosecution-related data is flawed.  *Id.* at 4–11.  The Court addresses each argument below.

*Opinions on Bias.*  The King County Defendants say that Dr. Greenwald's report is "devoid of any evidence" showing that "Baird acted in a racially biased manner towards Fair, which is the claim in this lawsuit."  Dkt. # 158 at 5.  They say that Dr. Greenwald offers only two emails that he says reveal bias towards Fair, and that the report does not explain how the emails show racial bias.  *Id.*  Fair responds that the law discourages Dr. Greenwald from offering testimony on Baird's state of mind because bias is an ultimate issue in this case.  Dkt. # 170 at 4 (citations omitted).  He says that Dr. Greenwald's opinion is meant to educate the factfinder on bias, and the language in the report is carefully limited so that Dr. Greenwald "does not impermissibly intrude on the province of the jury to determine whether . . .Baird actually was biased."  *Id.* at 4–5.  Fair also says that Dr. Greenwald cites more than just two emails in his report, and that the emails described in his report are "non-exhaustive" examples of the materials Dr. Greenwald reviewed in formulating his opinions.  *Id.* at 6 (citing Dkt. # 159-2 at 17–22).

Dr. Greenwald's testimony will likely help the factfinder understand a material aspect of Fair's argument: whether bias played a role in the decision to charge and prosecute him for

Jinaga's murder.  Dr. Greenwald's testimony is also likely helpful because his research on implicit social cognition, including implicit bias, prejudice, and stereotypes is not information necessarily within the apperception of laypersons.  *See* Dkt. # 159-2 at 5; *see also Nat'l Ass'n for Advancement of Colored People, Inc. v. City of Myrtle Beach*, 504 F. Supp. 3d 513, 518 (D.S.C. 2020) ("Expert testimony concerning matters beyond the comprehension of laypersons will almost always assist the trier of fact. . .") (internal quotation omitted).  The King County Defendants' argument that Dr. Greenwald's testimony must be excluded because he does not conclude that Baird exhibited racial bias towards Fair is meritless.  "Courts routinely exclude expert testimony as to intent, motive, or state of mind as issues better left to a jury."  *Camenisch v. Umpqua Bank*, No. 20-CV-05905-PCP, —F. Supp. 3d —, 2025 WL 249205, at *2 (N.D. Cal. Jan. 20, 2025) (quoting *Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280, 294 (N.D. Cal. 2017)); *see also In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MD-01570 (GBD)(SN), 2024 WL 5077293, at *22 (S.D.N.Y. Dec. 11, 2024), *reconsideration denied*, No. 03-MD-01570 (GBD)(SN), 2025 WL 370569 (S.D.N.Y. Jan. 31, 2025) (stating that an expert's testimony about "states of mind, attempting to divine what people knew, believed, or wanted" violated "settled law prohibiting expert opinions on states of mind").

The King County Defendants also contend that Dr. Greenwald relies only on two emails (one sent by Baird and the other by Baird's paralegal) to support his bias argument.  But Dr. Greenwald makes clear that he "reviewed deposition testimony, discovery documents, and other case materials that lend support to Fair's claim that bias played a role during the investigation of the murder of Arpana Jinaga, and ultimately his charge and prosecution for her murder."  Dkt. # 159-2 at 18.  The two emails that the King County Defendants refers to are "non-exhaustive" examples of the materials that Dr. Greenwald relied on in forming his opinion.  *Id.*  To the extent that the King County Defendants are challenging the factual basis of Dr. Greenwald's opinion,

this would "bear on the weight of the evidence rather than the admissibility.'" *Camenisch*, 2025 WL 249205, at *4 (quoting *Quality Packaging, Inc. v. Snak Club*, No. C 03-5240 SI, 2005 WL 8177597, at *5 (N.D. Cal. Apr. 26, 2005)).

*Conviction Data.* The King County Defendants assert that Dr. Greenwald's data opinion should be excluded because (1) Dr. Greenwald states only that the data "suggests" the possibility of prosecutorial overreach and does not meet the criteria for "scientific, technical, or other specialized knowledge"; (2) his data does not incorporate all data of jury acquittals and interest of justice convictions during the relevant time period; and (3) the data Dr. Greenwald relied on contains errors. Dkt. # 158 at 7. Fair counters that the King County Defendants cite no authority for their conclusory assertion that Dr. Greenwald's conclusions, based on his evaluation of data and the application his knowledge and expertise, do not constitute "scientific, technical, or other specialized knowledge." Dkt. # 170 at 7. Fair also says that the King County Defendants' arguments about the "breadth and quality of the underlying data" go to the weight, not the admissibility, of Dr. Greenwald's testimony. *Id.*

The Court agrees with Fair. The King County Defendant provide no authority to support their contention that an expert's use of "suggests" rather than other common terms in expert reports like "indicates," "demonstrates," or "shows" means that Dr. Greenwald's testimony should be excluded. As the Ninth Circuit has said, "Lack of certainty is not, for a qualified expert, the same thing as guesswork." *Primiano*, 598 F.3d at 565. And Dr. Greenwald's conclusions are based on his purported knowledge of implicit bias, and his expertise in statistical and data analysis. *See generally* Dkt. # 159-2.

Moreover, any argument that Dr. Greenwald's opinion should be excluded because of the size of the data set or flaws in the underlying data used to form his opinion goes to the weight that should be afforded to Dr. Greenwald's expert opinions, rather than the admissibility of his

testimony.  *See Navarro v. Procter & Gamble Co.*, No. 1:17-CV-406, 2021 WL 868586, at *25 (S.D. Ohio Mar. 8, 2021) ("But flaws in the underlying data set justify excluding expert testimony under *Daubert* only when "the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them.").  As another court in this District has mentioned, "'Shaky but admissible evidence' is to be attacked by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof,' not exclusion."  *United States v. Sanft*, No. CR 19-00258 RAJ, 2021 WL 5278766, at *1 (W.D. Wash. Nov. 13, 2021) (quoting *Daubert I*, 509 U.S. at 596).

