1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

EMANUEL D. FAIR,

                    Plaintiff,

          v.

KING COUNTY, a political subdivision of
the State of Washington; CITY OF
REDMOND, a municipal entity and political
subdivision of the State of Washington;
BRIAN COATS, in his personal capacity;
JEFF BAIRD, in his personal capacity,

                    Defendants.

CASE NO. 2:21-cv-01706-JHC

SEALED ORDER RE: DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

# I

## INTRODUCTION

This matter comes before the Court on two summary judgment motions.  King County

and former King County Senior Deputy Prosecuting Attorney Jeff Baird (collectively, the King

County Defendants) bring one motion, Dkt. # 196, and the City of Redmond and Redmond

Police Detective Brian Coats (collectively, the Redmond Defendants) bring the other.  Dkt.

# 200.  The Court has reviewed the materials filed in support of and in opposition to the motions,

pertinent portions of the record, and the applicable law.  The Court finds oral argument

unnecessary.  Being fully advised, the Court enters this Order.[1]

## II
### BACKGROUND

In 2010, Plaintiff Emmanuel D. Fair was charged with the murder of Arpana Jinaga.  *See*

Dkt. # 211-62 at 2.  After nine years in pretrial detention at the King County Correctional Facility

(King County Jail), Fair was acquitted.  *Id.* at 4.  In the Third Amended Complaint (TAC), Fair

brings claims under 42 U.S.C. § 1983 and Washington law against Defendants King County, the

City of Redmond, former Senior King County Deputy Prosecutor Jeff Baird, and Redmond

Police Detective Brian Coats.  *See generally* Dkt. # 147.

A.    The Murder

On October 31, 2008, Jinaga, along with three other residents of the Valley View

Apartments complex in Redmond, Washington hosted a Halloween party.  Dkt. # 197 at 18.

Around 40 to 50 people, including Fair, attended the party, and partygoers came and went

between various apartments.  *Id.* at 18, 25.  One of the co-hosts of the party, and Fair's friend,

Leslie Potts recalled the party ending around 1:00 or 2:00 a.m. the following morning.  *Id*. at 18.

She told investigators that many people got very inebriated at the party.  *Id.*

On November 1, 2008, around 2:00 a.m., one of Jinaga's neighbors, Kyle Rose, heard

Jinaga speaking to someone outside her apartment.  Dkt. # 211-2 at 332.  His apartment shared a

wall with Jinaga's.  *Id.*  Rose did not attend the Halloween party because he had worked the

graveyard shift that night and was also fighting off a cold.  *Id.*  Another neighbor, Jeffrey Perras,

---

[1] Fair's surreply requests that the Court strike certain arguments that the King County and Redmond Defendants raised for the first time in their reply briefs. Dkt. # 223. Because this Order does not rely on these arguments, the Court need not rule on the request.

who lived on the same floor as Jinaga, two apartments away from hers, returned home from work around 3:00 a.m. and saw a man speaking to someone in the doorway of Jinaga's apartment. Dkt. # 197 at 153–56. *Id.* Perras described the man as wearing an orange fleece jacket and between 5'11'' and 6'3'' with a "medium complexion" and "medium build." *Id.* He said the man "definitely wasn't Black." *Id.* Later, around 3:30 a.m. or 4:00 a.m., Rose woke up and looked outside his window. Dkt. # 211-2 at 332. He saw Jinaga in the parking lot standing by someone's car. *Id.* He heard someone shout at her, "Where you going, Arpana? Aren't we going to do some shots?" *Id.*

Later that morning, around 8:00 a.m., Rose was awoken by sounds that he described as "disturbing breathing or growling sounds" coming from Jinaga's apartment. *Id.* He thought the noises suggested sexual activity. *Id.* He then heard "quiet walking sounds" and the sound of running water. *Id.* He remembered hearing a "loud thud" and then everything going quiet. Dkt. # 197 at 84. Around 9:00 a.m., Rose left his apartment to drop off his rent check in the mailbox. Dkt. # 211-2 at 332. He saw that Jinaga's front door was slightly ajar. *Id.* Rose returned to his apartment and slept on and off throughout the day. *Id.* Around 4:30 p.m., Rose left his apartment to meet up with a friend. *Id.* at 332–33. He saw that Jinaga's front door was closed and "thought that she must be ok." *Id.* at 333.

Over the weekend, Jinaga's family did not hear from her. Dkt. # 197 at 76. On November 3, 2008, Jinaga's father asked a family friend, Jay Bodicherla, to go to Jinaga's apartment to check on her. *Id.* When he arrived at Jinaga's apartment complex, Bodicherla ran into Jinaga's next-door neighbor, Cameron Johnson, leaving his apartment. *Id.* Bodicherla then noticed that Jinaga's door was unlocked and appeared to be damaged. *Id.* Bodicherla asked Johnson for help, and they entered Jinaga's apartment and found her lying on the floor in her bedroom. *Id.* Johnson told Bodicherla not to enter the bedroom and to call 9-1-1. Dkt. # 211-2

1    at 294.  Johnson later told investigators that, at the time he discovered Jinaga's body, "he didn't

2    know" if she was dead or alive.  *Id.*

3          The medics pronounced Jinaga dead at the scene.  Dkt. # 211-2 at 23.  An autopsy

4    revealed that she died by asphyxia due to ligature strangulation.  Dkt. # 197 at 105.  She also

5    suffered blunt force injuries to her head, neck, and torso and had abrasions and contusions on her

6    face, scalp, and extremities.  *Id.*  Investigators estimated that Jinaga was killed sometime

7    between 3:00 a.m. on November 1, 2008, and 8:52 a.m. on Monday, November 3, 2008, when

8    Bodicherla discovered her body.  *Id.* at 7, 24.  She was found naked but partially covered with a

9    green sheet.  *Id.* at 84.  Her body had been coated with motor oil, and parts of the carpet beneath

10   her body were discolored and soaked with bleach.  *Id.*  Investigators found pieces of her

11   Halloween costume in the corner of her bedroom.  *Id.* at 100.  They also found a partially burned

12   paper towel in her bedroom and parts of the bedroom carpet were burned.  *Id.*  In Jinaga's

13   bathroom, investigators found a wet, bloodstained comforter that smelled of bleach.  *Id.* at 101.

14   They also discovered Jinaga's underwear on the kitchen counter and a piece of tape in the living

15   room that had hair and the elastic band from Jinaga's underwear sticking to it.  *Id.* at 101–02.

16   Investigators believed that Jinaga's assailant gagged her with her underwear and taped it over her

17   mouth.  *Id.* at 95.

18   B.    The Investigation

19         The Most Dangerous Offender Project (MDOP) is a unit within the King County

20   Prosecuting Attorney's Office (KCPAO).  Dkt. # 211-44 at 5–6.  Law enforcement contacts

21   MDOP at the onset of a homicide investigation, and a King County prosecutor is assigned to the

22   case.  *Id.*  After Jinaga was pronounced dead at the scene, the Redmond Police Department

23   (RPD) called MDOP.  Dkt. # 197 at 76.  The prosecutor assigned to the case was Senior Deputy

24

1    Prosecutor Jeff Baird.[2]  *Id.*  RPD Detective Brian Coats, tasked with leading the investigation,

2    described Baird as "directing the investigation from day one, being November 3rd, 2008."  Dkt.

3    # 211-45 at 6.  He said that given the "severity of the crime" Baird was "leading the investigation

4    if not orchestrating it."  *Id.* at 26.

5        During the investigation, police searched a dumpster in the parking lot of Jinaga's

6    apartment complex.  Dkt. # 197 at 26.  In the dumpster, they found a wig and cape matching the

7    description of Jinaga's Halloween costume and a plastic bag containing a red terry cloth bathrobe

8    that smelled of bleach, a nearly empty bottle of motor oil, a bathmat, and a dark blue shoelace.

9    *Id.* at 26, 30, 304.  These, along with other pieces of evidence, were submitted to the crime lab

10   for potential DNA recovery.  *Id.* at 90–92.  Investigators interviewed many people, including

11   Jinaga's neighbors and those who attended the Halloween party.  *Id.* at 7–40.  During the

12   investigation, several suspects emerged.

13       1.    The Suspects

14           a.    Emanuel Fair

15       Potts invited Fair to the Halloween party and let him stay at her apartment for the

16   weekend.  Dkt. # 197 at 33.  During the investigation, RPD detectives described Fair as "the only

17   black male who attended the party."  Dkt. # 211-2 at 299.  During her initial interview, Potts

18   informed investigators that she and Fair went to bed around 2:00 a.m. the night after the party.

19   Dkt. # 197 at 33.  She stated that they shared the same bed.  *Id.*  Ten months later, investigators

20   reinterviewed Potts and she said that Fair was *not* in her apartment when she went to bed around

21   2:00 a.m.  *Id.* at 39.  Potts also stated that she left her front door unlocked for Fair and that he

22   slept on her couch.  *Id.*  She said she did not know what time he returned to her apartment to

23

24   ───────────────
        [2] Baird retired in 2018.  Dkt. # 196 at 22.

sleep. *Id.* She said that Fair was asleep on the couch when she got up the following morning. *Id.* Potts added that the day after the party, Fair told her that he went to Johnson's apartment around 1:30 a.m. to listen to music. *Id.* at 38–39, 171. She also stated that while cleaning up on Saturday morning, she found a condom wrapper in her kitchen that she thought fell out of her garbage can or someone's pocket. *Id.* at 38.

Two weeks after the murder, RPD detectives were still trying to locate Fair to interview him. *Id.* at 33. They put out a police bulletin and a few agencies contacted the RPD with information about Fair. *Id.* Investigators learned that he had outstanding misdemeanor and felony warrants for "Escape from Community Custody" and "Failure to Register as a Sex Offender." *Id.* at 33–34. Fair's criminal history also showed prior arrests and convictions for rape, robbery, illegal firearm possession, and drug possession. *Id.* at 34. On November 21, 2008, Fair was arrested pursuant to his outstanding warrants. *Id.* at 35. That same day, during an interview with investigators, Fair informed investigators that he had a long conversation with Jinaga the night before the Halloween party. *Id.* at 53. He stated that during the party, he was in Jinaga's apartment including her living room, kitchen, back deck, bathroom, and bedroom. *Id.* at 57–58. He told investigators that he went back to Potts's apartment to sleep around 2:00 or 2:30 a.m. *Id.* at 50.

During the investigation, investigators obtained Fair's phone records and determined that, in the early morning hours after the party, he made or received 15 phone calls. *Id.* at 191–93. The phone calls were logged between 1:43 a.m. and 4:48 a.m. *Id.* Three of the phone calls, made between 3:48 a.m. and 3:51 a.m., were to Potts. *Id.* at 39. Fair also called a phone number associated with a website used to promote prostitution. *Id.* This number was linked to a woman named Christina Ridesatthedoor, and Fair called this number six times between 1:54 a.m. and 3:03 a.m. *Id.* at 198. Fair also made three calls to Audrey Lewis, an attendee of the Halloween

1    party. *Id.* at 41.  During an interview with investigators, Lewis stated that she gave Fair her

2    phone number at the party.  *Id.*  Fair said he could not recall making these phone calls.  *Id.* at

3    177.

4          Investigators also sent several evidentiary items to forensic laboratories for DNA testing.

5    The following DNA evidence was connected to Fair.

6          *Swabs from Jinaga's Neck.*  The Washington State Patrol Crime Lab (WSPCL) analyzed

7    three swabs taken from Jinaga's neck.  Dkt. # 201-27.  The WSPCL obtained DNA from one of

8    the swabs and noted that the DNA matched Jinaga and that "a trace component of limited genetic

9    information [was] also present, to which no comparisons [could] be made."  *Id.* at 7.  Baird sent

10   the swab to a different lab, Sorenson Forensics, that managed to extract a "partial Y-STR DNA

11   profile."  Dkt. # 197 at 243.  Sorenson determined that Fair was a potential contributor to the

12   DNA profile on Jinaga's neck at a frequency rate of about one in 3803 individuals.  *Id.* at 246.[3]

13   During an interview, Fair told investigators that he was "hanging out" with Jinaga in her

14   bedroom before the party started and they were on Jinaga's laptop and talking about Fair's hair.

15   *Id.* at 57, 184.  In another interview, he stated he was sweating a lot during the party and that "a

16   lot of people," including some women, played with his hair.  *Id.* at 59.

17         *Duct Tape.*  At the crime scene, investigators found a "roll of black duct tape" near the

18   back of Jinaga's couch.  Dkt. # 197 at 77.  Investigators observed a "length of tape pulled away

19   from the roll, with many possible hairs and fibers attached."  Dkt. # 201-28 at 2.  The WSPCL

20   did not find any fingerprints on the duct tape.  *Id.*  The end of the duct tape was removed and

21   WSPCL examined the piece of tape for DNA.  *Id.* at 3.  The major DNA component matched

22   Jinaga's DNA profile.  *Id.*  Fair was included "as a possible contributor to th[e] mixed profile."

23

24   _____
     [3] In terms of DNA frequency, this means that approximately one in every 3,803 individuals is a
     potential contributor to this DNA profile.  *See* Dkt. # 197 at 246.

*Id.* Based on the analysis, it was estimated that "1 in 3.4 million individuals [was] a potential contributor to this profile." *Id.*[4] Baird arranged to have the length of duct tape re-examined by another laboratory, Bode Technology. Dkt. # 211-83. Bode extracted a partial Y-STR DNA profile, and Fair could not be excluded as a "possible contributor []." *Id.* at 3.

*The Tissue.* Investigators also had WSPCL test six and one-half sheets of folded toilet tissue. Dkt. # 201-27 at 4. The tissue tested positive for blood and the single source of DNA matched Fair's DNA profile. *Id.* at 6. Fair and other witnesses informed investigators that during the party, Fair had been play sparring with another partygoer named Neil, and that Neil "sucker punched" Fair in the mouth causing his lip to bleed. Dkt. # 197 at 202.