    2.    Martin Horn

The King County Defendants seek to exclude the opinion of Fair's corrections expert Martin Horn, contending that (1) Conclusions ## 1–2 lack foundation; (2) Conclusion # 3 is unhelpful and is irrelevant; (3) Conclusions ## 4–6 are based on Washington statutes and policies that do not apply in this matter; and (4) Conclusion # 7 is unreliable.  *See* Dkt. # 158. The Court addresses each argument below.

*Conditions of Confinement.*  The King County Defendants challenge Conclusions ## 1–2, which concern the effects of Fair's long-term solitary confinement.  Dkt. # 158 at 14–15.  They say that Horn provides no basis to support his first conclusion that "King County ha[ving] other inmates in restrictive housing for multiple years . . . indicates that its indifference to Mr. Fair's risk of harm was not a one-off—it was a serious policy failure." *Id.* (citing Dkt. # 159-16 at 16). They also say that there is no foundation for Horn's second conclusion that Fair did not have adequate time outside of his cell or access to programming.  *Id.*

Fair responds that Horn formed his conclusions based on his review of Fair's correctional records, his interview of Fair, and various standards of care for correctional facilities.  Dkt. # 170 at 11 (citing Dkt # 159-16 at 2).  Fair also points out that the King County Defendants provide no

authority to support their argument that reviewing correctional records and relying on training, expertise, and experience is not a reliable methodology. *Id.*

In his report, Horn says that he "relied upon documents concerning this matter provided by counsel for Mr. Fair, reference [*sic*] to authoritative relevant statements of sound correctional practice, generally accepted standards of practice within the profession of corrections, and [his] education, training, and experience" in forming his opinions. Dkt. # 159-16 at 2. At multiple points in the report, Horn describes the current standards of care in corrections facilities and applies these standards to specific facts about Fair's conditions of confinement. *Id.* at 4–11. To the extent that the King County Defendants disagree with the facts Horn used in developing his opinions, this is not an adequate basis for exclusion. *See Rapp v. NaphCare, Inc.*, No. 3:21-CV-05800-DGE, 2023 WL 3983662, at *12 (W.D. Wash. June 13, 2023) ("[F]actual disputes do not justify the exclusion of [the expert witness's] opinions"); *SQM N. Am. Corp.*, 750 F.3d at 1044 ("The district court is not tasked with deciding whether the expert is right or wrong, just whether [their] testimony has substance such that it would be helpful to a jury").

*Social Isolation in Correctional Facilities.* The King County Defendants also assert that Horn's third conclusion—about the effects of long-term social isolation in a correctional setting—is inadmissible because Horn does not say how Fair was harmed or cite any specific harms to Fair. Dkt. # 185 at 15. Fair responds that Horn's third conclusion helps the factfinder because it shows that "King County had notice of the risk of harm of long-term social isolation on incarcerated persons and the standards of care related to long-term segregated housing such as [Fair] experienced." Dkt. # 170 at 12. Fair points out that Horn is not a damages or medical expert, and that it would be outside his expertise to opinion on how Fair's conditions of confinement affected his health. *Id.*

Horn has extensive qualifications in jail and prison administration and is familiar with the long-term solitary confinement of inmates.  As noted by Fair, Horn is not a medical expert.  He is unqualified to opine on the specific physiological or psychological effects of long-term isolation on Fair.  But Horn is qualified to offer *non-medical* testimony pertaining to administrative policies about long-term segregated housing and social isolation of inmates.  *See, e.g.*, *Sowell v. Dominguez*, No. 2:09 CV 47, 2017 WL 1151088, at *18 (N.D. Ind. Mar. 27, 2017) (determining that Martin Horn's "extensive qualifications in jail administration" allowed him "to offer non-medical testimony pertaining to administrative policies relating to suicide prevention").

*Alternative Confinement Options Available to King County.*  In Conclusions ## 4–6, Horn discusses the "options available" to King County to transfer Fair from King County Jail's PCU to another facility.  Dkt. # 159-16 at 16.  In Conclusion # 4, Horn says that "King County had reasonable alternatives available to it to ameliorate the isolation of [Fair] by transferring him to another county or the State [Department of Correction] pursuant to agreements it entered by authority of Revised Code of Washington (RCW) § 39.34."  *Id.*  The King County Defendants say that Horn conceded during his deposition that the statute applies only to misdemeanors.  Dkt. # 158 at 11.  The King County Defendants also assert that Horn cited contractual provisions in his report that do not apply in this matter.  *Id.*  They say that Horn relies on his own personal experience as a corrections official in New York, which does not help a factfinder understand correctional practices and policies in King County.  *Id.* at 13.

Fair responds that Horn only cites the "various statutes and policies as *examples* of mechanisms that allow for transfers of incarcerated individuals from jails to prisons or other custodial housing arrangements."  Dkt. # 170 at 8 (internal citation omitted) (emphasis in original).  He also states that Horn's opinions are based on his extensive history in the

correctional industry, his review of Fair's records and the depositions of King County

employees, and Horn's interview with Fair.  *Id.*  Fair also asserts that the location of Horn's

experience goes to the weight that should be afforded to his opinions, not admissibility.  *Id.*

(internal citations omitted).

Conclusion # 4 is based on Horn's interpretation of RCW Chapter 39.34 and his

understanding that this statute permitted Fair to be transferred to a Department of Correction

(DOC) facility.  *See* Dkt. # 159-1 at 16.  As shown by Horn's answers during his deposition, this

statute applies only to misdemeanors and not felony offenses.  *See* Dkt. # 159-15 at 12–13.