*The Robe.* A red terrycloth bathrobe and "ties" were found in a plastic bag in the apartment complex's dumpster along with a bottle of motor oil, a bathmat, and a shoelace. Dkt. # 197 at 26. Aaron Gurtler, Jinaga's former sexual partner, told investigators that Jinaga owned a red bathrobe, and she kept it in her bedroom closet or on a hook in her bathroom. Dkt. # 211-2 at 338. Investigators packaged the robe and ties together and sent them to the WSPCL for analysis. Dkt. # 201-27 at 6. The WSPCL determined that the DNA profile on the robe was "mixed in origin" and originated "from at least two individuals." *Id.* at 7. The major component "matche[d]" Jinaga and Fair was "included as a possible contributor" to the DNA profile. *Id.* WSPCL estimated that, based on the U.S. population, one in 340 individuals was a "potential contributor to this profile." *Id.* WSPCL re-tested the robe for DNA. Dkt. # 197 at 95. The lab determined the major component "matche[d]" Jinaga and that Fair was "as a possible contributor to the minor male component" at a frequency rate of one in six. *Id.*

---

[4] In terms of DNA frequency, this means about one in every 3.4 million individuals is a potential contributor to this DNA profile. *See* Dkt. # 201-28 at 3.

1

2          b.      Cameron Johnson

2          As stated above, Cameron Johnson, Jinaga's next-door neighbor, discovered Jinaga's

3   body with Bodicherla.  Dkt. # 197 at 76.  Investigators noted that Johnson was visibly limping

4   during his interviews on November 3, 2008, and November 5, 2008.  Dkt. # 211-2 at 394.

5   During his interview on November 3, Johnson told Coats that he arrived home around 11:00 p.m.

6   the night of the Halloween party.  *Id.* at 48.  He said that he only knew Jinaga "so, so."  *Id.* at 47.

7   Johnson recalled going around to different apartments and described Jinaga as "doing alright"

8   and that she "didn't seem. . . too drunk" at the party.  *Id*. at 48.  He said that he invited a small

9   group of people, including Jinaga, over to his apartment for drinks.  *Id.*  Johnson also told Coats

10  that at the party he met "a kind of short[] black man" and they talked about music.  *Id.* at 9.  He

11  said that after the party they went up to his apartment to listen to a CD and "mess[] around with

12  beats on [his] computer."  *Id.*  Later, they went outside to Johnson's car to listen to the CD

13  because they "didn't want to turn the music too loud up in the apartment."  *Id.*  Afterward, they

14  went back to Johnson's apartment, and the man left soon after.  *Id.*  Johnson told Coats that he

15  tried calling Jinaga the day after the party, around 10:00 a.m. or 11:00 a.m., to see how she was

16  doing.  *Id.* at 8.  Johnson said that she did not respond.  *Id.*

17         A few days later, on November 5, 2008, investigators reinterviewed Johnson.  Dkt.

18  # 211-2 at 292.  Johnson said that in the early morning hours after the party, around 3:00 a.m., he

19  heard what he thought were "sex sounds" coming from Jinaga's apartment.  *Id.* at 293.  He said

20  that he sent a text message to a former girlfriend, Heather Aquino, after the noise coming from

21  Jinaga's apartment woke him up.  *Id.*  But he "didn't exactly remember" messaging Aquino.  *Id.*

22  Johnson said that he likely messaged Aquino to have sex.  *Id.*  Johnson informed investigators

23  that the day after the party, he drove to Canada but could not cross the border because he did not

24  have his passport.  *Id.*  He said that the Canadian authorities searched his vehicle.  *Id.* at 294.

During this interview, Johnson said that the last time he saw Jinaga was at the Halloween party. *Id.* He said that he saw Jinaga out on her balcony smoking with a man named Neil. *Id.* Johnson reiterated during this interview that he called Jinaga the morning after the party around 10:00 a.m. or 11:00 a.m. *Id.* During the interview, he allowed investigators to look at his cell phone to view the call history. *Id.* at 294–95. The call history on Johnson's cell phone showed that he called Jinaga at 2:56 a.m. and 3:02 a.m. the night after the party. *Id.* at 295; Dkt. # 211-7 at 2. After investigators showed Johnson the time stamps for his calls to Jinaga, he appeared shocked and said that he did not recall calling her at that hour. Dkt. # 211-2 at 295. Later in the interview, Johnson told investigators that Jinaga "was looking really good" at the party and "he possibly did try to call her to see about having sex with her." *Id.* Johnson could not explain why he tried to call Jinaga, possibly for sex, around the same time he heard "sex sounds" coming from her apartment and around the same time he messaged Aquino also purportedly for sex. *Id.* Johnson stated that he could not recall whether he went next door and knocked on Jinaga's door that morning. Dkt. # 211-32.

A day later, detectives obtained a search warrant for Johnson's apartment and vehicle. Dkt. # 211-9. In Johnson's apartment, investigators found a piece of mail belonging to Jinaga. Dkt. 157-1 at 132. They also found a lighter on Johnson's kitchen counter covered in a "dark gooey substance"; the lighter was not taken into evidence. *Id.* at 99. In Johnson's car, investigators found a printed copy of a Google search for local pawn shops in the area. Dkt. # 211-15. The list of pawn shops was printed the morning after the Halloween party. Dkt. # 211-47. Investigators found this notable because they had yet to locate Jinaga's phone and camera. Dkt. # 211-9 at 6. On November 10, 2008, police obtained a warrant for Johnson's cell phone, but the phone's call and text history had been deleted. Dkt. # 211-45 at 47. Investigators also noted that Johnson made statements to his mother and uncle about Jinaga's murder

including, "Could I have done this in my sleep?" and "I can't be a, a schizophrenic or . . . I can't have done this and not remember it." Dkt. ## 211-2 at 248; 211-5 at 3.

During his second interview with police, Johnson allowed investigators to take buccal swabs for DNA testing. Dkt. # 211-2 at 292. The following DNA evidence was connected to Johnson.

*The Duct Tape.* As described above, on Jinaga's couch investigators found a "roll of black duct tape" with a "length of tape pulled away from the roll, with many possible hairs and fibers attached." Dkt. # 201-28 at 2. Baird arranged to have the length of the duct tape examined by Bode Technology. Dkt. # 211-83. Bode extracted a partial Y-STR DNA profile, and Johnson could not be excluded as a "possible contributor []" to the profile. *Id.* at 3.

*Bottle of Motor Oil.* As stated above, investigators found a nearly empty bottle of motor oil along with a red terrycloth robe and ties, bathmat, and shoelace in a plastic bag in the apartment complex's dumpster. Dkt. # 197 at 26, 304. Investigators determined that the motor oil from the bottle was "indistinguishable" from the motor oil they found covering Jinaga's body. Dkt. ## 197 at 304; 211-2 at 358. The Certification for Determination of Probable Cause (PC Certification) notes that Jinaga owned a motorcycle and a receipt for motor oil was found in her apartment. Dkt. # 197 at 304. Furthermore, WSPCL determined that the DNA profile obtained from the motor oil bottle was "mixed in origin" and "originat[ed] from at least two individuals." Dkt. # 201-27 at 6. Jinaga and Johnson were included as "possible contributors" to the DNA profile at a frequency rate of one in 5,100 individuals in the U.S population.[5] *Id.* Fair was excluded as possible contributors to the DNA profile. *Id.* During an interview on August 18,

---

[5] In terms of DNA frequency, this means about one in every 5,100 individuals is a potential contributor to this DNA profile. See Dkt. # 201-28 at 3.

2010, investigators asked Johnson many questions about the bottle of motor oil. Dkt. # 211-32.[6]

Johnson provided very few answers. *Id.*[7] At the end of the interview Coats informed Johnson

that investigators knew

> who did it—we just don't know if he had help or not. And anything you can do to
> shake a memory loose that could help you be a better witness for us and not be such
> an asset for the defense when this goes to trial, 'cause right now, that's what you
> are. You are the reasonable doubt for the guy that we're gonna take to trial.

*Id.* at 15.

In 2009, Coats reach out to the Federal Bureau of Investigation's (FBI) Behavioral

Analysis Unit (BAU) requesting their assessment of the investigation. Dkt. # 211-21. The FBI

prepared a report including "investigative suggestions" based on their review of the case file. *Id.*

In an email, Coats informed Baird that "the BAU was impressed with the results of the lab tests.

They think the oil container with [Johnson's] DNA is very crucial to the case. There isn't just

one item containing evidence against [Johnson]; we have to consider the bathrobe, floor matt

[*sic*] and shoelace as well because they were all together in the same bag." Dkt. # 211-23 at 3.

He noted that Fair "could do a better job explaining away his DNA than [Johnson]. One profiler

told me if she had to pick one suspect, she would choose [Johnson]. [Fair] wouldn't have

covered the body but [Johnson] would have." *Id.*

   c.  Aaron Gurtler

Aaron Gurtler had been in a sexual relationship with Jinaga in the months before her

death. Dkt. # 211-2 at 338. Jinaga met Gurtler through their motorcycle club. *Id.* Jinaga's

friends told investigators that Jinaga told Gurtler that she was no longer interested in continuing

---

[6] KCPAO granted Johnson immunity in connection with this interview. Dkt. # 211-18.

[7] During the interview, Coats also told Johnson, "And if something pops in your mind as we're talking, feel free 'cause, again, it's a big piece of evidence." Dkt. # 211-32 at 10. He informed Johnson that "an explanation would be real[ly] helpful." *Id.*

their relationship. Dkt. # 211-39. Gurtler told investigators that he and Jinaga had sex about two weeks before her death. Dkt. # 211-2 at 338. He said that Jinaga also modeled her Halloween costume for him and commented that "whoever killed [Jinaga] probably wanted to have sex with her after seeing her in that costume." *Id.* at 304. Over the course of multiple interviews with investigators, Gurtler gave conflicting statements about where he was, and who he was with, the night of the Halloween party. *See* Dkt. # 211-2 at 304, 337. During one of these interviews, he consented to providing buccal swabs for DNA. *Id.* at 337. The following DNA evidence was connected to Gurtler.

*Bath Towel.* A brown bath towel was collected from Jinaga's bedroom floor. Dkt. #211-2 at 315. WSPCL detected semen on the towel. Dkt. # 197 at 95. WSPCL determined that the male DNA matched Gurtler's DNA at a frequency of one in 89 quadrillion individuals. *Id.*[8]

*Green Fitted Sheet.* When investigators discovered Jinaga, a green fitted sheet covered her body. Dkt. # 211-2 at 40. WSPCL examined staining on the sheet (later determined to be blood) and found a DNA profile that was "mixed in origin" consisting of DNA from at least two individuals. Dkt. # 197 at 96. The major DNA component matched Jinaga and Gurtler was found to be a "possible contributor," at a frequency of one in 36 individuals. *Id.*

          d.      Josiah Lovett & Jacob Carlson

Josiah Lovett and his wife Priscilla lived in the same apartment complex as Jinaga. Dkt. # 211-2 at 41. Lovett told investigators that he was invited to the Halloween party but declined to attend. *Id.*

Jacob Carlson belonged to the same motorcycle club as Jinaga. *Id.* at 271. During his interview, he said that he did not attend the Halloween party. *Id.* Other interviewees identified

---

[8] In terms of DNA frequency, this means about one in every 89 quadrillion individuals is a potential contributor to this DNA profile. Dkt. # 197 at 95.

Carlson as having a "romantic interest" in Jinaga.  *Id.* at 352.  Investigators obtained DNA samples from both men.

*Shoelace.*  As mentioned above, investigators found a dark shoelace in a plastic bag along with a nearly empty bottle of motor oil, red terrycloth robe and ties, and bathmat in the apartment complex's dumpster.  Dkt. # 197 at 26.[9]  WSPCL tested the "shoelace center" and found a DNA profile "mixed in origin" and originating from at least two individuals.  Dkt. # 197 at 96. WSPCL determined that it was "inconclusive" whether Lovett was a "potential contributor" to the DNA profile.  *Id.*

WSPCL also tested the "shoelace-ends" and found a partial DNA profile that was a "complex mixture" consistent with DNA originating from at least three individuals.  *Id.*  WSPCL found it was "inconclusive" whether Lovett and Carlson were "potential contributors" to the DNA profile.  *Id.*

Lovett told investigators that he could have accidentally touched someone else's shoelaces in the laundry room or the storage area of the apartment complex.  Dkt. # 211-2 at 341. It does not appear that investigators spoke to Carlson about the shoelace.

C.    The Prosecution & Pretrial Detention

On October 28, 2009, Coats submitted the PC Certification.  Dkt. # 197 at 301–08.[10]  The PC Certification states that Fair's DNA was discovered (i) mixed with Jinaga's bloodstains on the bathrobe, (ii) on the length of black tape recovered from Jinaga's sofa, and (iii) on a swab taken from Jinaga's neck during her autopsy.  *Id.* at 308. The PC Certification further says that Fair made or received numerous calls between 1:54 a.m. and 4:48 a.m. on November 1, 2008,

---

[9] Fair and the King County Defendants appear to dispute whether the shoelace was the ligature used to strangle Jinaga.  *Compare* Dkt. # 196 at 41 *with* Dkt. # 210 (redacted) at 31.

[10] Baird drafted the PC Certification and Coats reviewed and signed the document.  *See* Dkt. # 197 at 149, 301–08.

seven of which were with a number associated with an ad for sexual services, and three of which were with Potts, when Fair stated he was in bed with her. *Id.* at 306–07.

The next day, nearly two years after Jinaga was killed, Fair was charged with first-degree murder and booked into King County Jail. Dkt. # 211-62 at 2. Fair's first trial started on February 14, 2017, and ended on April 19, 2017, with a hung jury. Dkt. # 67-5. After a second trial in 2019, Fair was acquitted. Dkt. # 211-62 at 4.

During eight of the nine years of his pretrial detention at King County Jail, Fair was housed in the Protective Custody Unit (PCU). Dkt. # 211-56 at 8, 13. He spent much of his time, up to 23 hours a day, alone in his cell. *Id.* While incarcerated, Fair expressed concerns to medical staff about his sleep apnea. Dkt. # 211-74. Fair told psychiatric expert, Dr. Stuart Grassian, M.D., that while he was housed in the PCU,

> He hardly exercised. There was no comfortable place to sit and work, or even to sleep. He gained at least 40 pounds, and developed chronic back pain, neuropathic pain in his right wrist, and chronic pain in his knee and his feet – the latter aggravated by the lack of support in the shoes he was provided by the jail. He almost gave up on exercising. And he could not escape the noxious noise of other inmates shouting, of doors slamming. He pleaded for ear plugs, but was told no, that he could not have them because only people on the autism spectrum were assumed to be intolerant of noise. He developed chronic epigastric pain and severe headaches, especially severe as he became increasingly intolerant of the glare of the fluorescent lights, and pleaded to see a doctor. He was so consumed and obsessed with his legal case that there were times he was overwhelmed – like he was having a "nervous breakdown". There were days that he could not get out of bed at all.