Therefore, this statute did not apply to Fair, who had been charged with murder.  *Id.*  During his

deposition, Horn also admitted that the DOC Contract CDMB2217, which he also relies on in his

report, would not apply to pretrial detainees like Fair.  *Id.* at 21–23.  To the extent that Horn's

opinion is based on his interpretation of Washington law or other purportedly applicable

contractual agreements, such testimony does not help the factfinder.  Horn is not a legal expert,

and the statutes and contractual provisions he cites in his report, as he admits during his

deposition, do not apply in this matter.  *See* Dkt. # 159-15 at 12–24.

But the Court agrees with Fair that the location of Horn's correctional experience goes to

the weight of his testimony, not to its admissibility.  Horn is qualified to testify as an expert on

correctional practices.  He has decades of experience in the corrections field, including

supervisory and policy roles as Pennsylvania's Secretary of Corrections and as Commissioner of

the New York City Department of Corrections.  *See* Dkt. # 159-16 at 2–4.  He also served as the

co-chair of the American Bar Association Corrections Committee and chaired the policy and

resolutions committee of the American Correctional Association and the Association of State

Corrections Administrators.  *Id.*  Horn's opinions are based on his review of Fair's records and

other documents, his education, training, and experience.  *Id.* at 2.  To the extent that the King

County Defendants seek to challenge the weight that should be afforded to Horn's opinion because he is an out-of-state expert, this can be done via cross-examination.[5]

Based on the above, the Court excludes Conclusion # 4 in its entirety. Conclusion # 5 is also excluded to the extent that Horn's opinion that King County "sanctioned the use of long-term solitary confinement without the use of reasonable alternatives" is based on his reading of state statutes or contract provisions. *See* Dkt. # 159-16 at 16. Likewise, Conclusion # 6, which says that "Corrections officials did not avail themselves of the above-discussed options or even consider the option of transferring [Fair] to another jurisdiction" is also excluded to the extent that it is based on Horn's understanding of Washington law or contractual provisions. *Id.*

*Standard of Care in Correctional Facilities.* The King County Defendants say that Conclusion # 7, which states that King County Jail's actions fell below the standard of care does not help the factfinder "because [Horn's] first six conclusions are unreliable." Dkt. # 158 at 15. They say that Horn admitted during his deposition that King County Jail wanted to house Fair in the general population, but that Fair did not want that. *Id.* They contend that Horn's knowledge as to educational services available to Fair is "limited" because Horn relies only on Fair's

_____

[5] The parties rely on *Jensen v. Shinn*, 609 F. Supp. 3d 789, 877 (D. Ariz. 2022), *amended*, No. CV-12-00601-PHX-ROS, 2022 WL 2910835 (D. Ariz. July 18, 2022), a case in which the defendants challenged Martin Horn's "requisite background, knowledge, or experience to provide opinions regarding the effects of isolation or other conditions of confinement" in Arizona prisons. *Id.* at 877. In that case, the court noted that Horn visited two prison facilities in Arizona and interviewed more than 60 prisoners. *Id.* The court determined that "Horn is qualified because he has sufficient knowledge, training, and experience such that his opinions are admissible." The King County Defendants argue that Horn's testimony should be excluded because he "did none of that" in this case. Dkt. # 177 at 5. But the district court in that matter also highlighted Horn's decades of experience in corrections and that "Horn has published articles, delivered lectures, and testified before state and federal legislative bodies as well as state and federal courts." *Id.* Horn's opinions here are based on his interview with Fair, his review of Fair's correctional records, and his extensive knowledge and experience in the correctional field. *See* Dkt. # 159-16. Thus, Horn is qualified to testify about correctional policies. *See Primiano*, 598 F.3d at 564–65 ("Under *Daubert,* the district judge is a gatekeeper, not a fact finder. When an expert meets the threshold established by Rule 702 as explained in *Daubert,* the expert may testify and the jury decides how much weight to give that testimony.").

statements that he did not receive those services. *Id.* at 16. Fair responds that the King County Defendants' arguments go to weight, not the admissibility of Horn's testimony. Dkt. # 170 at 13. They say that the King County Defendants' factual disputes are not suitable grounds for exclusion. *Id.*

The Court agrees with Fair. The King County Defendants' factual arguments go the weight that should be afforded to Horn's testimony rather than its admissibility. As already stated above, factual disputes do not justify excluding an expert witness's testimony. *See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013) ("Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable. The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.").

3.      Maybell Romero

The King County Defendants contend that the opinion of Fair's prosecution expert, Maybell Romero, should be excluded for three reasons: (1) Romero does not conclude that Baird committed a constitutional violation; (2) her opinions about ethical violations are irrelevant and unhelpful; and (3) her opinions about potential due process issues are unhelpful. Dkt. # 158 at 19–21. The Court addresses each argument below.

*Constitutional Violation.* The King County Defendants assert that Romero's opinion that Baird acted improperly and unethically, *see* Dkt. # 159-17 at 9, should be excluded because Romero does not conclude that Baird committed a constitutional violation. Dkt. # 158 at 18. They say that, at most, Romero concludes that Baird acted improperly or ethically. *Id.* at 17–18. Fair responds that the King County Defendants provide no legal support for their argument that Romero must say whether Baird committed a constitutional violation for her opinion on his

ethics to be admissible. Dkt. # 170 at 14. He also says that the law discourages experts from offering opinions on ultimate issues. *Id.*

As the Court has already noted, "[A]n expert witness cannot give an opinion as to [their] *legal conclusion*, i.e., an opinion on an ultimate issue of law." *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (quoting *Hangarter*, 373 F.3d at 1016) (alteration in original). The Ninth Circuit has recognized that "[w]hen an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Id.* (internal quotation omitted) (alteration and emphasis in original). Thus, it would have been improper for Romero to offer her opinion as to whether Baird committed a constitutional violation (i.e., Fair's claim for malicious prosecution under § 1983) as this is one of the core legal issues to be decided in this case.