Dkt. # 201-41 at 17. Commander Todd Clark, who oversaw King County Jail, stated that the Jail housed other inmates "in restrictive housing for multiple years," but he could not recall anyone else being housed in the PCU for as long as Fair. Dkt. # 211-57 at 27. Commander William Hayes, Clark's predecessor, said that King County Jail had been aware of some concerns about the long-term effects of segregated housing. Dkt. # 211-56 at 5.

1

2

### III

#### DISCUSSION

Summary judgment is warranted if the evidence, viewed in the light most favorable to the

non-moving party, shows "that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986). A fact is "material" if it might affect the outcome of the case.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "'genuine' only

if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far

Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248–

49). The evidence must be viewed in the light most favorable to the non-moving party, and all

reasonable inferences should be drawn in the nonmoving party's favor. *Anderson*, 477 U.S. at

255 (1986); *see also Nelson v. City of Davis*, 571 F.3d 924, 927 (9th Cir. 2009) ("All justifiable

inferences must be drawn in Nelson's favor, and we must deny summary judgment if any

rational trier of fact could resolve an issue in his favor."). And a court does not weigh evidence,

but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d

547, 549 (9th Cir. 1994).

The moving party bears the initial burden of showing there is no genuine dispute of

material fact and that it is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. To

carry its burden, "the moving party must either produce evidence negating an essential element

of the nonmoving party's claim or defense or show that the nonmoving party does not have

enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving

party meets its burden of production, the burden shifts to the nonmoving party to identify

SEALED ORDER RE: DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT - 16

specific facts from which a factfinder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

A.      The King County Defendants' Motion for Summary Judgment

      1.      Absolute Immunity

"Prosecutors performing their official prosecutorial functions are entitled to absolute immunity against constitutional torts." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 912 (9th Cir. 2012).[11]  Criminal prosecutors are entitled to absolute immunity for activities "intimately associated with the judicial phase of the criminal process," such as initiating and pursuing a criminal prosecution. *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976).  But "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).  And absolute immunity "is an extreme remedy, and it is justified only where 'any lesser degree of immunity could impair the judicial process itself.'" *Lacey*, 693 F.3d at 912 (quoting *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997)).

A prosecutor is not entitled to absolute immunity "'when they perform administrative functions, or investigative functions normally performed by a detective or police officer.'" *Garmon v. Cnty. of Los Angeles*, 828 F.3d 837, 843 (9th Cir. 2016) (quoting *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005)).  And the "'official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question.'" *Id.* (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)).

---

[11]Under Washington law, the "analysis of a prosecutor's absolute immunity from suit under state law claims tracks common law immunity analysis under 42 U.S.C. § 1983." *Musso-Escude v. Edwards*, 101 Wash. App. 560, 567–68, 4 P.3d 151 (2000).

1        The King County Defendants contend that Baird is entitled to absolute immunity for the

2 actions he took during the Jinaga homicide investigation. Dkt. # 196 at 28.[12] They say that Fair

3 has provided no facts to support his contention that Baird exceeded his role as an advocate. *Id.*

4 They also claim that Coats's description of Baird "'directing' the investigation is not supported

5 by the facts." *Id.*

6        Fair responds that the Supreme Court has determined that "there is no justification for

7 extending absolute immunity to prosecutors who take on 'the detective's role in searching for the

8 clues and corroboration that might give him the probable cause to recommend that a suspect be

9 arrested." Dkt. # 210 (redacted) at 41 (quoting *Buckley*, 509 U.S. at 273). He says that Baird

10 had a "deep level of involvement" in the investigation, including advising the police on various

11 interrogation techniques to use when questioning witnesses and directing the police on leads to

12 follow. *Id.* at 42 (citation omitted). Fair also contends that Coats's testimony that Baird directed

13 the investigation is "probative evidence" that supports his allegations. *Id.*

14        A genuine issue of material fact exists as to whether Baird is entitled to absolute

15 immunity. During his deposition, Coats, the lead RPD detective on the case, stated that Baird

16 "was directing the investigation from day one, being November 3, 2008." Dkt. # 211-45 at 6.

17 Coates described the case as "being put together by the prosecutor's office." *Id.* at 54. In an

18 email, Baird told RPD Detective Greg Mains that he had finished reviewing Jinaga's work

19 computer and emails and came up with a list of people they should investigate further. Dkt.

20 # 211-73 at 5. In another email, Baird sent Coats a list of people to re-interview. *Id.* at 30.

21 Baird also coordinated with the WSPCL about the evidence sent to the lab for DNA testing. *Id.*

22

23     [12] The King County Defendants also argue that Baird is entitled to prosecutorial immunity for his

24 decision to charge Fair with murder. Dkt. # 196 at 27. Fair responds that "he has always recognized" that
Baid is immune from suit for the filing of charging documents and the decision to charge Fair. Dkt. # 210
(redacted) at 43. Thus, the Court does not address this issue.

at 2, 10, 17–18, 32–37.  During the investigation, Baird also emailed Chuck Pardee, a KCPAO investigator, and stated that when working with smaller law enforcement agencies it is crucial to "tell them to take EVERYTHING from scene unless there is a damn good reason not to."  Dkt. # 215-3 (sealed) at 2.  He says that he did not tell the RPD officials to take certain items from the crime scene because he "was preoccupied with other stuff (coordinating interviews with apartment residents, working with the WSPCL CSRT, attending autopsy, getting blood alcohol levels rushed from toxicology, writing warrants...) and wrongly assumed they'd take everything in or near areas of obvious cleanup."  *Id.*

Baird is not entitled to summary judgment based on absolute immunity.  Viewed in the light most favorable to Fair, the evidence shows that Baird carried out "investigative functions normally performed by a detective or police officer."  *Garmon*, 828 F.3d at 843; *Cousins v. Lockyer*, 568 F.3d 1063, 1068 (9th Cir. 2009) (stating that investigative conduct generally involves "the evidence gathering and witness interviewing functions 'normally performed by a detective or police officer.'") (quoting *Buckley*, 509 U.S. at 273).

2.      Qualified Immunity

Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  When resolving a motion for summary judgment based on qualified immunity, courts "engage in a two-step inquiry."  *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022) (citing *Tolan v. Cotton*, 572 U.S. 650, 655 (2014) (per curiam)).  First, courts ask whether the facts, viewed in the light most favorable to the plaintiff, demonstrate that a constitutional right has been violated.  *Id.*  Second, courts ask "whether that right was 'clearly established' at the time of the alleged constitutional violation."  *Id.  See also Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  While the Supreme Court had once required courts to evaluate these questions

1  sequentially, *see generally Saucier*, 533 U.S. 194, it has since clarified that courts may answer

2  the questions in either order, *see Pearson*, 555 U.S. at 236.

3     The first step of the qualified immunity analysis asks whether, viewing the facts in the

4  light most favorable to the nonmoving party, the state actor violated a constitutional right.  *Peck*,

5  51 F.4th at 887.  The King County Defendants contend that qualified immunity bars Fair's

6  Section 1983 claim against Baird for malicious prosecution.[13]  In the TAC, Fair alleges that

7  Baird caused him to be prosecuted without probable cause based on his race and criminal

8  background, thereby depriving him of his right to equal protection.  *See* Dkt. # 147 at 59 ¶ 236.

9  The King County Defendants point out that "criminal background" is not a suspect class and

10  does not support an equal protection claim.  Dkt. ## 196 at n.42; 219 at 6 n.6.  They also contend

11  that "other than the fact that Fair is a black male and the other main suspect in this case was a

12  white male, Fair has put forth no evidence that the investigation and prosecution of him had

13  anything to do with his race."  Dkt. # 196 at 42.  They say that Baird would have offered Fair use

14

15

16     [13] In their reply brief, the King County Defendants argue that qualified immunity also bars Fair's
17  Fourth Amendment claim based on judicial deception.  Dkt. # 219 at 9–11.  Because this argument was
not raised in the King County Defendants' motion, the Court declines to address this issue.  *See*, *e.g.*,
*Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments
18  raised for the first time in a reply brief.") (citing *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003)).
   Although the King County Defendants say that "the specifics of Fair's alleged constitutional
19  allegations" were "unclear" until Fair responded to their motion, the TAC alleges a judicial deception
claim.  Dkt. ## 147, 219 at 6 n.5.  Fair's first cause of action is titled, "**42 U.S.C. § 1983 – CLAIMS**
**RELATED TO MALICIOUS PROSECUTION AND JUDICIAL DECEPTION**." Dkt. # 147 at 42
20  (emphasis in original).  And the TAC also says that Baird "intentionally omitted exculpatory evidence
from the Affidavit of Probable Cause and 'intentionally or recklessly omitted facts required to prevent
21  technically true statements in the affidavit from being misleading,' in violation of the Fourth
Amendment." *Id.* at 59–60 ¶ 236 (quoting *Liston v. Cnty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997),
*as amended* (Oct. 9, 1997).  This tracks the standard for a judicial deception claim.  *See Liston*, 120 F.3d
22  at 972 (9th Cir. 1997) ("A claim of judicial deception is made, if an officer 'submitted an affidavit that
contained statements he knew to be false or would have known to be false had he not recklessly
23  disregarded the truth and no accurate information sufficient to constitute probable cause attended the false
statements, . . .he cannot be said to have acted in a reasonable manner,' and the shield of qualified
24  immunity is lost.").

immunity for his interviews with law enforcement (such immunity was given to Johnson, a white suspect) if Fair had declined to speak to investigators.  Dkt. # 219 at 8.[14]

Fair counters that he has presented evidence that creates genuine issues of material fact as to whether Baird displayed bias towards him due to his race and criminal background.  Dkt. # 210 (redacted) at 54.[15]  Fair says that Baird used racially coded or negative language when referring to Fair as opposed to other white suspects.  *Id.* (citing Dkt. # 159-17 at 9–10).  He adds that the record does not show that Baird ever disciplined his colleagues for using racially coded language about Fair.  *Id.* at 54–55.  Fair contends that Baird offered use immunity to Johnson, a white suspect, during interviews with the police "hoping to implicate [Fair], but did not offer it to [Fair] to implicate Johnson."  *Id.* at 54.  He also says that Baird asked KCPAO investigator Chuck Pardee to advise RPD detectives on enhanced interrogation techniques to use in their interviews with Fair.  Fair says that Baird did not ask Pardee to advise investigators about these techniques for their interviews with white suspects.[16]

---

[14] The King County Defendants also assert that "any equal protection claim cannot be based on Baird's charging decision" because he is entitled to absolute immunity.  As noted above, Fair says that he is not bringing claims based on Baird's decision to charge him with murder.  Thus, the Court does not address this issue.

[15] In his opposition brief, Fair says that "two constitutional violations underpin his federal claim of malicious prosecution—a Fourteenth Amendment violation that he was discriminated on the basis of his race and criminal background, and a Fourth Amendment violation that he was detained pretrial without probable cause as a result of judicial deception which has no racial animus element."  Dkt. # 210 (redacted) at 46.  The Court notes that malicious prosecution and judicial deception are distinct Section 1983 claims.  *See Smith v. Almada*, 640 F.3d 931, 937–38 (9th Cir. 2011) (describing the standards for judicial deception and malicious prosecution claims).

[16] Fair does not address the King County Defendants' argument that an equal protection claim cannot be brought based on alleged discrimination because of a person's criminal background.  *See generally* Dkt. # 210 (redacted).  Thus, Fair has waived this issue.  *See Hartranft v. Encore Cap. Grp., Inc.*, 543 F. Supp. 3d 893, 913 (S.D. Cal. 2021) ("[W]here a non-moving party fails to address an argument raised by the moving party in the opposition brief, the Court may consider any arguments unaddressed by the non-moving party as waived"); *see also Qualey v. Pierce Cnty.*, No. 3:23-CV-05679-TMC, 2025 WL 306421, at *12 (W.D. Wash. Jan. 27, 2025), *reconsideration denied*, No. 3:23-CV-05679-TMC, 2025 WL 623669 (W.D. Wash. Feb. 26, 2025) (in resolving the defendants' motion for summary judgment, the court noted that "[w]hen a party fails to respond to an argument made to dismiss a claim, the argument is waived").

1      "The Equal Protection Clause of the Fourteenth Amendment commands that no State

2  shall deny to any person within its jurisdiction the equal protection of the laws, which is

3  essentially a direction that all persons similarly situated should be treated alike." *Boardman v.*

4  *Inslee*, 978 F.3d 1092, 1117 (9th Cir. 2020) (internal quotation omitted).  To establish a Section

5  1983 claim for an equal protection violation, "a plaintiff must show that the defendants acted

6  with an intent or purpose to discriminate against the plaintiff based upon membership in a

7  protected class." *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (internal quotation

8  omitted).  A plaintiff does not have to show that the "challenged action rested solely on racially

9  discriminatory purposes" but must demonstrate that the discriminatory purpose was a

10 "motivating factor" in the challenged action.  *Vill. of Arlington Heights v. Metro. Hous. Dev.*

11 *Corp.*, 429 U.S. 252, 265-66 (1977).

12     To avoid summary judgment, Fair must "must produce evidence sufficient to permit a

13 reasonable trier of fact to find by a preponderance of the evidence that [the] decision . . . was

14 racially motivated." *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948–49 (9th Cir.

15 2003), *overruled on other grounds in Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 949,

16 956 n.14 (9th Cir. 2010) (internal quotation and citation omitted); *see also Wingate v. City of*

17 *Seattle*, 198 F. Supp. 3d 1221, 1228 (W.D. Wash. 2016) (same).  "Intentional discrimination

18 means that a defendant acted at least in part because of a plaintiff's protected status." *Maynard v.*

19 *City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994), *as amended* (Nov. 22, 1994).