*Ethical Violations.*[6] The King County Defendants contend that ethical violations do not constitute constitutional violations and Romero's opinions on the subject are thus irrelevant. Dkt. # 158 at 19. Fair responds that "Romero's opinions on the propriety and ethical behavior of Defendant Baird aid the jury in ascertaining whether certain elements of [Fairs] claims are met— i.e., whether [the King] County Defendants knew or should have known of the risks of harm of their actions, whether [the King] County Defendants behavior rose to the level of deliberate indifference or reckless disregard for [Fair's] constitutional rights, and whether Baird acted with malice—all of which are elements of Emanuel's malicious prosecution and § 1983 claims." Dkt. # 170 at 14 (internal citation omitted).

---

[6] The King County Defendants assert that Romero's ethics-related opinions should also be excluded because she relied on the American Bar Association (ABA) standards from 2017. Dkt. # 158 at 16. Fair responds that Romero did not solely rely on these standards in forming her opinion but agrees "to instruct [] Romero not to specifically quote from the 2017 ABA standards to support her opinions." Dkt. # 170 at 14 n.13. Thus, Romero's citations to the 2017 ABA standards are excluded.

Romero's testimony includes information about the functions and duties of prosecutors, such as their relationships with law enforcement and truthfulness in statements to others. *See* Dkt. # 159-17 at 10. Although violations of ethical standards would not support a finding of liability, they could help a factfinder determine whether Baird acted with malice. Thus, Romero's testimony is admissible. She may testify about ethical standards for prosecutors and whether Baird's actions reflect a deviation from them. *See Donahoe v. Arpaio*, No. CV10-02756-PHX-NVW, 2013 WL 5604349, at *6 (D. Ariz. Oct. 11, 2013) (determining that an expert witness could "apprise the jury of the ethical duties . . . applicable to prosecutors, and he may testify as to whether [the] [d]efendants' actions reflect a deviation from them" because the plaintiff brought a malicious prosecution claim and violations of ethical duties "could support a finding of malice").

*Due Process.* The King County Defendants contend that Romero does not provide enough facts to support a conclusion that Baird's actions violated due process. Dkt. # 158 at 19. They say that she makes a three-sentence argument for a possible due process violation for conflation of roles. *Id.* Separately, the King County Defendants contend that Romero's *Brady*[7] opinion is misplaced. *Id.* at 20. They say that Romero stated during her deposition that the *Brady* opinion "was [about] not presenting exculpatory matters in the probable cause statement." *Id.* (citing Dkt. # 159-18 at 32). The King County Defendants assert that *Brady* does not apply to the investigation nor the filing of charges. *Id.* at 20–21.[8]

---

[7] *Brady v. Maryland*, 373 U.S. 83 (1963).

[8] The King County Defendants also seem to assert that Romero's opinions "are not the product of reliable principles and methods." Dkt. # 158 at 21. But as Fair points out, Romero is a former prosecutor, a former criminal defense attorney in private practice, and is a law professor at Tulane Law School teaching courses in criminal law, criminal procedure, and criminal legal system ethics. Dkt. # 159-17 at 2. She has also published legal scholarship and presented at national conferences on these subjects. *Id.* Romero is relying on her personal knowledge and experience in formulation her opinions. *See Kumho Tire Co.*, 526 U.S. at 150. And her specialized knowledge of prosecutorial duties and ethics

1    Fair counters that the King County Defendants' arguments about Romero's opinions on

2    due process violations goes to weight, not admissibility. Dkt. # 170 at 17. He points out that the

3    King County Defendants' argument about Romero's "three-sentence argument" ignores her

4    testimony, which expanded upon her opinion and supplemented the basis for her testimony. *Id.*

5    He says that the King County Defendants' disagreement with Romero's assessment is not

6    grounds for exclusion. *Id.* at 17–18.

7    In her expert report, Romero discusses the issues associated with prosecutors having a

8    vested interest in the outcome of any case that they work on. Dkt. # 159-17 at 12. During her

9    deposition, she described the potential issues with Baird "inserting himself into the investigation

10   so deeply." Dkt. # 159-18 at 19–20. King County's argument that Romero provides insufficient

11   facts to support her opinion is unavailing. "[T]he factual basis of an expert opinion goes to the

12   credibility of the testimony, not the admissibility, and it is up to the opposing party to examine

13   the factual basis for the opinion in cross-examination." *Hangarter*, 373 F.3d at 1017 n.14. Thus,

14   the Court will not exclude Romero's opinions on this basis.

15   But the Court agrees with the King County Defendants that Romero's *Brady* opinions

16   should be excluded. Romero's opinions are based on "issues with regard to not presenting

17   exculpatory matters/evidence in the PC statement." Dkt. # 159-18 at 32. She also did not

18   "think" that the Ninth Circuit or Washington law required that exculpatory information be

19   included in a certification for determination of probable cause. *Id.* at 36. Such testimony about

20   the "circumvention of *Brady*" would not help a factfinder because *Brady* does not apply to

21   pretrial proceedings, including the certification of probable cause. *See Parker v. Cnty. of*

22   *Riverside*, 78 F.4th 1109, 1116 (9th Cir. 2023) (reasoning that "*Brady*'s due process holding is

23

24   is "beyond the ken of the average juror." *See, e.g.*, *United States v. Heine*, No. 3:15-CR-00238-SI-2, 2017 WL 5260784, at *2 (D. Or. Nov. 13, 2017) (internal quotation omitted).

ORDER RE: EXPERT WITNESSES - 24

confined to trial" and subsequent Supreme Court decisions do not suggest "that *Brady* applies in pretrial proceedings") (Nelson, J., concurring).