20 "Discriminatory intent may be proved by direct or indirect evidence." *Fed. Deposit Ins. Corp. v.*

21

22 _____

23        In any event, "persons convicted of crimes" are not a suspect class for equal protection purposes.
   *United States v. Whitlock*, 639 F.3d 935, 941 (9th Cir. 2011); *United States v. Wehr*, 20 F.3d 1035, 1037
24 (9th Cir. 1994) ("We note that persons convicted of a crime do not constitute a class that is suspect in
   terms of constitutional deprivation.").

*Henderson*, 940 F.2d 465, 471 (9th Cir. 1991) (citing *Vill. of Arlington Heights*, 429 U.S. at 266).

During the homicide investigation, Baird offered Johnson, a white suspect, use immunity relating to multiple interviews despite the "concerning" evidence against him. Dkt. # 211-18 at 2; *see also* Dkt. # 157-1 at 156 (during his deposition, Baird stated that "the evidence against . . . Johnson that was the most concerning was the presence of the motor oil on her body and the . . . bottle of motor oil in the dumpster that – and the motor oil on her body was used in the cleanup of the murder."). Fair was not offered such immunity for his interviews with investigators. And during the investigation, MDOP paralegal, Kelly Rosa, emailed Baird and other colleagues claiming that Fair was "two timing some ladies." Dkt. # 159-2 at 20. Rosa also stated, "It would be interesting to sit at the jail and see who comes for his visiting hours…On [*sic*] of them is said to be carrying his babay [*sic*]." *Id.* After Fair was arrested, Baird told King County Prosecutor Erin Ehlert that because RPD investigated Johnson as a suspect, KCPAO will have a "great rebuttal to any accusation" that RPD arrested Fair because he was "the only black man at the Halloween Party." Dkt. # 157-1 at 179.

Fair's prosecution expert, Maybell Romero, said that Baird's communications about Fair with other investigators "reveal likely racial bias." Dkt. # 159-17 at 9–10. Romero noted that Baird

> describe[d] [Fair] as 'a smooth talker' and 'very articulate' and characterize[d] him as someone who lies 'whenever his lips are' moving. Conversely, he describe[d] other suspects as 'seemingly really smart.' Calling Black people 'articulate' has long been acknowledged as a racially based microaggression, signaling that the person using such language may thing that it is unusual for someone Black to be intelligent.

*Id.* at 10. Romero also noted that the PC Certification, written by Baird, "omits the fact that a neighbor gave an eyewitness account of someone closely matching [Johnson's] description

standing outside of [Jinaga's] doorway talking to her with the door open at 3:00 a.m., and that he described the person as 'definitely not Black.'" Dkt. # 159-17 at 6. Fair's bias and data analysis expert, Dr. Anthony Greenwald, concluded that Baird "allowed his confirmation bias, accompanied by implicit and/or explicit racial bias, to focus [RPD] investigators and detectives on . . . Fair as the prime suspect, to the exclusion of other, [w]hite, suspects." Dkt. # 159-2 at 26.

"[D]iscriminatory behavior is not a perfect dichotomy." *Wingate*, 198 F. Supp. 3d at 1229; *see also Lowe v. Monrovia*, 775 F.2d 998, 1011 (9th Cir.1985) ("Determining the existence of a discriminatory purpose demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."). Construing the facts in the foregoing paragraphs in the light most favorable to Fair, there is a genuine issue of material fact as to whether Baird was motivated, at least in part, by Fair's race. *See Sims v. City of Seattle*, No. 2:22-CV-00483-TL, 2023 WL 4866485, at *17 (W.D. Wash. July 31, 2023), *aff'd in part, rev'd in part and remanded sub nom. Sims v. Brown*, No. 23-35545, 2024 WL 1854284 (9th Cir. Apr. 29, 2024) (denying qualified immunity to the defendant-law enforcement official as to the plaintiff's race discrimination claim because "an inquiry into Defendant Brown's intent is best conducted by a finder of fact at trial, not by the court at summary judgment") (internal quotation omitted).[17] Thus, Baird is not entitled to summary judgment based on qualified immunity for his actions during the homicide investigation.[18]

---

[17] The Ninth Circuit determined that it did not "have jurisdiction to review the district court's determination that there was a genuine dispute of fact as to whether race was a motivating factor for Brown's decision to escalate tactics during the stop." *See Sims v. Brown*, No. 23-35545, 2024 WL 1854284, at *5 (9th Cir. Apr. 29, 2024) (noting that "[t]his is not a case where Sims relied on pure conclusory allegations of bad motive, contrary to Brown's assertion.").

[18] The King County Defendants do not present any arguments about the "clearly established" constitutional right prong of the qualified immunity analysis. They offer no arguments and no law about whether a reasonable official in Baird's position would have been aware that their alleged conduct constituted a constitutional violation. Thus, this Order does not address the issue.

1

2          3.        Malicious Prosecution

3          To succeed on a malicious prosecution claim under Washington law, a plaintiff must

4   show (1) the defendant instituted or continued a prosecution; (2) without probable cause; (3) with

5   malice; (4) in a proceeding terminated in the plaintiff's favor; and (5) to the plaintiff's injury.

6   *Bender v. City of Seattle*, 99 Wash. 2d 582, 664 P.2d 492 (1983).  For a malicious prosecution

7   claim under Section 1983, a plaintiff "must show that the defendant[] prosecuted [them] with

8   malice and without probable cause, and that they did so for the purpose of denying [them] equal

9   protection or another specific constitutional right." *Lassiter v. City of Bremerton*, 556 F.3d 1049,

10  1054 (9th Cir. 2009) (internal quotation omitted).  "Federal courts rely on state common law for

11  elements of malicious prosecution." *Mills v. City of Covina*, 921 F.3d 1161, 1169 (9th Cir.

12  2019).

13         The King County Defendants say that Fair's federal and state malicious prosecution

14  claims fail because Fair cannot establish lack of probable cause or malice.  Dkt. # 196 at 33–42.

15  The Court addresses each argument below.[19]

16         a.        Probable Cause

17         Probable cause "is a fluid concept – turning on the assessment of probabilities in

18  particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."

19  *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  In assessing probable cause, a court must look at the

20  "totality of the circumstances." *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005).  "The

21  term 'probable cause,' as used in connection with an action for malicious prosecution, means

22  reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to

23  _____

24  [19] The King County Defendants also says that Fair's federal malicious prosecution claim fails
    because he has failed to show that Baird violated his constitutional rights. Dkt. # 196 at 32.  As stated
    above, a genuine issue of material fact exists as to whether Baird was motivated at least in part by Fair's
    race in violation of the Equal Protection Clause of the Fourteenth Amendment.

warrant an ordinarily prudent and cautious man in believing the accused guilty of the offense *with which he is charged*." *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wash. 2d 485, 508, 125 P.2d 681 (1942) (internal citations omitted) (emphasis in original). Probable cause exists when

> it clearly appears that the defendant, before instituting criminal proceedings against the plaintiff, made to the prosecuting attorney a full and fair disclosure, in good faith, of all the material facts known to him, and that the prosecuting attorney thereupon preferred a criminal charge and caused the arrest of the accused, probable cause is thereby established as a matter of law and operates as a complete defense to a subsequent action by the accused.

*Bender v. City of Seattle*, 99 Wash. 2d 593 (citing *Peasley*, 13 Wash. 2d at 499–500).

If an issue of fact exists, "under all the evidence, as to whether or not the prosecuting witness did fully and truthfully communicate to the prosecuting attorney . . . all the facts and circumstances within [their] knowledge, then . . . the existence or nonexistence of probable cause must then be determined by the jury." *Peasley*, 13 Wash. 2d at 500. "A prima facie case of want of probable cause is established by proof that the criminal proceedings were dismissed or terminated in favor of the party bringing the malicious prosecution action." *Id*. If a prima facie case is made by a plaintiff, it may be rebutted by the defendant's evidence. *Id.* In the event of such a rebuttal, "plaintiff must *by evidence* affirmatively establish want of probable cause." *Id.* at 499 (emphasis in original). The existence of probable cause is a complete defense to a malicious prosecution claim. *See Chen v. D'Amico*, No. C16-1877JLR, 2019 WL 2248105, at *25 (W.D. Wash. May 24, 2019).

The King County Defendants say that Fair has failed to show that he was prosecuted without probable cause because the state trial courts already determined that probable cause existed for the murder charge. Dkt. # 196 at 36. They say, "The fact that Fair was acquitted in his second trial only establishes a prima facie case of lack of probable cause." *Id.* (internal

citation omitted).  They also contend that if "investigator Baird" and Coats "fully and fairly disclosed to 'prosecutor Baird' all the material facts known to them," this is a complete defense to a malicious prosecution claim.  *Id.* at 35.  The King County Defendants say that probable cause exists because, among other things, (1) Fair denied making any phone calls after he went to bed but his cellphone records show that he made 18 phone calls in the early morning hours after the Halloween party; (2) DNA consistent with Fair's (Y-STR profile of one in 11,393) was found on a neck swab taken from Jinaga's body; (3) DNA consistent with Fair's (STR profile: one in 550 trillion) was found on a piece of bloody tissue in Jinaga's bedroom; (4) DNA consistent with Fair was found on duct tape used to gag Jinaga; and (5) Jinaga's red terrycloth robe, found in the dumpster outside the apartment complex, contained DNA consistent with Fair. *Id.* at 37–38.  They also say that all of Fair's allegations contending that there were "intentional omissions or misleading statements" in the PC Certification "reflect a basic misunderstanding of the purpose of" the Certification.  *Id.* at 38–39.

Fair responds that if the PC Certification "had not included misleading information and omitted exculpatory information, probable cause would not have been found."  Dkt. # 210 (redacted) at 51.  He disputes the characterization of the DNA evidence in the PC Certification as "'linking' him to the murder, and especially the misrepresentation that his DNA was the *only* DNA linked to the murder."  *Id.* at 50.  Fair says that he provided investigators with plausible explanations for the phone calls that were consistent with other statements by witnesses, but that investigators chose not to credit them.  *Id.* (internal citations omitted).  He also asserts that the duct tape evidence is misleading because Johnson's DNA was also associated with the tape, but the PC Certification fails to mention this.  *Id.* at 49.  He also says that there is a plausible explanation for the presence of his DNA on Jinaga's neck — "[p]hotos procured by investigators showed [him] in pictures with [Jinaga] and other partygoers virtually touching [Jinaga], in one of

his interviews with police he told them that during the party she was close to him showing him something on her computer, she touched his hair, and he told police he was in all areas of her apartment." *Id.* at 49 (internal citation omitted). He also disputes that there was no plausible explanation for the DNA on Jinaga's robe. *Id.* (internal citation omitted).

In 2019, a jury acquitted Fair of Jinaga's murder. Dkt. # 211-62 at 4. Thus, Fair has established a prima facie case of lack of probable cause. *See Peasley*, 13 Wash. 2d at 499. The King County Defendants contend that the state courts already determined that probable cause existed for the murder charge. But as the Court previously stated, Fair "was twice tried and essentially twice acquitted, which substantially undermines the persuasive effect of the state court's probable cause rulings." *See* Dkt. # 85 at 15 n.10.

Moreover, the description of the DNA evidence against Fair in the PC Certification could be misleading. For example, the DNA results from roll of duct tape found on Jinaga's sofa indicate that Fair *and* Johnson could not be excluded as "*possible* contributors." Dkt. # 211-83 (emphasis added). But the PC Certification only says that "Fair's DNA ha[d] been discovered" on the tape. Dkt. # 197 at 308. Also, according to the WSPCL, the neck swab contained only "a trace component of limited genetic information." Dkt. # 201-27 at 7. Later testing of the swab indicated that Fair was a "potential contributor" at a frequency rate of one in 3803 individuals. Dkt. # 197 at 243–46. But the PC Certification says that Fair's DNA was "discovered" on the body. Dkt. # 197 at 308.

And the PC Certification does not mention that a key piece of evidence, an almost empty bottle of motor oil found in a plastic bag with Jinaga's robe, contained DNA consistent with Jinaga and Johnson (at a frequency of one in 5,100 individuals). Dkt. ## 211-2 at 311; *see also* Dkt. # 159-17 (Fair's expert, Maybell Romero, quotes WSPCL analyst, Brianne Huseby's description of Johnson's DNA on the bottle as "more DNA than you would expect from just

casual handling of the bottle"). Investigators believed that oil from this bottle was used to coat Jinaga's body in oil after she was killed. Dkt. ## 211-2 at 311, 358; 157-1 at 156 (during his deposition, Baird called the motor oil evidence "concerning"). Lastly, the King County Defendants contend that the presence of Gurtler's DNA in Jinaga's bedroom was not "obviously connected to the murder." But Gurtler was a "possible contributor" to the DNA on the green sheet that investigators found covering Jinaga's body. Dkt. ## 196 at 40, 197 at 96. And when investigators questioned Gurtler, he did not have an alibi for the suspected time of death and made inconsistent statements to investigators about where he was and who he was with the night of the Halloween party. *See* Dkt. ## 211-2 at 304, 337; 157-1 at 24.

Fair's police practices expert, Susan Peters, observed that "[b]ased on [her] experience and training as an officer and major crimes detective, a certification for probable cause must contain objective facts and evidence that indicates the suspect's responsibility for the crime." Dkt. # 157-1 at 13. And if investigators know of "information that could be interpreted as contradictory to those facts, that information has to be revealed as well, to give the Prosecutor/Court/Judge an impartial overview of the case." *Id.* She also stated that "the Certification for Probable Cause [used to support the murder charge against Fair] did not reflect best police practices and indeed fell well below the standards of practice in law enforcement criminal investigations." *Id.*; *see also* Dkt. # 157-1 at 13–28 (describing various omissions from the PC Certification that were "unreasonable" and "fall below standards for similarly situated law enforcement officers").