D.    Fair's Motion to Exclude

    1.    Marko Yakovlevitch, M.D.

Dr. Yakovlevitch is a board-certified cardiologist, jointly proffered by the Redmond Defendants and King County Defendants. *See* Dkt. # 186-4. Fair challenges Dr. Yakovlevitch's opinions related to sleep apnea, contending that his opinions on this topic are unreliable and offered without qualification. Dkt. # 185 at 3Dr. Yakovlevitch's report states that Fair's current medical conditions include "obstructive sleep apnea" and that Fair's medical conditions were "NOT caused by or exacerbated by his 2009 arrest and subsequent incarceration." Dkt. # 185 at 3–4; Dkt. # 186-4 at 7. Dr. Yakovlevitch also concluded that "[w]hile sleep apnea can occur naturally, [Fair's] sleep apnea is likely due to or at least aggravated by his obesity, based on the nature of the condition and [Fair's] medical history." Dkt. # 186-4 at 7. Fair notes that Dr. Yakovlevitch stated during his deposition that he was not a "pulmonologist" or "sleep apnea expert" and "**would prefer not to be testifying as to the physiologic details of sleep apnea because that's not [his] area of expertise.**" Dkt # 185 at 5 (quoting Dkt. # 186-3 at 13–14) (emphasis in original).

The Redmond and King County Defendants jointly respond that Dr. Yakovlevitch is only opining on sleep apnea to the extent that the condition impacts Fair's cardiovascular health. Dkt. # 191 at 3. They say that Fair alleges in the TAC "that he has left-sided heart failure due to sleep apnea," Dkt. # 147 at 40 ¶ 201, and thus "a cardiologist with expertise in heart failure who can expertly discuss whether sleep apnea is a possible cause [of] left-sided heart failure is relevant to the jury and helpful on such a specialized issue of fact." *Id.* at 1, 4.

The Redmond and King County Defendants mischaracterize Fair's allegations in the TAC. Fair alleges that, while incarcerated, he "developed severe sleep apnea, which if untreated can cause high blood pressure, stroke, heart failure, diabetes, and ADHD." Dkt. 147 at 40 ¶ 201. Nowhere in the TAC does Fair allege that he has left-sided heart failure because of sleep apnea. Instead, Fair says that heart failure is a *possible* consequence of the severe sleep apnea he developed while in King County Jail. In his report, Dr. Yakovlevitch also discusses the cause and the effects of Fair's sleep apnea. For example, he says that if Fair "fails to lose weight, he will likely also require long term treatment for sleep apnea. That will be compromised of CPAP or similar therapy and will require routine monitoring." Dkt. # 186-4 at 6. But Fair's counsel asked Dr. Yakovlevitch about the "positive effects" of CPAP treatment on the cardiovascular system during his deposition, and Dr. Yakovlevitch refused to answer and stated he "would refrain from testifying on sleep apnea physiology on th[at] kind of level." Dkt. # 186-3 at 12.

Thus, the Court excludes Dr. Yakovlevitch testimony about Fair's sleep apnea. As shown by Dr. Yakovlevitch's responses during his deposition, he lacks to the qualifications to opine about sleep apnea. And Dr. Yakovlevitchs' opinions about the causes of and treatment for Fair's sleep apnea are thus unreliable. *Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (reasoning that lack of specialization may go to weight only as long as an expert stays within the *reasonable confines* of his subject area.") (internal quotation omitted) (emphasis added).

2.    Theodore Kessis, Ph.D.

Fair asserts that the Court should exclude Dr. Kessis's expert report because (1) Dr. Kessis is unqualified to testify about Redmond Police Department's practices related to the collection and submission of DNA evidence; and (2) the accuracy and reliability of DNA testing is not at issue. Dkt. # 185 at 6–11. The Court addresses each argument below.

*Evidence Collection and Submission.*[9] Fair says that Dr. Kessis is unqualified to testify about "the propriety of the manner of collecting evidence, police practices, or whether there was bias in the way evidence was collected." Dkt. # 185 at 7. He says that Dr. Kessis has no education or prior training in the collection of evidence, police practices, or bias in policing. *Id.* at 8.

The Redmond Defendants respond that Dr. Kessis has considerable experience in reviewing evidence provided by police departments in an array of criminal matters. Dkt. # 193 at 5. They say that Dr. Kessis has handled around 1,500 cases since 1995 and "has the requisite experience to know exactly the type of evidence that is typically associated with a murder investigation." *Id.* They also contend that the TAC raises issues about the collection of evidence from the apartment complex dumpster and potential DNA cross-contamination. *Id.*

Dr. Kessis is qualified to provide opinions about the evidence collection and submission during the homicide investigation. As stated above, an expert may be qualified by "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, and in many situations "the relevant reliability concerns may *focus upon personal knowledge or experience*," rather than scientific proof. *See Kumho Tire Co.*, 526 U.S. at 150 (emphasis added). Dr. Kessis is a former faculty member of Johns Hopkins University's Departments of Pathology, Immunology, and Infectious Diseases, and Molecular Microbiology and Immunology, and currently serves as principal of

---

[9] One of the opinions that Fair seeks to exclude is Dr. Kessis's opinion about the reasonableness of Gurtler's DNA being found in Jinaga's apartment because he was "involved in an intimate relationship" with Jinaga near the time of her death. *See* Dkt. # 185 at 7 (quoting Dkt. # 186-9 at 17). The Redmond Defendants agree that Dr. Kessis's opinion about Gurtler's DNA is "speculative and not a proper opinion for trial." Dkt. # 193 at 6. Thus, the Court excludes Dr. Kessis's opinion about Gurtler's DNA in Jinaga's apartment.

In their opposition brief, the Redmond Defendants also acknowledge that Dr. Kessis admitted during his deposition that his opinion on bias "was a lay opinion as opposed to an expert opinion." Dkt. # 193 at 5. Thus, the Court also excludes Dr. Kessis's bias opinion. *See Hangarter*, 373 F.3d at 1016 (stating that an expert must have "*the minimal foundation* of knowledge, skill, and experience required in order to give 'expert' testimony") (internal citation omitted) (emphasis added).