Viewing the facts outlined above in the light most favorable to Fair, there are triable issues of fact as to whether he was prosecuted without probable cause. *See, e.g.*, *Spencer v. Peters*, 966 F. Supp. 2d 1146, 1164 (W.D. Wash. 2013), *on reconsideration in part* (Oct. 2, 2013) (denying the defendant's summary judgment motion as to the plaintiff's malicious

prosecution claim because there were genuine issues of fact regarding the existence of probable cause).

                    b.     Malice

For purposes of a malicious prosecution claim, malice may be shown "by proving that the prosecution complained of was undertaken from improper or wrongful motives or in reckless disregard of the rights of the plaintiff." *Bender*, 664 P.2d at 501. An improper motive may be established by "by proof that the defendant instituted the criminal proceedings against the plaintiff: (1) without believing him to be guilty, or (2) primarily because of hostility or ill will toward him, or (3) for the purpose of obtaining a private advantage as against him." *Id.* (internal citations omitted). "Malice may be inferred from lack of probable cause and from proof that the investigation or prosecution was undertaken with improper motives or reckless disregard for the plaintiff's rights." *Youker v. Douglas Cnty.*, 162 Wn. App. 448, 464, 258 P.3d 60, 68 (2011) (citing *Turngren v. King Cnty.*, 104 Wash.2d 293, 306, 705 P.2d 258 (1985)). But malice cannot be inferred from lack of probable cause alone; "the plaintiff must [] demonstrate affirmative acts disclosing at least some feeling of bitterness, animosity or vindictiveness." *Id.* (internal citation and quotation omitted). To support an inference of malice, reckless disregard "requires proof of bad faith, a higher standard than negligence" and may be shown by evidence that the defendant "entertained serious doubts." *Id.* (citing *State v. Chenoweth*, 160 Wash.2d 454, 479, 158 P.3d 595 (Wash. 2007)).

The King County Defendants assert that Fair has adduced no evidence of malice. Dkt. # 196 at 41. They say that Fair has not shown that "Baird investigated or prosecuted him for any reason other than to bring Jinaga's murderer to justice." *Id.* They also contend that Fair has only offered "speculation that because he was black and Johnson was white, that malice existed." *Id.*

1    They say that Fair alleges a racial motive in the investigation and prosecution but "offers no

2    evidence of actions by Baird that support such racial animus."  *Id.*

3           Fair responds that there are genuine issues of material fact as to the element of malice.

4    Dkt. # 210 (redacted) at 53.  He says that some of Baird's email exchanges contain language

5    expressing "bitterness, animosity, or vindictiveness towards" Fair.  *Id.* (citation omitted).  He

6    also says that Baird showed recklessness disregard for Fair's rights because he participated in an

7    interview in which Coats informed Johnson that he was the "reasonable doubt for the guy that

8    we're gonna take to trial."  *Id.* (citations omitted).  He also says that his expert witnesses have

9    opined on the various ways in which a "reasonable juror could infer that [] Baird displayed

10   negative or biased attitudes towards" Fair.  *Id.* (citations omitted).

11          First, regarding the King County Defendants' argument that Fair has not shown that

12   Baird acted with racial animus, the Court has determined that there is a genuine issue of material

13   fact as to whether Baird was motivated, at least in part, by Fair's race.  *See* Sec. III.A.2.

14   Furthermore, some of the emails Baird sent during the investigation raise a genuine issue of

15   material fact as to whether Baird acted with "bitterness, animosity, or vindictiveness" towards

16   Fair.  For example, Baird emailed Coats and Ehlert with the subject line "How can you tell

17   Emanuel Fair is lying?" and in the body of the email Baird wrote, "His lips are moving."  Dkt.

18   # 211-55 at 2.  In another email, following an interview with Fair, Baird told Elhert that Fair was

19   displaying a "typical sociopath's efforts to ingratiate himself within the investigation" because

20   Fair had informed his parole officer that he had been "helpful to investigators."  Dkt. # 215-6

21   (sealed) at 3.  Baird also interviewed Johnson with Coats and, during that interview, Coats

22   informed Johnson, "[A]nything you can do to shake a memory loose that could help you be a

23   better witness for us and not be such an asset for the defense when this goes to trial, 'cause right

24

SEALED ORDER RE: DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT - 31

1  now, that's what you are. You are the reasonable doubt for the guy that we're gonna take to

2  trial." Dkt. # 21-32 at 15.

3      Fair's prosecution expert, Maybell Romero also states that

4  Baird let his own personal opinions of potentially exculpatory witnesses determine
   the direction of the investigation. There was a question about whether [Fair] was
5  spending time on the phone with a woman, Christina "Mandy" Ridesatthedoor, at
   the time of Jinaga's murder that that [*sic*] he may have been assisting her to engage
6  in prostitution. (Baird had no evidence that [Fair] "had any involvement in
   prostitution"). Baird reasoned that this was impossible since he considered
7  Ridesatthedoor "quite unattractive" and that she made the woman that [Fair] was
   staying with "look great."

8  Dkt. # 159-17 at 5–6 (internal citations omitted). She also notes that Baird stated during a

9  deposition that "'there has always been probable cause to believe that' Cameron Johnson

10  committed the murder of Arpana Jinaga." *Id.* at 4. She also says that Baird "dismissed

11  submitting material for DNA testing though there were never conclusive matches for either

12  [Fair] or Cameron Johnson, though there was a conclusive match with Aaron Gurlter's [*sic*]

13  semen on the sheet covering Jinaga's body and on a towel in the room." *Id.* at 6.

14      Viewing the above facts in the light most favorable to Fair, triable issues of fact exist as

15  to malice.

16      4.    *Monell* Liability

17      King County may not be held liable under § 1983 on a respondeat superior theory. *See*

18  *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978); *Ulrich v. City & Cnty. of San*

19  *Francisco*, 308 F.3d 968, 984 (9th Cir. 2002). Instead, governmental liability under Section

20  1983 must hinge on at least one of four theories: (i) a policy or longstanding practice or custom

21  from which the alleged constitutional violation resulted; (ii) an unconstitutional action by an

22  official with final policy-making authority; (iii) ratification by an official with final policy-

23  making authority of a subordinate's unconstitutional conduct; or (iv) a failure to adequately train

24

employees that amounts to "deliberate indifference" about the constitutional right at issue. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005); *City of Canton v. Harris*, 489 U.S. 378 (1989).

King County seeks to dismiss Fair's *Monell* claims based on (1) policy, custom, or practice, (2) ratification, and (3) failure to train.

          a.        Fair's *Monell* Claims Related to Malicious Prosecution

                (1)      Policy, Practice, or Custom

A local government can be liable under § 1983 if a plaintiff establishes that the government "had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation [they] suffered." *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012) (quoting *Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir.2007)) (alteration in original); *see also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (reasoning that a plaintiff must establish that the policy, practice, or custom was the "actionable cause" of the injury) (internal quotation omitted). "To meet this requirement, the plaintiff must show both causation-in-fact and proximate causation." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013) (internal citation omitted); *see also Canton*, 489 U.S. at 385 (a plaintiff must establish "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation").

The King County Defendants contend that Fair has shown no evidence "as to how the MDOP policy, practice, or custom caused him to be maliciously prosecuted." Dkt. # 196 at 45. They say that even if MDOP "had a policy of making prosecutors into *de facto* investigators," Fair has not demonstrated that MDOP caused the constitutional harm, as opposed to Baird's actions during the investigation. *Id.* They also assert that Fair has not shown how the mere fact

1    of having a prosecutor at a crime scene and working with law enforcement during an

2    investigation leads to a malicious prosecution. *Id.*

3        Fair says that because of MDOP's policy and practice, Baird and other KCPAO

4    employees were able to (1) control pertinent information about the investigation (and thus direct

5    the investigation towards Fair); (2) use biased and disparaging language in their communications

6    about Fair; (3) use enhanced interrogation techniques on Fair; and (4) offer an immunity deal to a

7    white suspect to get him to implicate Fair in Jinaga's murder. Dkt. # 210 (redacted) at 57. He

8    says that his experts have opined that MDOP's policy creates a risk of constitutional harm. *Id.*

9    (citations omitted).

10        The record before the Court does not show a causal link between a policy of having a

11    prosecutor as part of the homicide investigation team and Fair's alleged injuries. Even if MDOP

12    turned Baird into a "*de facto* detective," Fair has not produced evidence to show that MDOP, as

13    opposed to Baird's decisions during the investigation, was the but for cause of the constitutional

14    harm. For example, there is no evidence that Baird's alleged decisions, such as offering

15    immunity to Johnson during interviews or directing RPD investigators to use enhanced

16    interrogation techniques on Fair, was a result of municipal policy. And Fair's experts' reports do

17    not show that MDOP, a program in which a prosecutor works with law enforcement, the medical

18    examiner, and forensic scientists during a homicide investigation, is the moving force behind a

19    constitutional violation. For example, Fair's prosecution expert, Maybell Romero, states, "The

20    way in which MDOP allows prosecutors, and in this case, Baird, to imbed themselves directly

21    into investigations helped to create the potential for biased and unfairly disparate impacts." Dkt.

22    # 159-17 at 10. But under MDOP, KCPAO prosecutors are tasked with "observ[ing]," and

23    "assess[ing] the weight of th[e] evidence when it comes to a charging decision." Dkt. # 197 at

24    120. MDOP allows KCPAO prosecutors to be "notified earlier regarding the onset of a homicide

investigation so that [they] could have some sense of where that investigation was going, some, perhaps even participation into how evidence was collected so that it would meet constitutional standards so that it would be admissible at trial." *Id.* at 118.

Viewing the facts in the light most favorable to Fair, the evidence does not show that MDOP was "the actionable cause" behind the alleged constitutional violations. *See Tsao*, 698 F.3d at 1143 (granting the defendant's summary judgment motion as to the plaintiff's § 1983 claim based on policy, custom, or practice because the plaintiff could not show that the policy at issue was the "actionable cause of the constitutional violation"); *see also Molton v. City of Cleveland*, 839 F.2d 240, 246 (6th Cir. 1988) (stating that a city's "failure to build a suicide-proof jail cell, and its inadequate training of its police force, may well be acts of negligent omission, but they have not been shown to be the result of municipal policy: '*a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing formal policy with respect to the subject matter in question.*'") (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (emphasis added).

### (2)    Ratification

A local government can be liable for an "isolated constitutional violation if the final policymaker 'ratified' a subordinate's actions." *Christie v. Iopa*, 176 F.3d 1231, 1238 (9th Cir. 1999) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality)).  To establish a ratification claim, a plaintiff must show that "an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Rosenbaum v. City & Cnty. of San Francisco*, 484 F.3d 1142, 1155 (9th Cir. 2007) (quoting *Ulrich*, 308 F.3d at 984-85).  "The policymaker must have knowledge of the constitutional violation and actually approve of it. A mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004).

The King County Defendants contend that Fair's ratification claim fails because Fair has adduced no evidence that King County Prosecutor Daniel Satterberg delegated final decision-making authority to Baird.[20] Dkt. # 196 at 50. The King County Defendants argue that a final policymaker's delegation "'must be such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review.'" *Id.* at 51 (quoting *Pino v. City of Miami*, 315 F. Supp. 2d 1230, 1245 (S.D. Fla. 2004)). They say that although Fair identifies Baird as the "creator/founder, policymaker, and supervisor for [the] MDOP program," he acknowledges that Baird acted under Satterberg's supervision. *Id.* at 52 (citing Dkt. # 147 at 53 ¶¶ 225–26). They also say that the evidence does not show that Baird had final policymaking authority that was not subject to review by Satterberg. *Id.* The King County Defendants contend that Fair has only established that Satterberg delegated the discretion to perform duties of the job as "befits a large county agency." Dkt. # 219 at 17.

Fair responds that Baird "was the chair of MDOP" and Satterberg "delegated [to Baird] decision-making authority over its investigative functions." Dkt. # 210 (redacted) at 60. He says that Satterberg testified that he "delegated authority over MDOP to his chief criminal deputy, Mark Larson, and did not take an active role in supervising MDOP." *Id.* Fair says that Larson testified that Baird retained authority over decisions like assigning MDOP prosecutors to go to crime scenes, initiating immunity agreements, and investigating crimes. *Id.*

---

[20] The King County Defendants also say that Fair has not shown that Satterberg ratified any decisions or knew that the practice of sending prosecutors to homicide scenes would result in constitutional violations. Dkt. # 196 at 50. Fair does not respond to this argument. *See generally* Dkt. # 210 (redacted). Thus, to the extent Fair's ratification claim is based on Satterberg ratifying Baird's actions, it is waived. *See Hartranft v. Encore Cap. Grp., Inc.*, 543 F. Supp. 3d 893, 913–14 (S.D. Cal. 2021) ("[W]here a non-moving party fails to address an argument raised by the moving party in the opposition brief, the Court may consider any arguments unaddressed by the non-moving party as waived." (citing *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016) (noting that "the plaintiffs did not raise that argument to the district court in their . . .opposition to the defendants' motion for summary judgment, so the argument was waived.")

The issue is whether Satterberg "delegated discretion to act, or . . . done more by delegating final policymaking authority." *Christie*, 176 F.3d at 1236; *see also Fiorenzo v. Nolan*, 965 F.2d 348, 351 (7th Cir.1992) ("[A] municipality is not liable merely because the official who inflicted the alleged constitutional injury had the discretion to act on its behalf; rather, the official in question must possess final authority to establish municipal policy with respect to the challenged action."). The Court considers "whether the official's discretionary decision is 'constrained by policies not of that official's making' and whether the official's decision is 'subject to review by the municipality's authorized policymakers.'" *Christie*, 176 F.3d at 1236–37 (quoting *Praprotnik*, 485 U.S. at 127). Here, the record does not show that Baird possessed final authority to establish municipal policy or make binding decisions on behalf of King County. Although Larson, KCPAO's chief criminal deputy, supervised MDOP, this does not mean that Satterberg delegated to Baird (or even to Larson) final decision-making authority. For example, although Fair contends that Baird had authority to "initiate" immunity agreements, nothing in the record suggests that Baird's actions were not constrained by municipal policies or subject to review by Satterberg. *See, e.g.*, *Sanchez v. Melendrez*, 934 F. Supp. 2d 1325, 1341 (D.N.M. 2013) ("The fact that the 'higher ups' might have been aware of the tact plan and d[id] nothing to stop it, does not amount to a delegation of policymaking authority.").