Applied DNA Resources, a company focused on forensic DNA testing. Dkt. # 186-9 at 3. He has also "reviewed the testing and case file information in more than 1450 criminal, military, and paternity cases involving forensic DNA testing." *Id.* He reviewed the case file materials and reports associated with the collection, submission, and DNA testing that took place during the Jinaga homicide investigation. *Id.* at 3–4 (listing materials and documents Dr. Kessis reviewed to prepare his report).

Moreover, Dr. Kessis's opinions respond to Fair's allegations in the TAC. For example, Fair alleges that "[o]fficers did not secure, monitor, guard, or retrieve all the evidence from, the dumpster until November 5, 2008. It took three days for Investigating Defendants to secure the dumpster even though Defendant Coats and RPD Detective Harding retrieved Jinaga's bedsheets from it after an initial search on November 3, 2008." Dkt. # 147 at 11 ¶ 54. Dr. Kessis states that the "collection of evidence from the dumpster left unsecure in the weather for some period of time . . . would not have changed the DNA profiles detected on the evidence found within the bag collected from the dumpster." Dkt. # 186-9 at 17–18. Dr. Kessis's opinions are well-within his qualifications as a DNA expert. *See United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) ("An expert may be qualified to give expert testimony by knowledge, skill, experience, training, or education . . . which need only exceed the common knowledge of the average layman.") (internal quotations and citations omitted).

*Accuracy and Reliability of DNA Testing.* Fair says that he is not challenging the accuracy or reliability of the DNA testing of the evidence collected during the investigation. Dkt. # 185 at 9. He says that he is challenging the "misleading and inaccurate use of the DNA results in the certification of probable cause . . . led to him being maliciously prosecuted and incarcerated for murder." *Id.* The Redmond Defendants respond that Fair has put the science at issue in a "roundabout" way. Dkt. # 193 at 7.

Testimony about the accuracy and reliability of the DNA testing would not help a factfinder here; Fair does not challenge the accuracy of the testing by the various laboratories or the DNA results. *See generally* Dkt. # 147. And the Redmond Defendants only cursorily assert that Fair has somehow put the DNA testing at issue in a "roundabout" way. Thus, the Court excludes this testimony. *See Daubert I*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (internal quotations omitted).

3.    Frank Vanecek

Fair contends that the opinions of Frank Vanecek, the Redmond Defendants' police practices expert, should be excluded because (1) his opinions related to bias are offered without qualification and contain improper opinions about the objectivity and credentials of Fair's expert witnesses; (2) Vanecek is unqualified to offer opinions on criminology or psychology; (3) he is unqualified to offer opinions interpreting the law nor is he qualified to offer his opinions about the MDOP program and prosecutorial roles and duties; (4) Vanecek is unqualified to offer opinions about statistical or forensic analysis of DNA results; (5) Vanecek's opinions rely on materials that post-date the investigation; and (6) Vanecek's opinions related to *Brady* are irrelevant. The Court addresses each argument below.

*Bias.* Fair asserts that in Vanecek's 200-plus pages of reports, he offers many opinions related to bias. Dkt. # 185 at 12. Fair says that Vanecek stated during his deposition that he is not being proffered as a bias expert. Dkt. # 185 at 11 (citing Dkt. # 186-11 at 14). Fair contends that Vanecek impermissibly provides his opinion on an ultimate issue (i.e., whether the investigators acted with bias towards Fair) and on the investigators' states of mind. *Id.* (internal citations omitted). Lastly, Fair says that Vanecek's opinions questioning the credibility of Fair's witnesses are improper character attacks and should be excluded. Dkt. # 185 at 14. The

1  Redmond Defendants say that Vanecek never suggests that he is an expert in bias nor is he

2  "providing the opinion that anyone acted in a biased or unbiased manner." Dkt. # 193 at 8.  They

3  say that Vanecek is qualified to offer his opinion on bias training.  *Id.* at 7.

4         Contrary to the Redmond Defendants' assertion, Vanecek offers his opinion on bias, at

5  least tacitly, at multiple points in his reports.  For example, Vanecek says that Fair "does not

6  provide any examples or discussion of actual racist behavior or bias on the part of the involved

7  detectives, but suggests that the mere use of an appropriate and acceptable descriptive term is in

8  itself a demonstration of inappropriate bias." Dkt. # 186-6 at 109.  As Vanecek and the

9  Redmond Defendants acknowledge, Vanecek is not being proffered as a bias expert.  And the

10 Redmond Defendants only assert in a conclusory manner that Vanecek is qualified to offer his

11 opinion on bias training.  Thus, the bias-related portions of Vanecek's report must be excluded as

12 beyond the scope of his expertise.  And because the Redmond Defendants do not make any

13 specific arguments about the sections of Vanecek's expert and rebuttal reports that Fair

14 highlighted in his briefing, *see* Dkt. # 185 at 12–13 n. 58–61, the Redmond Defendants have

15 waived the opportunity to show how any of those specific bias opinions are reasonably supported

16 by Vanecek's expertise.  *See Subrigo Int'l Corp v. Sentinel Ins. Co.*, No. 2:23-CV-03354-JLS-

17 SK, 2024 WL 4467595, at *3 (C.D. Cal. Aug. 28, 2024) ("[F]ailure to respond in an opposition

18 brief to an argument put forward in an opening brief constitutes waiver") (quoting *Stitching

19 Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011)).

20        Lastly, the Redmond Defendants do not respond to Fair's argument that Vanecek's

21 opinions targeting the objectivity and credentials of Fair's experts is impermissible.  *See

22 generally* Dkt. # 193.  Thus, the Redmond Defendants have waived the opportunity to show that

23 this testimony is admissible.  *See Subrigo Int'l Corp*, 2024 WL 4467595, at *3.  And as other

24 courts have said, "Credibility is an issue for jurors to decide, not for an expert to decide."