### (3)    Failure to Train

While a local government's failure to adequately train its employees can amount to official government policy for purposes of § 1983 "in limited circumstances," "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Proof of inadequate training "does not render the city liable [under § 1983] per se." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

Rather, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick*, 563 U.S. at 61 (quoting *City of Canton*, 489 U.S. at 388). "Only then can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* (citation and quotation marks omitted). A government entity's "[f]ailure to train may amount to a policy of 'deliberate indifference,' if the need to train was obvious and the failure to do so made a violation of constitutional rights likely." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). And single-incident failure-to-train municipal liability can exist "in a narrow range of circumstances [] [where] a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997).

The King County Defendants contend that Fair has provided no evidence of a pattern of similar constitutional violations. Dkt. # 196 at 52. They also say that Fair has adduced no evidence that "KCPAO disregarded a known or obvious consequence of failing to train or supervise and, therefore, exhibited deliberate indifference to the constitutional rights of citizens." *Id.* They also say that KCPAO "is not an investigative agency so would not have been on notice that not training its prosecutors as to how to conduct law enforcement investigations in an unbiased manner would lead to a constitutional violation." *Id.* at 54.

Fair says that, through MDOP, King County prosecutors "works as part of an investigative team." Dkt. # 210 (redacted) at 61 (internal citation omitted). He says that "assigning deputy prosecutors to criminal investigations of major crimes—crimes that carry the heaviest of criminal penalties—without any training how to prevent bias in criminal investigations could risk constitutional violations." *Id.* Fair notes that Larson stated during his

1   deposition that MDOP has no specific training program. *Id.* (internal citation omitted). And Fair

2   contends that the "Principles and Practices" guidance for MDOP prosecutors (drafted in 2012)

3   says that "MDOP DPAs have no formal training in investigations; the primary purpose of our

4   presence at the scene is to promote the presentation of the case in the courtroom. Nevertheless, in

5   most cases, the MDOP attorney will find him- or herself immersed and involved in the actual

6   investigation of the crime." *Id.* at 62 (Dkt. # 211-52 at 3).

7        Contrary to the King County Defendants' argument that they "had no notice" of the need

8   to train their employees because they are not an investigative agency, their written materials

9   acknowledge that they "have no formal training in investigations" but will in "most cases" will

10  find themselves "*immersed and involved in the actual investigation of the crime.*" Dkt. # 211-52

11  at 3 (emphasis added). A reasonable juror could conclude that MDOP prosecutors not receiving

12  any training on how to conduct racially unbiased investigations could amount to a policy of

13  deliberate indifference.

14       This appears to be a close call. Liability under a failure-to-train theory remains rare. The

15  risk of the constitutional violation must be foreseeable in such a way that it amounts to deliberate

16  indifference when the municipality fails to prepare their personnel for it. *See Connick*, 563 U.S.

17  at 63. But as other district courts in this Circuit have noted "a complete absence of training

18  supports an inference of deliberate indifference." *Manzanillo v. Lewis*, 267 F. Supp. 3d 1261,

19  1276 (N.D. Cal. 2017); *Esser v. McIntyre*, No. 21-CV-03440-JST, 2022 WL 20184567, at *3

20  (N.D. Cal. July 21, 2022) (same); *Turner v. CA Dep't Corrs. & Rehab.*, No. 2:18-CV-2672 DB

21  P, 2019 WL 283712, at *4 (E.D. Cal. Jan. 22, 2019) (same).

22       Thus, viewing the evidence in the light most favorable to Fair, a genuine issue of material

23  fact exists as to whether KCPAO's lack of any training had "patently obvious" unconstitutional

24  consequences. *See, e.g.*, *Wereb v. Maui Cnty.*, 830 F. Supp. 2d 1026, 1034 (D. Haw. 2011)

(denying the defendant's motion for reconsideration as to the court's denial of summary

judgment for the plaintiff's failure-to-train claim because the county employees had "no

training" and thus "had no knowledge or familiarity with their relevant constitutional duties");

*Manzanillo v. Lewis*, 267 F. Supp. 3d 1261, 1276 (N.D. Cal. 2017) (denying summary judgment

as to the plaintiff's failure-to-train claim because the defendants pointed to "no training

requirements" for prison control-booth officers even though these officers were responsible for

observing inmate movement for prison safety).

        b.      Fair's *Monell* Claims Related to His Conditions of Confinement

       The King County Defendants assert that Fair's *Monell* claims about his conditions of

confinement at King County Jail must be dismissed because Fair has adduced no evidence about

any specific Department of Adult and Juvenile Detention (DAJD) policies. Dkt. # 196 at 55.

They say that Fair has not shown any specific policies that DAJD had about medical and mental

healthcare and understaffing. *Id.* The King County Defendants contend that municipal liability

cannot be based on Fair's "general allegations" that "DAJD has a policy of running an unsafe

facility." *Id.*

       Fair counters that a municipality's policy or custom need not be formally approved or

written down. Dkt. # 210 (redacted) at 63 (citing *Est. of Hill by & through Grube v. NaphCare,*

*Inc.*, No. 23-2741, 2025 WL 1098549, at *1 (9th Cir. Apr. 14, 2025)). He says that "'there is no

case law indicating that a custom cannot be inferred from a pattern of behavior toward a single

individual.'" *Id.* (quoting *Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794 (9th Cir. 2017)).

Fair contends that DAJD employees "were aware of his sleep apnea but failed to provide

treatment, which contributed to his worsening heart condition." *Id.* (internal citation omitted).

He also says that he was held in protective custody for nearly nine years at King County Jail. *Id.*

at 65. Fair asserts that Commander Todd Clark, the final policymaker in charge of King County

1    Jail, knew that Fair's time in protective custody was "a long time'" but this was "not necessarily

2    exceptional." *Id.* Clark said that King County Jail had some inmates "in restrictive housing for

3    multiple years." *Id.* Fair also says that Clark (and Clark's predecessor, Commander William

4    Hayes) acknowledged that they were aware of concerns about the long-term effects of segregated

5    housing. *Id.* Fair contends that he has been "severely harmed" by the nine years he spent in

6    protective custody and that "his current physical complaints and chronic pain are an

7    understandable and predictable consequence of the severe restrictions imposed in solitary

8    confinement." *Id.* at 68.

9        *Sleep Apnea.* As stated above, *Monell* liability cannot be "predicated on isolated or

10   sporadic incidents[.]" *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). But as acknowledged

11   by other district courts in this Circuit "multiple instances of insufficient medical care provided to

12   a single plaintiff can evidence a *Monell* custom." *Tapia v. NaphCare Inc.*, No. C22-1141-KKE,

13   2025 WL 90973, at *7 (W.D. Wash. Jan. 14, 2025) (citing *Tabb v. NaphCare*, No. 3:21-cv-

14   05541-LK-TLF, 2024 WL 1905638, at *7 (W.D. Wash. May 1, 2024)); *Jennings v. Cnty. of

15   Riverside*, No. 5:19-01523 JFW (ADS), 2023 WL 9379974, at *2 (C.D. Cal. Sept. 1, 2023);

16   *Trejo v. Cnty. of Imperial*, No. 20-cv-1465-LAB-DDL, 2023 WL 4194442, at *1–2 (S.D. Cal.

17   June 26, 2023)). And the Ninth Circuit has acknowledged the same. *See Oyenik*, 696 F. App'x

18   at 794 ("There is no case law indicating that a custom cannot be inferred from a pattern of

19   behavior toward a single individual[.]"); *Manzo v. Cnty. of Santa Clara*, No. 17-CV-01099-BLF,

20   2020 WL 6940935, at *12 (N.D. Cal. Nov. 25, 2020) ("Although *Oyenik* is not a precedential

21   opinion, the observation about the state of Ninth Circuit law is unquestionably correct.").

22       District courts in this Circuit have stated that sleep apnea may be a serious medical

23   condition. *Floyd v. Ada Cnty.*, No. 1:17-CV-150-DCN, 2017 WL 6543872, at *5 (D. Idaho Dec.

24   21, 2017); *see also Goudlock v. Perez*, No. 08CV204 AJB RBB, 2012 WL 846444, at *5 (S.D.

Cal. Mar. 13, 2012) (citing *Pierce v. Gonzales*, No. 1:10cv285 JLT(PC), 2011 WL 703594, at *12 (E.D. Cal. Feb. 18, 2011)).  Fair asserts that he requested sleep apnea treatment multiple times while in King County Jail, but his condition went untreated.  Fair provided the Court with documents showing that medical staff examined Fair in 2013, and he asked them "*again* if he has sleep apnea." Dkt. # 211-74 at 2 (emphasis added).  In 2017, medical staff noted that Fair "express[ed] concern about weight gain and possible sleep apnea." *Id.* at 4.  In 2018, a nurse informed Fair that "sleep apnea [was] not on his problem list" and Fair informed them that "it should" be. *Id.* at 5. The nurse noted that they "reviewed all office notes from 2016-present, filtering for sleep and sleep apnea." *Id.*  Fair also provided a "Transfer Request" form from King County Public Health to "HMC Sleep Clinic," which says "35-year-old African American male with persistently elevated BP despite three BP rx, pt. reported snoring, PND, daytime somnolence, please evaluate for possible OSA." *Id.* at 8.

The King County Defendants say that medical records Fair provided only show that he was being treated by medical staff for his sleep apnea, and that he was referred to a sleep apnea clinic in 2018. Dkt. # 219 at 20.  But the record before the Court does not show that Fair was ultimately evaluated or treated for sleep apnea.  Nor does it show why Fair was referred to a sleep apnea clinic about five years (or more) after he first mentioned sleep apnea issues to medical staff.  And King County has not provided the Court with any medical records refuting Fair's contention that his sleep apnea went untreated during the nine years he was in pretrial detention.

Thus, a genuine issue of material facts exists about whether King County had a policy or custom of delaying or denying sleep apnea treatment.  *See, e.g.*, *Thompson v. Corizon Health Care Inc.*, No. CV1902841PHXSRBESW, 2020 WL 6748736, at *18 (D. Ariz. July 27, 2020), *on reconsideration in part*, No. CV1902841PHXSRBESW, 2020 WL 6748556 (D. Ariz. Aug.

1    31, 2020) ("[E]ven without an official, written policy, a reasonable jury could conclude that

2    Corizon's denials or delays of proper treatment for [the] [p]laintiff's hand injury were part of a

3    policy or widespread custom of Corizon to deny or delay proper medical care."); *see also*

4    *Jennings*, 2023 WL 9379974, at *8 (stating that the defendant's disagreement with the evidence

5    presented by the plaintiff about an alleged policy or practice of denying soft shoes to inmates

6    who complained of foot pain from wearing sandals did not warrant dismissing the plaintiff's

7    *Monell* claim; instead it "raise[d] a dispute of material fact regarding whether the evidence shows

8    a policy or custom existed").

9        *Protective Custody.*    Fair contends that he was allowed to "languish" in protective

10   custody "because it was regular King County practice."  Dkt. # 210 at 66 (alteration and citation

11   omitted).  During eight of the nine years of his pretrial detention at King County Jail, Fair was

12   housed in the PCU.  Dkt. # 211-56 at 8, 13. He spent much of his time, up to 23 hours a day,

13   alone in his cell.  *Id.*  In their reply brief, the King County Defendants say that Fair provides "no

14   factual support of a constitutional violation or harm that was caused by" his years in protective

15   custody.[21]

16       Commander Clark described King County's policy as "hous[ing] individuals in the least

17   restrictive means possible."  Dkt. # 211-57 at 7–8.  But during his deposition, he acknowledged

18   that, apart from Fair, he did not know of any other times that a pretrial detainee was housed in

19   protective custody for almost a decade.  *Id.*  He also said that there have been other inmates

20   housed in restrictive custody "for multiple years."  *Id.*  Commander Hayes, Clark's predecessor,

21   acknowledged that there were "concerns about the conditions of confinement for inmates housed

22   in administrative segregation."  Dkt. # 211-56 at 5.  During his deposition, Hayes said that he

23

24       [21] The King County Defendants, without any citation to the record, say that it was Fair's "decision" to remain in protective custody.  Dkt. # 219 at 21.

SEALED ORDER RE: DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT - 43

was unaware of any policy for "sending long-term administrative segregation inmates to a different facility that may be more appropriate." *Id.* at 6.  Fair's corrections expert, Martin Horn, stated

> Mr. Fair, a pretrial detainee, was held in protective custody at King County for an unusually long period of time under conditions that amount to extreme social isolation. This fact alone should have alerted any corrections professional exercising his or her professional judgment that Mr. Fair would unreasonably be put at risk of serious harm. What is more, the fact that King County has had other inmates in restrictive housing for multiple years as well indicates that its indifference to Mr. Fair's risk of harm was not a one-off—it was a serious policy failure.

Dkt. # 159-16 at 16.  He also said, "It was known, generally, in the field of corrections during the time of Mr. Fair's detention, that long term extreme social isolation was harmful and was more likely than not to result in unnecessary pain and suffering to inmates." *Id.*  Furthermore, Fair's psychiatric expert, Stuart Grassian concluded

> to a reasonable degree of medical certainty that Emanuel Fair has been severely harmed by the nine years he spent in pretrial detention in solitary confinement at King County Jail. His many physical complaints and chronic pain are an understandable and predictable consequence of the severe restrictions imposed in solitary confinement. And very critically, a person housed in general population is still a member of a community, albeit a small community of fellow inmates. Lingering desperate feelings of depression, of social isolation, of being an outsider in the community – feelings that Emanuel Fair has suffered since his release from incarceration - those feelings are very common among those who were housed in long-term solitary confinement.

Dkt. # 201-41 at 20.

The cases cited by the King County Defendants on this issue are distinguishable.  In *Martinez v. Nueces County, Texas*, 71 F.4th 385, 389 (5th Cir. 2023), the Fifth Circuit, in ruling on a Rule 12(b)(6) motion to dismiss, dismissed Martinez's *Monell* claim based on a policy, custom, or practice because Martinez vaguely alleged that Nueces County "had a policy of ignoring the serious medical needs of those entrusted to [its] care." *Id.* (alteration in original) (internal citation omitted).  Here, Fair has stated a specific custom and practice—custom of

1    denying sleep apnea treatment and practice of housing pretrial detainees for long periods of time

2    in protective custody— that he says caused the harm he suffered.  And in *Thomas v. Cook*

3    *County Sheriff's Dept.*, 604 F.3d 293, 297 (7th Cir. 2010), the Seventh Circuit ruled on a post-

4    trial motion challenging, among other issues, the sufficiency of the evidence supporting the

5    jury's liability determinations.  *Id.*  There, the court determined that the theory that a policy or

6    practice of understaffing correctional officers may have caused the inmate's death was "too

7    remote" to support the verdict on this issue.  *Id.* at 306.  Here, Fair's arguments focus on the

8    denial of medical treatment for his sleep apnea and the years he spent in protective custody at

9    King County Jail.

10        Thus, viewing the evidence in the light most favorable to Fair, a genuine issue of material

11    exists as to whether King County had a practice of holding pretrial detainees in protective

12    custody for long periods of time without efforts to mitigate the effects of long-term confinement.