*DiBiasi v. Starbucks Corp.*, No. CV-07-276-LRS, 2009 WL 10704419, at *2 (E.D. Wash. May 22, 2009); *see also Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 481 (E.D.N.Y. 2011) ("In general, expert opinions which assess or critique another expert's substantive testimony are relevant, but opinions which attack an expert's credibility (*e.g.,* testimony than an expert is lying) are not.") (internal quotations omitted)).  Thus, to the extent that Vanecek's opinions center on the credibility, objectivity, or characteristics of Fair's experts, such testimony is excluded.

*Criminology/Psychology.*  Fair contends that Vanecek is unqualified to offer opinions on criminology or psychology.  Dkt. # 185 at 14.  He says that Vanecek cites criminology texts to support his opinions about the psychological profile of Jinaga's killer and the recidivism rate of certain criminal profiles.  *Id.*  Fair says that Vanecek stated during his deposition that he is not a psychologist, mental health expert, or criminologist.  *Id.*  The Redmond Defendants respond that Vanecek's opinion centers on Fair's prior criminal history and the appropriateness of considering "a suspect's criminal background when investigating a crime."  Dkt. # 193 at 8.  They say that the criminology sources Vanecek cites in his report are "obviously resources commonly used by detectives in police settings and not just criminologists performing research."  *Id.* at 9.

In his report, Vanecek says that Redmond Police investigators "used Criminal History Record Information (CHRI) legally and appropriately during the course of this investigation." Dkt. # 186-6 at 26.  He discusses how police generally use prior criminal history information during an investigation and the recidivism rate for sex offenders.  *Id.* at 27–28.  He also incorporates literature about recidivism and information about the ways investigators consider a suspect's criminal history during an investigation.  *Id.*  Vanecek had a 38-year career in law enforcement and participated "in over 100 homicide or equivocal death investigations and in thousands of interviews of victims."  *Id.* at 6.  The crux of Vanecek's opinion centers on the

1    appropriateness of considering Fair's prior criminal history information during the homicide

2    investigation.  Vanecek cites various criminology texts to support his expert opinions that are

3    based on his decades of experience in law enforcement.  Thus, Vanecek's opinions about prior

4    criminal history could help the factfinder.  *See Primiano*, 598 F.3d at 566 ("Where the

5    foundation is sufficient, the litigant is entitled to have the jury decide upon the experts'

6    credibility, rather than the judge.") (internal quotation and citation omitted).

7        *Interpreting of the Law, Prosecutorial Duties & MDOP.*  Fair says that Vanecek is

8    unqualified to offer his opinions on the law, the role of prosecutors during a homicide

9    investigation, or on MDOP because he is not a legal expert and has no experience with MDOP.

10   Dkt. # 185 at 14–15.  The Redmond Defendants respond that Vanecek does not discuss the role

11   of prosecutors in his report.  Dkt. # 193 at 9.  They say that Vanecek's report focuses on the

12   appropriateness of the contact that officers maintained with the prosecutor's office during the

13   investigation.  They also say that Vanecek "does not attempt to interpret case law other than as it

14   relates to police procedures."  *Id.*

15       The Redmond Defendants agree that Vanecek will not be providing testimony about the

16   role of prosecutors.  Dkt. # 193 at 9.  And the Court agrees with the Redmond Defendants that

17   Vanecek is qualified, based on his experiences as a member of joint task forces on federal, state,

18   and local levels, to provide testimony about the appropriate level of contact between the

19   Redmond Police Department and KCPAO.  *See, e.g.*, Dkt. # 186-7 at 36.

20       But Vanecek interprets and applies state and federal law at multiple points in his report.

21   For example, he discusses various federal appellate decisions about cell phone seizures.  *See* Dkt.

22   # 186-6 at 20–21.  He then concludes that "the detectives likely had a general understanding that

23   the law on cell phones was evolving . . . [and] [t]hey did not have probable cause to arrest

24   Johnson."  *Id.* at 22.  Vanecek's opinion on what the investigators likely knew about the law at

ORDER RE: EXPERT WITNESSES - 32

that time, would not help the factfinder.  *See Camenisch*, 2025 WL 249205, at *2 ("Courts

routinely exclude expert testimony as to intent, motive, or state of mind as issues better left to a

jury.") (internal quotation omitted).  And to the extent that Vanecek interprets the law, such

opinions are also impermissible.  *See Dold v. Snohomish Cnty.*, No. 2:20-CV-00383-JHC, 2023

WL 123335, at *1 (W.D. Wash. Jan. 5, 2023) ("While experts may permissibly opine as to

standard law enforcement practices and whether defendants' conduct is in accord with those

practices, *they may not offer legal conclusions* that are solely within the Court's or the fact-

finder's province.")  (quoting *Fontana v. City of Auburn*, No. C13-0245-JCC, 2014 WL

4162528, at *6 (W.D. Wash. Aug. 21, 2014)) (emphasis added).

Lastly, in his rebuttal report, Vanecek offers his opinions about MDOP.  *See* Dkt. # 187-7

at 34.  In their response brief, the Redmond Defendants do not respond to Fair's arguments that

Vanecek is unqualified to offer his opinion about MDOP.  *See generally* Dkt. # 193.  Thus, the

Redmond Defendants have waived the opportunity to show how any of Vanecek's opinions

about MDOP are reasonably supported by his expertise.  *See Subrigo Int'l Corp.*, 2024 WL

4467595, at *3.