13        5.    Negligence

14        A claim for negligent investigation does not exist under common law in Washington.  *See*

15    *Ducote v. State, Dep't of Soc. & Health Servs.*, 167 Wash. 2d 697, 702, 222 P.3d 785 (2009)

16    (citing *Pettis v. State*, 98 Wash. App. 553, 558, 990 P.2d 453 (1999) ("In general, a claim for

17    negligent investigation does not exist under the common law of Washington. That rule

18    recognizes the chilling effect such claims would have on investigations.").  But liability can be

19    imposed for a public official's negligent conduct when the claim at issue involves "affirmative

20    acts of misfeasance."  *Beltran-Serrano v. City of Tacoma*, 193 Wash. 2d 537, 550, 442 P.3d 608

21    (2019).

22        The Washington Supreme Court's decision in *Beltran-Serrano v. City of Tacoma* is

23    instructive.  193 Wash. 2d 537.  In that case, a mentally ill homeless man was shot multiple times

24    by a Tacoma police officer.  *Id.* at 540.  As the court reasoned, the plaintiff could bring a

negligence claim against the City of Tacoma because "[a]t common law, every individual owes a duty of reasonable care to refrain from causing foreseeable harm in interactions with others." *Id.* at 551. The court said this common law duty "applies in the context of law enforcement and encompasses the duty to refrain from directly causing harm to another through affirmative acts of misfeasance. *Id.* In light of the nature of the claim and the fact that the officer had an "affirmative interaction" with the plaintiff, the court held that "[t]he City therefore owed Beltran-Serrano a duty in tort to exercise reasonable care." *Id.* at 551–52.

The King County Defendants contend that Fair has provided no evidence of any affirmative acts of misfeasance by King County or Baird during the homicide investigation. Dkt. # 196 at 57. They say that the TAC alleges only acts of nonfeasance such as failing (1) to test certain pieces of evidence, (2) investigate other suspects, and (3) change gloves while handling evidence. *Id.* at 60 (internal citations omitted). They assert that the alleged failures to act are omissions—not affirmative acts of misfeasance. *Id.*

Fair responds that he alleged various acts of misfeasance in the TAC. Dkt. # 210 (redacted) at 69. He says that King County Jail employees were aware of his sleep apnea but failed to treat his condition. *Id.* (citing Dkt. # 147 at 40 ¶ 201). He also says that Baird drafted the PC Certification and directed Coats to sign the document despite having a reason to know that Coats did not know the totality of the circumstances and could not attest to probable cause. *Id.* (citing Dkt. # 147 at 38–39 ¶¶ 181–90). Fair also contends that King County Jail employees kept him in "inhumane conditions" from 2010 to 2019. *Id.* at 70.

A party opposing a motion for summary judgment "may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that . . . [a factual] dispute exists." *Hoban v. Nova Cas. Co.*, 335 F. Supp. 3d 1192, 1199 (E.D. Cal. 2018) (citing

Fed. R. Civ. P. 56(c)(1)).  Fair asserts that genuine issues of material fact preclude the Court

from granting summary judgment as to his negligence claims related to his sleep apnea and Baird

drafting the PC Certification.  But Fair does not cite the record, beyond allegations in the TAC,

or provide specific evidence to support his contention that a genuine issue of material fact exists.

Dkt. # 210 (redacted) at 69.  *See Holmes v. N. Texas Health Care Laundry Coop. Ass'n*, 304 F.

Supp. 3d 525, 539 (N.D. Tex. 2018) ("Rule 56 does not impose a duty on the court to sift

through the record in search of evidence to support the nonmovant's opposition to the motion for

summary judgment.") (internal quotation omitted).  Thus, Fair has not raised a genuine issue of

material fact as to these claims.

As to Fair's negligence claim related to the "inhumane conditions" at King County Jail,

he cites the record including Martin Horn's expert report and Commander Clark's statements

during his deposition.  Fair contends that King County Jail was put on notice about the long-term

effects of his extended isolation but did nothing.  The King County Defendants do not respond to

Fair's argument in their reply brief.  Thus, this claim survives summary judgment.  *See Sang

Geoul Lee v. Won Il Park*, 720 F. App'x 663, 666 (3d Cir. 2017) ("Mr. Lee's failure to respond

to the pertinent opposition-brief argument acts as a concession of that argument."); *see also

Velez v. Jack Sprats LLC*, No. 6:19-CV-01493-MK, 2020 WL 1845812, at *1 (D. Or. Feb. 24,

2020) (stating that the party's failure to address an argument in reply is a concession of the

argument) (citing *Hanse v. Long*, No. SACV 12–2131–VBF (DTB), 2014 WL 3435871, *14

(C.D. Cal. Jan. 28, 2014), *adopted* 2014 WL 3436156 (C.D. Cal. July 10, 2014)).[22]

---

[22] Fair's outrage (intentional infliction of emotional distress) and negligent infliction of emotional distress claims are predicated on the same alleged behavior as his malicious prosecution claim.  *See* Dkt. # 147 at 64–65 ¶¶ 268–276.  Under Washington law, Fair can recover emotional distress damages based on a malicious prosecution claim.  *See Odom v. Williams*, 74 Wash. 2d 714, 719, 446 P.2d 335 (1968); *Cagle v. Burns & Roe, Inc.*, 106 Wash. 2d 911, 917 n.1, 726 P.2d 434 (1986).  Thus, Fair's outrage and

1

B.    The Redmond Defendants' Motion for Summary Judgment

2

1.    Qualified Immunity

3

As stated above, when resolving a motion for summary judgment based on qualified

4

immunity, courts "engage in a two-step inquiry." *Peck*, 51 F.4th at 887 (citing *Tolan*, 572 U.S.

5

at 655 (2014).  First, courts ask whether the facts, viewed in the light most favorable to the

6

plaintiff, demonstrate that a constitutional right has been violated.  *Id.*  Second, courts ask

7

"whether that right was 'clearly established' at the time of the alleged constitutional violation."

8

*Id.  See also Saucier*, 533 U.S. at 201.  "If the answer to the first prong is 'no,' then the inquiry

9

ends[,] and the plaintiff cannot prevail." *Williams v. Cnty. of Alameda*, 26 F. Supp. 3d 925, 939–

10

40 (N.D. Cal. 2014) (citing *Saucier*, 533 U.S. at 201).  If the answer is "yes," then the court

11

proceeds to the second prong of the analysis.  *Id.*

12

a.    Constitutional Violation Prong

13

The first prong of the qualified immunity analysis asks whether, viewing the facts in the

14

light most favorable to the nonmoving party, the state actor violated a constitutional right.  *Peck*,

15

51 F.4th at 887.  The Redmond Defendants say that Fair cannot show a violation of his Fourth

16

Amendment rights.  Dkt. # 200 at 17.[23]  They say that the TAC alleges that Coats "intentionally

17

18
19
20
21

negligent infliction of emotional distress claims are subsumed by his malicious prosecution claim.  *See Vargas Ramirez v. United States*, 93 F. Supp. 3d 1207, 1235 (W.D. Wash. 2015) (dismissing claims for intentional and negligent infliction of emotional distress because the plaintiff could recover emotional damages on his false arrest claim); *see also Lawson v. City of Seattle*, No. C12-1994-MAT, 2014 WL 1593350, at *11 (W.D. Wash. Apr. 21, 2014) (citing *Rice v. Janovich*, 109 Wash.2d 48, 61–62, 742 P.2d 1230 (1987)) (finding error in jury instruction allowing for "possibility of double recovery" on both assault and tort of outrage for same conduct).  Thus, the Court grants summary judgment on these claims.

22
23
24

[23] Fair alleges that Coats "intentionally omitted exculpatory evidence from the Affidavit of Probable Cause and intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading, in violation of the Fourth Amendment." Dkt. # 147 at 59–60.  The Redmond Defendants contend that Fair cannot establish a Fourth Amendment claim because there is no evidence that Coats acted in a racially discriminatory manner during the investigation.  Dkt # 200 at 14–15.  But as Fair points out, this argument is inapt because racial animus is not an element of his Fourth Amendment claim.  Dkt. # 210 (redacted) at 73.

omitted exculpatory evidence from the Certification and intentionally or recklessly omitted facts required to prevent technically true statements from being misleading." *Id.* at 13 (citation omitted).[24]  They contend that there was "no legal requirement in 2010" that police officers include exculpatory information or describe other suspects in a PC Certification. *Id.* at 13.  They also say that there was no requirement that police officers describe DNA evidence with "particularity." *Id.* at 14.  They point out that their police practices' expert, Frank Vanecek, explained that it is "common practice" "when writing an affidavit of probable cause for a charge against a single individual, to include only information about that individual." *Id.*

Fair responds that "**any information, exculpatory or otherwise**, must be included" in a PC Certification if the failure to include this information would be misleading to the judge.  Dkt. # 210 (redacted) at 73 (citing *Liston*, 120 F.3d at 973) (emphasis in original).  He adds that the Redmond Defendants cite no authority to support their argument. *Id.* at 74.  Fair also says that his police practices expert, Susan Peters, opined, "If the certification [for probable cause] contains certain facts and the officer signing the certification knows of information that could be interpreted as contradictory to those facts, that information has to be revealed as well, to give the Prosecutor/Court/Judge an impartial overview of the case." *Id.* at 74–75 (citing Dkt. # 157-1 at 13).  Peters concluded that Coats "included information in his affidavit that was misrepresented, omitted, and misleading to the Prosecutor/Court/Judge." *Id.*

---

[24] The Redmond Defendants describe these allegations as a malicious prosecution claim. *See* Dkt. # 200 at 12–13.  But as stated above, this is the standard for a judicial deception claim. *See Pac. Marine Ctr., Inc. v. Silva*, 809 F. Supp. 2d 1266, 1276 (E.D. Cal. 2011), *aff'd*, 553 F. App'x 671 (9th Cir. 2014) ("To support a § 1983 claim of judicial deception, a plaintiff must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause."); *see also Liston*, 120 F.3d at 972 (9th Cir. 1997) ("A claim of judicial deception is made, if an officer 'submitted an affidavit that contained statements he knew to be false or would have known to be false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements, . . .he cannot be said to have acted in a reasonable manner,' and the shield of qualified immunity is lost.").

As pointed out by Fair, the Redmond Defendants cite no authority to support their contention that exculpatory information need not be included in a PC Certification. *See, e.g.*, *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 459 n.9 (S.D.N.Y. 2007) ("[T]he [c]ourt has no obligation to consider an argument for which a party has cited no legal authority").  In any event, as the Ninth Circuit stated in *Liston v. County of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997), [w]hether the alleged judicial deception was brought about by material false statements or *material omissions* is of no consequence." *Id.* (emphasis added) (citing *United States v. Stanert*, 762 F.2d 775, 777 (9th Cir.), *amended*, 769 F.2d 1410 (9th Cir. 1985)).  As the court reasoned, "reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw." *Id.* (citing *Stanert*, 762 F.2d at 781).  It stressed that allowing a magistrate "to be mis[led] in such a manner could denude the probable cause requirement of all real meaning." *Id.* (citing *Stanert*, 762 F.2d at 781).[25]

And the parties' police practices experts present conflicting opinions on the types of information that must be included in the PC Certification.  Because this issue is central to this case, summary judgment would not be appropriate.  *See Realtime Data, LLC v. Stanley*, 897 F. Supp. 2d 146, 153 (S.D.N.Y. 2012) ("[W]hen there are dueling experts, both of whom have put forward opinions in contradiction with each other, and when those opinions are important to resolution of a material factual dispute, summary judgment may not be appropriate.") (citing *Hodosh v. Block Drug Co., Inc.,* 786 F.2d 1136, 1143 (Fed. Cir. 1986) ("The fact issues herein

---

[25] In their reply brief, the Redmond Defendants contend, for the first time, that Fair cannot bring a Fourth Amendment claim against Baird because he was serving a sentence for a different charge at the time Coats filed the PC Certification. Dkt. # 218 at 3.  They also assert that the information Fair says should have been included in the PC Certification was not "material to the finding of probable cause." *Id.* at 4.  The Court does not consider these arguments because they were raised for the first time in a reply brief.  *See Zamani*, 491 F.3d at 997 ("The district court need not consider arguments raised for the first time in a reply brief."); *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) ("[A]rguments raised for the first time in a reply brief are waived.").

must be resolved by trial in which the conflicting views of the experts will be subject to the
refining fire of cross examination.")).

        b.     "Clearly Established" Prong

        The second prong of the qualified immunity analysis asks whether the constitutional right
was "clearly established" at the time of the alleged constitutional violation. *Peck*, 51 F.4th at
887. A right is "clearly established" if a court can "identify a case where an officer acting under
similar circumstances . . . was held to have violated" the Constitution. *White v. Pauly*, 580 U.S.
73, 79 (2017) (per curiam). An officer "cannot be said to have violated a clearly established
right unless the right's contours were sufficiently definite that any reasonable official in [his]
shoes would have understood that he was violating it." *City & Cnty. of San Francisco, Calif. v.
Sheehan*, 575 U.S. 600, 611 (2015) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014)).
While there need not be "a case directly on point for a right to be clearly established, existing
precedent must have placed the statutory or constitutional question beyond debate." *Rivas-
Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (quoting *White v. Pauly*, 580 U.S. at
79); *see also Kisela v. Hughes*, 584 U.S. 100, 104 (2018). The Supreme Court has described the
"clearly established" test as creating an "exacting standard" that "gives government officials
breathing room to make reasonable but mistaken judgments." *Sheehan*, 575 U.S. at 611 (internal
quotation marks and citation omitted). To that end, qualified immunity "protects 'all but the
plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S.
731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

        The Supreme Court has also "repeatedly told courts . . . not to define clearly established
law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting
*al-Kidd*, 563 U.S. at 742). "The dispositive question is 'whether the violative nature
of *particular* conduct is clearly established.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 742). This

inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (citation and internal quotation marks omitted). "[S]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Rivas-Villegas*, 595 U.S. at 6 (quoting *Mullenix*, 577 U.S. at 12) (first two alterations in original).