*Analysis of DNA Results.*  Fair says that Vanecek's opinions about the forensic and

statistical analysis of the DNA results in this case are irrelevant.  Dkt. # 185 at 16.  Fair says that

Vanecek stated during his deposition that he is not a DNA expert.  *Id.*  Fair also says that he is

not challenging the efficacy of the DNA testing during the investigation.  *Id.*  The Redmond

Defendants assert that Vanecek "does not undertake a statistical or forensic analysis of DNA

evidence."  Dkt. # 193 at 10.  They say that Vanecek offers his opinion as to "how a reasonable

officer such as DC Coats would read and understand these laboratory reports."  *Id.*

Contrary to the Redmond Defendants' assertions, Vanecek does discuss the efficacy of

the DNA testing during the investigation.  For example, he says that "changes in technology

between the time of these initial analyses and the charging of Emanuel Fair with the crime of murder, the updated statistic would state that it *'was 1,000 times more likely that the observed DNA profile occurred as a result of a mixture of Arpana Jinaga and Emanuel Fair…'*"  Dkt. # 186-6 at 42 (emphasis in original) (internal citation omitted).  Vanecek is not a qualified DNA expert nor would his opinions on the efficacy of the DNA testing help the factfinder.  Also, to the extent that Vanecek's opinions concern what Coats knew about the DNA reports or how he understood the reports, such state-of-mind testimony is inadmissible.  *See Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) ("Expert testimony as to intent, motive, or state of mind offers no more than the drawing of an inference from the facts of the case. The jury is sufficiently capable of drawing its own inferences regarding intent, motive, or state of mind from the evidence [.]").  Thus, Vanecek's opinions about the DNA testing and analysis in this matter are inadmissible.

*Reliance on Materials Post-Dating the Investigation.*  Fair asserts that Vanecek's opinions that rely on materials that post-date the murder investigation should be excluded.  Dkt. # 185 at 16–17.  He says that Vanecek "cites to multiple sources and guidelines that far post-date the investigation at issue here." *Id.*  Fair contends that Vanecek "frequently relies on U.S. Department of Justice reports dated 2018 or later, without explaining how these were relevant to the investigation in this case." *Id.* at 17 (citing Dkt. # 186-6 at 28–29).  The Redmond Defendants respond that Vanecek's reliance on materials that post-dates the murder investigation is "limited." Dkt. # 193 at 10.  They say that Vanecek only cites on sources that post-date the investigation for "general" and "widely known" principles. *Id.*

Vanecek cites the U.S. Department of Justice reports for general principles to support his expert opinions.  For example, he cites a Department of Justice Report titled "Use and Management of Criminal History Record Information" to support his opinion that a suspect's

criminal history record is commonly used by police during an investigation. *See* Dkt. # 186-6 at 28. Fair does not highlight any instances where Vanecek's citations to materials that post-date the homicide investigation would render his expert opinions inadmissible. *See* Dkt. # 185 at 16–17. Fair can challenge the factual basis of Vanecek's opinions on cross-examination.

     *Brady-Related Opinions.* Fair contends that Vanecek "repeatedly offers opinions related to what evidence [Fair's] defense attorneys were provided with, or allowed to request, at trial." Dkt. # 185 at 17. He says that Vanecek appears to offer these opinions because they are relevant to a *Brady* claim. *Id.* Fair says that the TAC does not include a *Brady* claim, nor did he assert a *Brady* claim during his criminal trials. *Id.* The Redmond Defendants assert that Fair and his experts have "repeatedly suggest[ed] that exculpatory information was left out of the certification of probable cause." Dkt. # 193 at 10.

     As discussed earlier, the Court excluded Fair's expert witness Maybell Romero's *Brady*-related opinions. Her testimony would not help a factfinder given that *Brady* does not apply to pretrial proceedings. Likewise, Vanecek's *Brady*-related testimony does not help a factfinder. Fair has not alleged a *Brady* claim, and this Court has excluded Fair's expert's opinions about *Brady*. Thus, Vanecek's testimony about "*Brady* implications" or "information provided to Fair's criminal defense team" would not help the factfinder. *See Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329, 342 (S.D.N.Y. 2006) ("For expert testimony to 'fit,' the testimony must have a valid 'connection to the pertinent inquiry' and be 'sufficiently tied to the facts of the case so that it will aid the jury in resolving a factual dispute.'") (quoting *Daubert I*, 509 U.S. at 591–92).

## IV
### CONCLUSION

     For these reasons, the Court ORDERS as follows:

- The Court DENIES the Redmond Defendants' motion to exclude expert witness testimony (Dkt. # 156).

  - o  The Court DENIES the motion as to Susan Peters.

  - o  The Court STRIKES the overlength portion of the Redmond Defendants' motion, including the arguments related to Russ Hicks and Brian Landers.

- The Court GRANTS in part and DENIES in part the King County Defendants' motion to exclude expert witness testimony (Dkt. # 158).

  - o  The Court DENIES the motion as to Dr. Anthony Greenwald.

  - o  The Court GRANTS the King County Defendants' motion as to Martin Horn's Conclusion # 4.  The Court also GRANTS the motion as to Horn's Conclusions ## 5–6 to the extent that Horn's opinions are based on his interpretation of state statutes or contractual provisions.  The Court otherwise DENIES the motion as to Horn's remaining opinions.

  - o  The Court GRANTS the King County Defendants' motion as to Maybell Romero's *Brady*-related opinions.  The Court also excludes Romero's citations to the 2017 ABA standards.  The Court otherwise DENIES the motion as to Romero's remaining opinions.

- The Court GRANTS in part and DENIES in part Fair's motion to exclude expert witness testimony (Dkt. # 185).

  - o  The Court GRANTS Fair's motion as to Dr. Marko Yakovlevitch's sleep-apnea opinions.

  - o  The Court GRANTS Fair's motion as to Dr. Theodore Kessis's (1) bias opinions, (2) opinions about Aaron Gurtler's DNA, and (3) opinions about

the accuracy and reliability of DNA testing.  The Court DENIES the

motion as to Dr. Kessis's remaining opinions.

    o   The Court GRANTS Fair's motion as to Frank Vanecek's (1) bias

opinions, (2) opinions about the objectivity and credentials of Fair's

experts, (3) opinions on the role of prosecutors, (4) opinions interpreting

federal and state law, (5) opinions about MDOP, (6) opinions about the

statistical or forensic analysis of DNA evidence, and (7) *Brady*-related

opinions.  The Court DENIES the motion as to Vanecek's remaining

opinions.

Dated this 7th day of April, 2025.

*John H. Chun*

John H. Chun
United States District Judge