The Redmond Defendants say that Fair "cannot point to a single case, let alone one predating the events at issue, stating that police officers need to include exculpatory information in probable cause affidavits, that they need to include information on other suspects in these affidavits, or that they need to use the precise language from lab reports when describing DNA evidence." Dkt. # 200 at 18. Fair responds that qualified immunity does not bar his Fourth Amendment claim against Coats because it "is not objectively reasonable for [an officer] to deliberately or recklessly to misstate or omit facts material to the existence of probable cause. Dkt. # 210 (redacted) at 82 (quoting *Morley v. Walker*, 175 F.3d 756, 761 (9th Cir. 1999)).

In 1995, the Ninth Circuit, in *Hervey v. Estes*, 65 F.3d 784 (9th Cir. 1995), said, "a plaintiff can only survive summary judgment on a defense claim of qualified immunity if the plaintiff can *both* establish a substantial showing of a deliberate falsehood or reckless disregard and establish that, without the dishonestly included or omitted information, the magistrate would not have issued the warrant." *Id.* at 789, *as amended on denial of reh'g* (Dec. 5, 1995) (emphasis in original). Two years later, in *Liston v. County of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997), the court reasoned "[w]hether the alleged judicial deception was brought about by material false statements or *material omissions* is of no consequence." *Id.* at 973(emphasis added). The court stressed that "reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw." *Id.* (citing *Stanert*, 762 F.2d at 781). That same year, the Ninth Circuit

1   decided *Lombardi v. City of El Cajon*, 117 F.3d 1117 (9th Cir. 1997).  This case involved a claim

2   of qualified immunity for a law enforcement officer who left out information about an

3   informant's relationship with the suspect in an application for a search warrant.  *Id.* at 1118.  The

4   Ninth Circuit determined that the facts the official left out the affidavit were "not such that the

5   magistrate would plainly have not issued the warrant had they been disclosed."  *Id.* at 1127.  As

6   the court reasoned, it is only "objectively unreasonable for a law enforcement officer to *omit*

7   *facts that are material to the determination of probable cause*."  *Id.* at 1126–27 (emphasis

8   added).

9       The Redmond Defendants assert that there is no case law "such that it would have been

10  clear to everyone in DC Coats' position that his conduct was unlawful."  *See* Dkt. # 200 at 17.

11  But there is precedent that says it is objectively unreasonable for law enforcement officials not to

12  disclose information to the court that is material to its probable cause determination.  In other

13  words, if information is material, whether it be exculpatory or otherwise, it must be included in

14  the PC Certification.  *Hervey*, *Liston*, and *Lombardi* are the type of controlling precedent

15  envisioned in *Saucier* and its progeny.  These cases provided the requisite notice to Coats, more

16  than a decade before Jinaga's murder and the prosecution at issue, that his alleged conduct

17  constituted a constitutional violation.[26]

18      Thus, Coats is not entitled to summary judgment based on qualified immunity for his

19  actions during the homicide investigation.

20          2.      Malicious Prosecution

21      As stated above, under Washington law, a malicious prosecution claim requires that (1)

22  the defendant instituted or continued a prosecution; (2) without probable cause; (3) with malice;

23

24  _____

        [26] The Redmond Defendants cite *Hervey* in their motion.  *See* Dkt. # 200 at 13.

(4) in a proceeding terminated in the plaintiff's favor; and (5) to the plaintiff's injury. *Bender*, 664 P.2d at 500. These elements also apply to Fair's federal malicious prosecution claim. *See Mills*, 921 F.3d at 1169.[27] The Redmond Defendants say that Fair's federal and state malicious prosecution claims fail because Fair cannot establish lack of probable cause or malice. Dkt. # 200 at 16.

But beyond citing one case to describe the common law elements for malicious prosecution claims under Washington law, the Redmond Defendants cite no authority to support their argument that Fair cannot establish probable cause or malice. *See* Dkt. # 200 at 16, 20. And they make factual statements, with no citations to the record. *Id.* at 16. As the movants, the Redmond Defendants bear the initial burden of informing the court of the basis for their motion. *See Celotex*, 477 U.S. at 324. As other courts have said, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997); *see also Joshua Allen F. v. Saul*, No. 2:19-CV-00394-MKD, 2020 WL 6493427, at *3 (E.D. Wash. Nov. 4, 2020) (same). And in any event, as stated above in Section III.A.3.a–b, genuine issues of material fact exist as to whether Fair was prosecuted without probable cause and with

---

[27] As stated above, federal malicious prosecution claims also require the plaintiff to show that the defendant "prosecuted [them] with malice and without probable cause" to deny them "equal protection or another specific constitutional right." *Lassiter*, 556 F.3d at 1054. The Redmond Defendants' summary judgment motion does not address Fair's equal protection claim based on racial discrimination. *See* Dkt. # 200. In their reply, the Redmond Defendants argue that Fair has "abandoned his Fourteenth Amendment equal protection claim," but the Redmond Defendants never addressed Fair's equal protection claim in their motion. *See generally* Dkt. # 200.

Further, to the extent the Redmond Defendants contend that Fair's federal malicious prosecution claim should be dismissed because Fair's Fourth Amendment argument fails, the Court already determined that a genuine issue of material fact exists as to whether Coats violated Fair's Fourth Amendment rights. *See* Sec. III.B.1.a. And Fair's Fourth Amendment claim is more appropriately characterized as a judicial deception claim.

1    malice.  Thus, the Court denies the Redmond Defendants' motion as to Fair's malicious

2    prosecution claims.

3         3.    *Monell* Liability: Failure to Train or Supervise

4         The Redmond Defendants assert that Fair's failure to train or supervise claim against the

5    City of Redmond should be dismissed because (1) Coats did not violate any of Fair's

6    constitutional rights; and (2) the City of Redmond was not indifferent "to any known need to

7    train."  Dkt. # 200 at 19.

8         As to the Redmond Defendants first argument, the Court has determined that a genuine

9    issue of material fact exists as to whether Coats violated Fair's Fourth Amendment rights.  *See*

10   Sec. III.B.1.a.  As to the second, Fair notes that the Redmond Defendants' argument is

11   "conclusory" and sparse," consisting of two sentences without any citations to any case law or to

12   the record."  Dkt. # 210 (redacted) at 83.  Fair says that such arguments are insufficient at the

13   summary judgment stage.  *Id.*

14        In their motion, the Redmond Defendants simply say, "Coats' testimony and training log

15   evidence the fact that he was well-trained in proper investigative practices at the time of this

16   investigation."  Dkt. # 200 at 20.  But the Redmond Defendants do not cite the record or provide

17   any information about the testimony or training log evidence that purportedly support their

18   argument that Fair's failure-to-train claim should fail as a matter of law.  *See Celotex*, 477 U.S.

19   at 324; *see also Mayer Botz Enters. LLC v. Cent. Mut. Ins. Co.*, 720 F. Supp. 3d 1081, 1082

20   (D.N.M. 2024) (stating that a party moving for summary judgment must either "(a) cite to

21   specific parts of the record—including deposition testimony, documentary evidence, affidavits or

22   declarations, or other competent evidence—in support of its position, or (b) demonstrate that the

23   materials relied upon by the opposing party do not actually establish the absence or presence of a

24   genuine dispute") (internal quotation and citation omitted).  And as stated above, "issues

1   adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation,

2   are deemed waived.  It is not sufficient for a party to mention a possible argument in the most

3   skeletal way, leaving the court to . . . put flesh on its bones." *McPherson*, 125 F.3d at 995-96;

4   *see also Saul*, 2020 WL 6493427, at *3 (same).

5          Thus, the Court denies the Redmond Defendants' motion as to Fair's failure-to-train

6   claim.

7          4.      Negligence

8          As stated above, Washington law does not recognize claims for negligent investigations.

9   *Ducote*, 222 P.3d at 787.  But liability can be imposed for a public official's negligent conduct

10  when the claim at issue involves "affirmative acts of misfeasance."  *Beltran-Serrano*, 193 Wash.

11  2d at 551.

12         The Redmond Defendants assert that Fair's negligence claim should be dismissed

13  because he is bringing a negligent investigation claim.  Dkt. # 200 at 21.  They say that Fair

14  "spends hundreds of paragraphs alleging actions of Redmond PD detectives related solely to the

15  investigatory process."  *Id.*  Fair responds that he is not bringing a negligent investigation claim.

16  Dkt. # 210 (redacted) at 84.  He says that this Court recognized, in its Order resolving

17  Defendants' motions to dismiss, that he alleged affirmative acts of misfeasance that could form

18  the basis for his negligence claim.  *Id.* (citing Dkt. # 85 at 23).

19         In its April 13, 2023 Order resolving Defendants' motions to dismiss, the Court noted

20  that Fair alleged, among other things, that "one or more members of Redmond PD" interrogated

21  him in "an unmarked car" without giving him *Miranda* warnings.  *See* Dkt. # 85 at 23.  And he

22  alleged that Coats "prepared the PC Certification used to seek bail in the amount of $5 million

23  and keep Plaintiff in custody for almost nine years."  *Id.*  As noted above, a party opposing a

24  motion for summary judgment "may not rely upon the allegations or denials of its pleadings but

1    is required to tender evidence of specific facts in the form of affidavits, and/or admissible

2    discovery material, in support of its contention that . . . [a factual] dispute exists." *Hoban*, 335 F.

3    Supp. 3d at 1199 (E.D. Cal. 2018) (citing Fed. R. Civ. P. 56(c)(1)).  Because Fair has not cited to

4    the record, beyond allegations in the TAC, this does not support a finding of a genuine dispute of

5    material of fact.  *See* Dkt. # 210 (redacted) at 84.

6          Thus, the Court grants summary judgment as to Fair's negligence claim against the

7    Redmond Defendants.[28]

8                                            **IV**

9                                      **CONCLUSION**

10         For these reasons, the Court ORDERS as follows:

11    •    The Court GRANTS in part and DENIES in part the King County Defendants'
           Motion for Summary Judgment, Dkt. # 196.

12         o    The Court DENIES the motion as to absolute immunity.

13         o    The Court DENIES the motion as to qualified immunity.

14         o    The Court GRANTS the motion as to Fair's Section 1983 malicious
                prosecution claim to the extent it is based on a violation of the Equal
15              Protection Clause for discrimination based on criminal history.  The Court
                DENIES the motion as to Fair's Section 1983 malicious prosecution
16              claim.

17         o    The Court DENIES the motion as to Fair's state-law malicious
                prosecution claim.

18

---

19    [28] Fair's outrage (intentional infliction of emotional distress) and negligent infliction of emotional
      distress claims are predicated on the same alleged behavior as his malicious prosecution claim.  *See* Dkt.
20    # 147 at 64–65 ¶¶ 268–276.  Under Washington law, damages for "mental and emotional distress" are
      recoverable in malicious prosecution actions.  *See Odom v. Williams*, 74 Wash. 2d at 719; *Cagle v. Burns*
21    *& Roe, Inc.*, 106 Wash. 2d at 917 n.1.  Thus, Fair's allegations of outrage and negligent infliction of
      emotional distress claims are subsumed by his malicious prosecution claim, and Fair is not entitled to
22    double recovery for his emotional distress.  *See Vargas Ramirez*, 93 F. Supp. 3d at 1235 (dismissing, at
      the summary judgment stage, claims for intentional and negligent infliction of emotional distress because
23    the plaintiff could recover emotional damages on his false arrest claim); *see also Lawson*, 2014 WL
      1593350, at *11 (citing *Rice*, 109 Wash.2d at 61–62 ) (finding error in jury instruction allowing for
      "possibility of double recovery" on both assault and tort of outrage for same conduct).  Thus, the Court
24    grants summary judgment on these claims.

1

2
     ○  The Court GRANTS the motion as to Fair's *Monell* policy, practice, or custom claim about MDOP.

3
     ○  The Court GRANTS the motion as to Fair's *Monell* ratification claim based on Satterberg purportedly delegating final decision-making authority about MDOP.

4

5
     ○  The Court DENIES the motion as to Fair's *Monell* failure-to-train claim.

6
     ○  The Court DENIES the motion as to Fair's *Monell* claims related to his conditions of confinement at King County Jail.

7

8
     ○  The Court GRANTS the motion as to Fair's negligence claims related to his sleep apnea at King County Jail and Baird's drafting of the PC Certification.  The Court DENIES the motion as to Fair's negligence claim related to the years he spent in protective custody at King County Jail.

9

10
     ○  The Court GRANTS the motion as to Fair's outrage (intentional infliction of emotional distress) claim.

11

12
     ○  The Court GRANTS the motion as to Fair's negligent infliction of emotional distress claim.

13
•  The Court GRANTS in part and DENIES in part the Redmond Defendants' Motion for Summary Judgment, Dkt. # 200.

14

15
     ○  The Court DENIES the motion as to qualified immunity.

16
     ○  The Court DENIES the motion as to Fair's Section 1983 malicious prosecution claim.

17
     ○  The Court DENIES the motion as to Fair's state-law malicious prosecution claim.

18

19
     ○  The Court DENIES the motion as to Fair's *Monell* failure-to-train claim.

20
     ○  The Court GRANTS the motion as to Fair's negligence claim.

21
     ○  The Court GRANTS the motion as to Fair's outrage (intentional infliction of emotional distress) claim.

22
     ○  The Court GRANTS the motion as to Fair's negligent infliction of emotional distress claim.

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

     The Court provisionally files this Order under seal.  The Court DIRECTS the parties to file a joint statement, on or before May 30, 2025, indicating what redactions, if any, should be included in the public version of the Order.

     Dated this 21st day of May, 2025.

John H. Chun
United States District Judge